FILED

'03 OCT 20  A 11: 49

DISTRICT COURT
HARTFORD CT

### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | |
|---|---|
| WILLIAM E. CALLAHAN, | ) |
| Plaintiff, | ) Civil Action No. 301 CV1205 (CFD) |
| | ) |
| vs. | ) |
| | ) |
| UNISOURCE WORLDWIDE, INC., and | ) |
| GEORGIA-PACIFIC CORPORATION, | ) |
| Defendants. | ) October 20, 2003 |

## DEFENDANTS' OPPOSITION TO MOTION TO QUASH SUBPOENA DUCES TECUM

Defendants Unisource Worldwide, Inc. ("Unisource") and Georgia-Pacific Corporation

("Georgia-Pacific") (collectively "Defendants"), through their attorneys Day, Berry & Howard,

LLP, respond as follows to the Motion to Quash Subpoena Duces Tecum filed by plaintiff William

Callahan ("Plaintiff"). Plaintiff is seeking protection, at least temporarily,[1] of the files of his

former attorneys, Stephen McEleney and Albert McGrail ("Attorneys"), on the assertion of

attorney-client and work product privilege. While ordinarily these files might well be protected by

one or both of these privileges, however, Plaintiff unequivocally waived any otherwise-applicable

privilege by testifying affirmatively as to the specific advice allegedly provided to him by

Attorneys. As such, his assertion that he "may waive the privilege" in the future is an empty

---

[1] In his Motion to Quash, Plaintiff indicated that he "may waive the privilege with respect
to the documents called for in the subpoena" and that it would take seven (7) days to "evaluate the
issue of waiver." To date, Plaintiff has not communicated to Defendants whether he intends to
honor his prior waiver of privilege, or instead to continue to seek to quash the subpoena duces
tecum.

Q:     Did you recognize you were waiving valuable legal rights?

A:     No, because I was told by Attorney McGrail I could sign it and still sue them.

Q:     What did Mr. McGrail say?

A:     What did he say?

Q:     Yes.  You could sign this and still sue the company?

A:     Yes.

Q:     Did he say anything beyond that?

A:     He felt that the company was not negotiating with him in good faith, and that they had lied to him, and that he basically said, you know: Sign this, and you know, we'll consider it that you signed it under duress.

Q:     He told you this before you signed it?

A:     Yes.

Q:     And what did he say with regard to the company not negotiating in good faith?

A:     Lack of return phone calls.   He made a distinction between tough negotiations and just refusing to negotiate.

Q:     Anything more specific about what Attorney McGrail said about the company not acting in good faith?

A:    Well, he was concerned that I had been asking during the summertime if I would have

continued employment in my position there, and his comment was that he thought they had been

fairly reckless.

Q:    . . . Anything else that he attributed to the company that indicated they were not acting in

good faith?

A:    Yes.  When we asked if they could add some years to the years of service, the response

was, "No, we don't do that"; but it was – and the link to the good faith is that it was in the annual

report that they had done that for some individuals, and the point was even though they were high

ranking individuals, under the law he felt that they could add years of service.

Q:    Anything else that indicated, anything else Attorney McGrail said about the company not

acting in good faith?

A:    No.

Q:    And he used the words, the company was not acting in good faith against you, and

therefore that you were signing this agreement under duress?

A:    Yes.

Q:    He linked the words "duress" to "not acting in good faith?"

A:    Yes, he did. . . .

. . . Q:  What did he tell you?

A:    He told me that he could overturn it, and he had done it before.

(Callahan Dep. at pp. 130-34.) Plaintiff also testified that following Attorney McGrail's death he

had discussed with Attorney McEleney "Attorney McGrail's thought process for overturning the

severance letter." (Callahan Dep. at pp. 177-79.) Plaintiff testified that Attorney McEleney took

notes of this conversation. (Callahan Dep. at p. 179.)

## ARGUMENT

Under well-established law, Plaintiff's testimony concerning the advice provided to him by

Attorneys waives any attorney-client or work-product privilege on the subjects of such advice --

Plaintiff's employment, its termination, and the Release Agreement he executed. As the Second

Circuit has noted:

> [I]t has been established law for a hundred years that when the client waives the
> privilege by testifying about what transpired between her and her attorney, she
> cannot thereafter insist that the mouth of the attorney be shut. . . . From that has
> grown the rule that testimony as to part of a privileged communication, in fairness,
> requires production of the remainder.

In re von Bulow, 828 F.2d 94, 101-102 (2d Cir. 1987) (citations omitted). This waiver will be

found regardless of whether it is made explicitly or merely by implication. See McGrath v. Nassau

County Health Care Corp., 204 F.R.D. 240, 247 (E.D.N.Y. 2001) (noting that "[w]here a litigant

asserts a claim that in fairness requires examination of a privileged communication, courts have

held the protections of the attorney/client privilege and the work product doctrine implicitly

waived," and that such implicit waiver "may include the characteristics of (1) a litigant asserting a

privilege; (2) placing 'at issue' the protected communication through an affirmative act such as a

claim of an affirmative defense; and (3) making the protected communication relevant information and necessary to the original claim of the adversary") (citations and internal quotations omitted).

In this case, Plaintiff testified expansively concerning advice allegedly provided to him by Attorneys, that he claimed to have been relying upon in arguing that the Release Agreement was unenforceable against him. His selective disclosure of advice purportedly provided to him by Attorneys is a paradigm of "implicit waiver," and accordingly requires disclosure of any documents in Attorneys' files addressing such purported advice.

WHEREFORE, Defendants respectfully request that this Court deny Plaintiff's Motion to Quash Subpoena Duces Tecum, and grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

DEFENDANTS UNISOURCE WORLDWIDE,
INC. AND GEORGIA-PACIFIC
CORPORATION

By _____
    Felix J. Springer (ct 05700)
    Jennifer L. Sachs (ct 20684)
    Day, Berry & Howard, LLP
    CityPlace I
    Hartford, CT  06103-3499
    Tel:  860/275-0100
    Fax: 860/275-0343
    E-mail: fjspringer@dbh.com
           jlsachs@dbh.com

    Rayne Rasty (ct 24918)
    Georgia-Pacific Corporation
    133 Peachtree St. NE
    Atlanta, GA  30303
    Tel:  404/652-4972
    Fax:  404/584-1461
    E-mail:  rmrasty@gapac.com

**CERTIFICATE OF SERVICE**

This is to certify that on this date, I served a copy of the foregoing via first-class mail, postage prepaid to:

> Andrew B. Bowman, Esq.
> 1804 Post Road East
> Westport, CT 06880
>
> Kay Kyungsun Yu
> Joseph Costello
> S. Elizabeth Hamilton
> Morgan, Lewis & Bockius
> 1701 Market Place
> Philadelphia, PA 19103
>
> Robert L. Wyld
> Patrick Fahey
> Shipman & Goodwin
> 1 American Row
> Hartford, CT 06103

Felix J. Springer

Unisource Northeast
100 Hartford Way
P.O. Box 740
Windsor, CT 06095

Tel 860.298.3200
Fax 860.298.3123

December 23, 1998

## PERSONAL & CONFIDENTIAL

Mr. William E. Callahan
234 East Opal Drive
Glastonbury, CT 06033

Dear Bill:

As you know, Unisource Worldwide, Inc. ("Company") is undergoing a reorganization of its business that requires certain difficult business decisions. As a result, many positions have been combined or eliminated, and your position has been adversely affected. This letter outlines and confirms our agreement of the terms and conditions that will apply relative to the separation of your relationship with the Company.

1. _Separation Date_.  You acknowledge that your employment with the Company will cease as of December 31, 1998 ("Separation Date").

2. _Salary Continuation_.  In consideration of your execution of this agreement the Company shall continue payments to you at the semi-monthly rate of $5,188.28 in accordance with the Company's normal payroll procedures through July 31, 1999 ("Final Payroll Severance Date").

3. _Earned Vacation_.  Earned vacation which has not yet been taken will be paid in addition to the severance payments, or as prescribed by state law.

4. _Health Insurance_.  If you are currently covered by the Company's medical and dental insurance as well as the Company's Employee Assistance Program (EAP), you will continue to be covered through July 31, 1999, provided that you do not receive medical coverage from another employer and provided that any co-payment obligations are maintained.  This continuation period will run concurrently with the COBRA extension periods.

5. _Other Insurance_.  All insurances, other than medical and dental, will cease to be effective on December 31, 1998, if you are currently covered by these programs.  You have the right to convert your life insurance to an individual policy and should contact your local human resources professional, if interested.

Streamlining/Cat4/0401

6. _COBRA_. Conversion opportunities which exist under the Company's insurance policy and those that are guaranteed you by the COBRA law may be exercised as indicated in the plan document and the COBRA notices which will be sent to you within fourteen (14) days after your Separation Date or within fourteen (14) days after you sign and return this letter, whichever is later.

7. _Retirement Savings / Pension Plan_. Contributions under the Unisource Worldwide, Inc. Retirement Savings Plan ("RSP") may continue and benefit accrual under the Unisource Participating Companies Pension Plan ("Pension Plan") will continue throughout the period of salary continuation. If you are not already fully vested in your account under the RSP and your accrued benefit under the Pension Plan, you will become fully vested in both plans as of your "Final Payroll Severance Date." At the end of the salary continuation period you will be entitled to all normal choices outlined in the plan documents in regard to your account under the RSP, if any. Any contributions you may have previously authorized under the RSP will cease effective with your final paycheck as provided in paragraph 2. When eligible to do so, you may request distribution of your account under the RSP by contacting Benefits Express at 1-888-953-8647.

8. _Deferred Compensation._ - Benefits under the 1991 IKON Office Solutions, Inc. (formerly Alco Standard Corporation) Deferred Compensation Plan will vest 100% and be distributed to you in the future, in accordance with the provisions of the Plan. You must continue to make the annual premium payments under the 1991 IKON Office Solutions, Inc. Deferred Compensation Plan to your age 65 to perpetuate the lump sum death benefit and age 65 policy transfer thereunder. These will be invoiced to you annually by IKON Office Solutions, Inc.

9. _Other Fringe Benefits._ - You will receive accelerated vesting under the following programs: Unisource Partners' Stock Purchase Plan and Unisource Stock Option Plan.

10. _Leased Vehicle._ - You will be provided the opportunity to purchase the company-leased vehicle you currently have the use of for the sum of $5,000. If you desire to do so, please confirm it with me.

11. _Company Property_. If you have not already done so, please return any remaining keys, credit cards, and any other property of the Company which have been issued to you prior to this time.

12. _Outplacement._ Professional outplacement counseling will be provided to you up to an amount determined by the Company, provided that you do not have any other employment commitments. You must advise us within thirty (30) days of your notification of termination if you want to utilize this service.

13. _Employment Letter_. The Company's Human Resources department will provide a letter describing your employment history and responsibilities at the Company, if requested.

14. *Unemployment Compensation*. The Company will support your application for unemployment compensation should you apply, verifying the reason for your displacement as a reduction in workforce.

15. *Employee Assistance*. EAP programs, as referenced in paragraph 4, will be provided in conjunction with local unemployment office assistance with resume preparation and other available job search assistance.

16. *Cooperation*. It may be necessary from time to time during your salary continuation period and thereafter to call upon you for assistance in connection with your prior responsibilities. We expect that you will be willing to do so provided, of course, that the same does not unreasonably interfere with your other employment obligations.

17. *Confidentiality*. You agree that you will keep the terms, amount, and fact of this Agreement strictly and completely confidential, and that you will not communicate or otherwise disclose to any employee of the Company (past, present, or future) or to any member of the general public (other than your attorney), the terms, amount, or fact of this agreement, except as may be required by law or compulsory process.

You understand and acknowledge that the benefits contained in this letter exceed the benefits to which you would otherwise be entitled upon termination of your employment. In consideration for the additional benefits extended to you in this letter, and intending to be legally bound hereby:

1) you agree to release and hold harmless forever, the Company, its direct and indirect subsidiaries and affiliates, directors, officers and employees from any and all causes of action, known or unknown, arising out of or relating to your association and/or employment with or termination from the Company, which may have existed prior to or contemporaneously with the execution of this agreement, including but not limited to breach of contract, implied or otherwise, impairment of economic opportunity, breach of the covenant of good faith and fair dealing, intentional or negligent infliction of emotional distress, or other contract or tort claims, the Age Discrimination in Employment Act of 1967 as amended, and the Older Workers Benefit Protection Act of 1990, the Fair Labor Standards Act, the Civil Rights Act of 1964 and amendments thereto, the Civil Rights Act of 1991, the Americans with Disabilities Act, Executive Order 11246, the Rehabilitation Act of 1973, and the Vietnam Veterans' Readjustment Assistance Act or any other federal, state, or local law (statutory or common) relating to discrimination in employment;

The Company reciprocally agrees to release and hold you harmless from any and all causes of action, known or unknown, arising out of or relating to your employment with the Company, and shall indemnify you against any expenses, judgments, penalties, fines and amounts paid in settlement in connection with any third party claims arising out of your employment with the Company to the extent that you acted as an authorized representative of the Company in good faith and in the best interests of the Company.

2) you agree you will not disparage in any way the Company or any of its employees to any person, either orally or in writing;

3) you hereby waive any right or claim you may have to employment, re-employment, or reinstatement with Company; and

4) you agree you will not induce or encourage any employee of the Company to leave the employment of the Company for a period beginning from the date hereof and continuing through your Final Payroll Severance Date; and

5) you agree you will not, directly or indirectly, for yourself or on behalf of any other person, use or disclose any Confidential Information belonging to the Company.  Confidential Information includes, but is not limited to, memoranda, documents or records marked confidential or otherwise considered by the Company to be of a proprietary nature; names, addresses and buying practices of customers; customer service requirements, management practices; selling processes; pricing policies and lists, sources of supply; electronic information formats; business plans; financial policies and non-public financial information.

By signing this agreement, you acknowledge that

(1) you have had at least 45 days to consider the terms of this agreement and whether or not you should sign it;

(2) the Company has advised you that you should consult with an attorney of your own choosing prior to signing this agreement;

(3) you have consulted with, or have had sufficient opportunity to consult with, an attorney of your own choosing regarding the terms of this agreement;

(4) you are waiving valuable legal rights and releasing the Company of all claims which may have existed prior to or contemporaneously with the execution of this agreement, except for those obligations expressly stated in this agreement;

(5) you have not relied upon any representation or statement made by the Company or any employee or other person on behalf of the Company with regard to the subject matter, meaning, or effect of this agreement;

(6) you have read this agreement and fully understand its terms; and

(7) except as provided in this agreement, you have no right or claim, contractual or otherwise, to any or all of the benefits described in paragraphs 2, 3, 4, 5 and 7 of this letter; and

(8) this agreement does not reflect any admission by the Company of any liability or wrongdoing.

You further understand and agree that even if you do sign this agreement, you have the right to revoke it by delivering a notice of revocation in writing to me by mail, personal delivery, or facsimile (860-298-3275) within seven (7) calendar days of your signing the agreement. Because you have this right, this agreement will not become effective or enforceable until seven (7) calendar days after it is signed by you.

If the above is consistent with your understanding, and if you are in agreement with all of its terms, please sign this letter and return it to me. A fully-executed copy will be returned to you for your files.

Sincerely,

Gary J. Setta
Regional Vice President
Human Resources

/kmb

Agreed to and accepted by the undersigned the 24th day of December, 1998.

_William E. Callahan_          _Kristina M. Beakey_
Employee Signature                     Witness

_Gary J. Setta_                        _12/24/98_
Gary J. Setta                          Date
Regional Vice President

CALLAHAN v. UNISOURCE                                August 25, 2003

Page 1

```
 1    IN THE UNITED STATES DISTRICT COURT

 2    FOR THE DISTRICT OF CONNECTICUT

 3    - - - - - - - - - - - - - - - x

 4    WILLIAM E. CALLAHAN,              :

 5               Plaintiff,      : Civil Action No.

 6          vs.                  :   3:01CV1205

 7    UNISOURCE WORLDWIDE, INC.,   :      (CFD)

 8    GEORGIA-PACIFIC CORPORATION :

 9    and IKON OFFICE SOLUTIONS,   :

10    INC.,                        :

11               Defendants.      :

12    - - - - - - - - - - - - - - x

13               Deposition of WILLIAM E. CALLAHAN,

14         taken pursuant to the Federal Rules of Civil

15         Procedure at the law offices of Day, Berry &

16         Howard, CityPlace, Hartford, Connecticut,

17         before Elizabeth A. Zawacki, LSR #00087, a

18         Registered Merit Reporter and Notary Public in

19         and for the State of Connecticut, on Monday,

20         August 25, 2003, at 9:37 a.m.

21

22

23

24

25
```

CALLAHAN v. UNISOURCE                                    August 25, 2003

Page 130

1    rights?

2        A.    No, because I was told by Attorney McGrail

3    I could sign it and still sue them.

4        Q.    What did Mr. McGrail say?

5        A.    What did he say?

6        Q.    Yes.  You could sign this and still sue

7    the company?

8        A.    Yes.

9        Q.    Did he say anything beyond that?

10       A.    He felt that the company was not

11   negotiating with him in good faith, and that they

12   had lied to him, and that he basically said, you

13   know:  Sign this, and, you know, we'll consider it

14   that you signed it under duress.

15       Q.    He told you this before you signed it?

16       A.    Yes.

17       Q.    And what did he say with regard to the

18   company not negotiating in good faith?

19       A.    Lack of return phone calls.  He made a

20   distinction between tough negotiations and just

21   refusing to negotiate.

22       Q.    Anything more specific about what Attorney

23   McGrail said about the company not acting in good

24   faith?

25       A.    Well, he was concerned that I had been

CALLAHAN v. UNISOURCE                                    August 25, 2003

Page 131

1    asking during the summertime if I would have

2    continued employment in my position there, and his

3    comment was that he thought they had been fairly

4    reckless.

5        Q.    Anything else that he said that indicated,

6    that stated that the company was not acting in good

7    faith?  And let me rephrase that.

8             Anything else that he attributed to the

9    company that indicated they were not acting in good

10   faith?

11       A.    Yes.  When we asked if they could add some

12   years to the years of service, the response was,

13   "No, we don't do that"; but it was -- and the link

14   to the good faith is that it was in the annual

15   report that they had done that for some individuals,

16   and the point was even though they were high ranking

17   individuals, under the law he felt that they could

18   add years of service.

19       Q.    Anything else that indicated, anything

20   else Attorney McGrail said about the company not

21   acting in good faith?

22       A.    No.

23       Q.    And he used the words, the company was not

24   acting in good faith against you, and therefore that

25   you were signing this agreement under duress?

SANDERS, GALE & RUSSELL                            (203)624-4157

CALLAHAN v. UNISOURCE                                    August 25, 2003

Page 132

1       A.      Yes.

2       Q.      He linked the words "duress" to "not

3    acting in good faith"?

4       A.      Yes, he did.

5       Q.      When was the occasion for this

6    conversation?

7       A.      It was a phone conversation I had with

8    him.  I don't know the exact date, I would have to

9    look at my billing records, but it was several days

10   before I signed it.

11      Q.      What was -- how did the conversation start

12   where he indicated that the company was not acting

13   in good faith?

14      A.      How did it start?

15      Q.      Yes.  Just tell me how the subject came

16   up.

17      A.      He was upset that they had asked me to

18   stay on indefinitely, with no position, and that

19   they wouldn't take or return his calls, but yet they

20   would approach me and tell me that it was time to

21   leave.

22      Q.      When did Mr. --  was it Mr. Keneally who

23   told you it was time to leave?

24      A.      Mr. Setta.

25      Q.      And when did he say that?  Do you remember

SANDERS, GALE & RUSSELL                        (203)624-4157

CALLAHAN v. UNISOURCE                                August 25, 2003

Page 133

1    when?

2         A.    It was early December.

3         Q.    December; and by the way, did this -- how

4    many conversations had Attorney McGrail had with

5    Mr. Setta at the time that he was telling you that

6    the company was not acting in good faith? Two or

7    three?

8         A.    I don't know.

9         Q.    You don't know how many?

10        A.    I don't know.

11        Q.    You still have the billing records?

12        A.    Yes,

13        Q.    Anything else that you remember about that

14   conversation with Mr. McGrail where he alleged the

15   company was not acting in good faith?

16        A.    No.

17        Q.    And that gave you the chance to vitiate

18   this agreement?

19        A.    No.

20        Q.    So he told you two or three days but you

21   signed it that you could sign it and you would be

22   able to get out of it; is that correct?

23                MR. BOWMAN:  Object to the form. He

24   testified to what he said.

25                MR. SPRINGER:  I'm just not clear

SANDERS, GALE & RUSSELL                          (203)624-4157

Page 133

Page 134

ecember.

by the way, did this -- how

ttorney McGrail had with

at he was telling you that

ng in good faith?  Two or

how many?

the billing records?

that you remember about that

Grail where he alleged the

n good faith?

you the chance to vitiate

two or three days but you

sign it and you would be

s that correct?

N:  Object to the form.  He

d.

GER:  I'm just not clear

ou?

e could overturn it, and

eded to tell you the

overturn it?

yed all the bases he told

turn it?

em to who?

testified to all the

he could overturn this

en.  He was concerned

al investment based on

that they were acting

oncerned that the

nded years of service for

sed, that, "We don't do

y reasons he told you he

is that correct?

CALLAHAN v. UNISOURCE                          August 25, 2003

Page 177

1    office and asked for the file, and all that was in

2    it was the employee handbook and a handwritten note

3    from me to Attorney McGrail.  That was it.

4        Q.    You don't remember seeing anything else?

5        A.    No.  There was nothing else.

6        Q.    Was Attorney McEleney present for any of

7    the discussions with Attorney McGrail about what

8    you've claimed is the unenforcibility of the

9    agreement?

10       A.    He wasn't present at any of the meetings I

11   had with Attorney McGrail.

12       Q.    You don't know what they discussed between

13   themselves; is that correct?

14       A.    Correct.

15       Q.    Did you ever discuss the unenforcibility

16   separately with Attorney McEleney?

17       A.    No.

18       Q.    Never did?

19       A.    Not that I can recall.

20       Q.    Did you ever discuss with him what

21   Attorney McGrail said about the unenforcibility?

22       A.    I discussed with Attorney McEleney

23   Attorney McGrail's thought process for overturning

24   the severance letter.

25       Q.    For what?

SANDERS, GALE & RUSSELL                    (203)624-4157

CALLAHAN v. UNISOURCE                                        August 25, 2003

Page 178

1       A.    For being able to overturn the severance

2    letter.

3       Q.    So you did discuss that with Attorney

4    McEleney?

5       A.    I discussed what I thought was Attorney

6    Mack McGrail's thought process for turning over the

7    severance, yes.

8       Q.    What did you tell Attorney McEleney?

9       A.    That according to Attorney McGrail, I had

10   signed this under duress.

11      Q.    And did you explain what Attorney McGrail

12   explained to you, why he thought it was under

13   duress?

14      A.    I kind of hit the bullets of what we

15   already discussed here this afternoon.

16      Q.    Just tell me in bullet fashion, then, what

17   you said to -- well, tell me what you said to

18   Attorney McEleney about Attorney McGrail's thought

19   process?

20      A.    The promises that were made that weren't

21   kept, the request to keep coming in with nothing to

22   do, the illness of my son, the purchase of the land.

23   I believe that's it.

24      Q.    Anything else that you remember?

25      A.    I don't remember anything else.

SANDERS, GALE & RUSSELL                    (203)624-4157

CALLAHAN v. UNISOURCE                                    August 25, 2003

Page 179

1       Q.    Do you remember when this conversation
2    occurred with Attorney McEleney?
3       A.    It was right around the holiday.  I
4    believe it was Labor Day weekend.
5       Q.    Of 1999?
6       A.    I believe so, yes.  Whenever he wrote the
7    letter.
8       Q.    The letter is dated September 3, 1999, so
9    it was before he wrote the letter that you had this
10   conversation?
11      A.    Yes.  I believe the letter had to be
12   delivered the Friday of Labor Day weekend.
13      Q.    And did you have a discussion with --
14   withdraw that.
15            Did Attorney McEleney respond in any way
16   when you told him what Attorney McGrail's thought
17   process was?
18      A.    No.  He just made notes.
19      Q.    Did he respond at all verbally that you
20   remember?
21      A.    No.
22      Q.    Did you ever tell anyone at the company
23   that you believed you were signing under duress or
24   being coerced to sign?
25      A.    No.