FILED

2003 OCT 30  P 5 03

UNITED STATES DISTRICT COURT

U.S. DISTRICT COURT
HARTFORD CT

DISTRICT OF CONNECTICUT

WILLIAM E. CALLAHAN                    :

      PLAINTIFF                    :

VS.                                                    : DOCKET NO: 3:01CV1205(CFD)

UNISOURCE WORLDWIDE, INC.,      :
GEORGIA-PACIFIC CORPORATION,
ALCO STANDARD CORPORATION
AND IKON OFFICE SOLUTIONS,       :
INC.

      DEFENDANTS                 : OCTOBER 30, 2003

## PLAINTIFF'S OBJECTION AND MEMORANDUM
## IN OPPOSITION TO DEFENDANTS' MOTION
## FOR PERMISSION TO FILE MOTION FOR PARTIAL
## SUMMARY JUDGMENT

      Plaintiff William Callahan submits this objection and memorandum in opposition to defendants' motion for permission to file partial summary judgment for two reasons. First, granting the defendants permission to file a motion for partial summary judgment which is premature and not case dispositive would constitute an unnecessary and costly commitment of resources resulting in the non-determination of legal issues in a piecemeal fashion.  Second, the defendants' motion for summary judgment will fail.  It

will fail now, and it will fail later.  Requiring plaintiff to expend resources to respond now and to respond later, since defendants brazenly reserve the right to move again for summary judgment successively, will require the needless application of judicial resources to a motion which should await the conclusion of discovery and which motion must fail, because there is a genuine issue of material fact relating to the issue of waiver.

As set forth in Exhibit A, there was an oral representation made by Gary Setta, Vice President of Human Resources at Unisource, the point person at Unisource who negotiated the Callahan severance letter, that Setta had the authority from the Board of Directors to offer irrevocably the benefits of the 1991 IKON Deferred Compensation Plan at issue in this case.

Plaintiff Callahan testified at his deposition that Setta delivered to him a September 22, 1998 letter which contained no reference to the 1991 IKON Deferred Compensation Plan (Exh. B); (Exh. A, pg. 214).  Subsequently, Setta, acting as Vice President for Unisource, delivered a letter dated December 23, 1998 (Exh. C) which provides the benefits of the 1991 IKON Deferred Compensation Plan to plaintiff (Exh. A, pg. 214).  Plaintiff and his now deceased attorney, Albert McGrail, had demanded that the 1991 Deferred Compensation Plan be part of plaintiff's severance (Exh. A, pg.

214).  Plaintiff testified that he was concerned that the Plan could be cancelled at any time by the Board of Directors (Exh. A, pg. 215).  Callahan testified that the 1991 Plan was the biggest and most critical element of the severance package being offered to him by Unisource (Exh. A, pg. 215).  Callahan also testified that he would never have signed the December 23, 1998 severance letter if he understood that his entitlement to benefits of the Plan could be cancelled by the Board of Directors (Exh. A, pg. 216).

Plaintiff Callahan understood that par. 8 of Exh. C meant that as long as he made premium payments on the split dollar life insurance policy, he would get the benefits from the 1991 Plan (Exh. A, pg. 216).  Plaintiff further testified that both he and attorney McGrail believed that Setta had the approval and authority to extend the benefits of the Plan to Callahan, and that Gary Setta advised attorney McGrail in plaintiff's presence that Setta had the authority to extend the benefits of the Plan to Callahan (Exh. A, pg. 217).  Callahan testified that it was his belief, based upon Setta's representation as well as the language of the Severance Agreement, that he was protected in terms of actual receipt of the benefits under the 1991 Deferred Compensation Plan, (Exh. A, pg. 218).

In addition, defendant Unisource knew that plaintiff had not had 45 days in which to consider the terms of the agreement and whether he should sign it.  (Exh. A,

pg. 219). Plaintiff testified that he relied upon the representations made by Gary Setta, Vice President of Human Resources at Unisource, when he signed the Agreement (Exh. A, pg. 219).   Setta's representations were made to Callahan and attorney McGrail with respect to the Deferred Compensation provision. (Exh. A, pg. 219).

Plaintiff Callahan also testified that he received a copy of a Metlife Insurance Certificate in the mail that described him as a beneficiary under the 1991 Metlife Split Dollar Life Policy (Exh. A, pg. 221). That Certificate is attached as Exh. D.

Upon cross-examination at his deposition, plaintiff reiterated that in his presence attorney McGrail asked Gary Setta if he had the authority to promise Callahan the benefits of that plan in a severance letter (Exh. A, pg. 227). The benefits included $15,000 a year for 10 years at age 65, a $95,000 cash value and an insurance policy worth $375,000 (Exh. A, pg. 227).  Attorney McGrail was specific, and Mr. Setta said yes to the deferred compensation, the cash value of the policy and the death benefit (Exh. A, pg. 228).

Callahan continued on cross-examination, "We were concerned about the Board of Directors being able to cancel the plan, and that was why the specific question was asked "Do you have the authority of the Board of Directors to promise me the benefits of the Plan?" (Exh. A, pg. 230). "Setta said as long as I made the

4

premium payments, I would get the benefits of the plan." (Exh. A, pg. 231). Callahan believed, and he had reason to believe, that Setta had the authority to promise him the benefit of the plan. (Exh. A, pg. 231). After all, Setta had worked for IKON before he came to Unisource (Exh. A, pg. 231). (IKON took over the ALCO Standard 1991 Plan in 1997). Setta had worked for ALCO Standard.

When defendants state in their moving papers at page 18 of their memorandum in support of their motion for summary judgment that "there is no evidence of oral misrepresentation", they have conveniently omitted the portions of plaintiff's deposition referred to herein above.

If Setta believed he had the authority, but didn't actually have the authority, then his misrepresentations were actionable even if negligent. See, <u>Daley vs. Aetna Life & Cas. Co.</u>, 249 Conn. 766, 793 (Conn. 1991). If Setta made the representation even though he believed he did not have authority, then clearly this was actionable as intentional fraud. Under either scenario, plaintiff was induced to sign the December 23, 1998 severance letter and was induced to do so, because he reasonably believed that he would actually receive the benefits of the 1991 IKON Plan which included Deferred Compensation payments commencing at age 65 and the benefits of the split dollar life insurance policy including cash value and death benefit.

Moreover, as this Court ruled on March 27, 2003, "[t]he validity of an employee's waiver of an ADEA claim is governed by the Older Workers Benefit Protection Act ("OWBPA")", 29 USC §626(f) et seq., which requires that any waiver of rights or claims under ADEA be knowing and voluntary. Id., 2003 WL 1714369 at page. 5 citing Tung vs. Texaco, Inc., 150 F.3rd 206, 208-09 (2nd Cir. 1998)(per curium). "Additionally the district court must review the 'totality of the circumstances' and determine that the waiver is knowing and voluntary." Id., see also, Bormann vs. AT&T Communications, Inc., 875 F.2d 399, 403 (2nd Cir). cert denied, 493 U.S. 924 (1989); Pampillonia vs. RJR Nabisco, Inc., 138 F.3rd 459, 463 (2nd Cir. 1998)."

This Court ruled that Callahan's allegations that Unisource induced him to sign the Severance Agreement and Waiver by misrepresenting the benefits he would receive by retiring "are sufficient to defeat a conclusion that he knowingly and voluntarily waived his ADEA claim," Id. at pg. 5. Although the Court left the defendants the opportunity to file a motion for summary judgment on this issue, there still remains at minimum, a genuine issue of material fact as to the voluntariness of this waiver.

It cannot go unnoticed that the Second Circuit Tung vs. Texaco, Inc., supra expressly found that "an employer requesting a waiver in connection with a termination program offered to a group of employees must give the employee a period of at least

45 days in which to consider the waiver agreement, see 29 USC §626(f)(1)(F)(ii); Id., 150 F.3rd at 208.

Defendants materially and fraudulently induced this plaintiff to sign a severance agreement purporting to waive and give up his meritorious ADEA claim.  He was discriminated against because of his age; he was isolated, placed in a completely untenable position and constructively discharged by the defendant Unisource.  Gary Setta, acting with authority in direct response to plaintiff and plaintiff's attorney's concern over that authority, represented to plaintiff that he, Setta, had the authority and ability to promise plaintiff the actual receipt of the benefits of the 1991 IKON Plan. Plaintiff was completely justified and acted in the most reasonable way in relying upon the representations made by Setta and the language of the December 23, 1998 severance letter which language was drafted by Unisource.

Finally, although the defendants attempt to make reference to the administrative proceedings before CHRO, the law is clear that judicially unreviewed findings of state administrative agencies with respect to age discrimination claims have no preclusive effect on federal proceedings, Astoria Federal Savings & Loan Association vs. Solimino, 501 U.S. 104, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991).

7

For these reasons the defendants' motion for permission to file a motion for partial summary judgment should be denied.

THE PLAINTIFF,
WILLIAM E. CALLAHAN

By

ANDREW B. BOWMAN, ct00122
1804 Post Road East
Westport, CT 06880
(203) 259-0599
(203) 255-2570 (Fax)

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was sent by facsimile transmission and mailed, postage prepaid on this 30th day of October, 2003 to:

Felix J. Springer
Jennifer L. Sachs
Day, Berry & Howard
CityPlace 1
Hartford, CT 06103-3499

Joseph J. Costello
Kay Kyungsun Yu
Megan E. Shafer
Morgan, Lewis & Bockius, LLP
1701 Market Street
Philadelphia, PA 19103-2921

8

Robert L. Wyld
Patrick M. Fahey
Shipman & Goodman
One American Row
Hartford, CT 06103

Rayne Rasty
Georgia-Pacific Corp.
133 Peachtree St., N.E.
Atlanta, GA 30303

_____
ANDREW B. BOWMAN

CALLAHAN v. UNISOURCE                              August 25, 2003

Page 1

```
 1      IN THE UNITED STATES DISTRICT COURT

 2      FOR THE DISTRICT OF CONNECTICUT

 3      - - - - - - - - - - - - - - x

 4      WILLIAM E. CALLAHAN,            :

 5                 Plaintiff,      : Civil Action No.

 6            vs.                  :    3:01CV1205

 7      UNISOURCE WORLDWIDE, INC.,  :      (CFD)

 8      GEORGIA-PACIFIC CORPORATION :

 9      and IKON OFFICE SOLUTIONS,  :

10      INC.,                       :

11                 Defendants.      :

12      - - - - - - - - - - - - - - x

13                 Deposition of WILLIAM E. CALLAHAN,

14          taken pursuant to the Federal Rules of Civil

15          Procedure at the law offices of Day, Berry &

16          Howard, CityPlace, Hartford, Connecticut,

17          before Elizabeth A. Zawacki, LSR #00087, a

18          Registered Merit Reporter and Notary Public in

19          and for the State of Connecticut, on Monday,

20          August 25, 2003, at 9:37 a.m.

21

22

23

24

25
```

SANDERS, GALE & RUSSELL                    (203)624-4157

CALLAHAN v. UNISOURCE                         August 25, 2003

Page 213

```
 1              I also want to note that I had

 2   written a letter to Kay Yu.  There is a motion for

 3   leave to amend a complaint that's pending now in the

 4   Callahan case, and Kay Yu had and her law firm had

 5   clear notice this deposition of Mr. Callahan was

 6   going forward today, and it's our position that if

 7   the motion to amend is granted that Ikon has waived

 8   its right to examine Mr. Callahan.  Since Ms. Yu and

 9   -- neither Ms. Yu nor anybody from her firm is

10   present today, her silence is appropriate.

11              MR. SPRINGER:  I think we know what

12   her position will be.

13              MR. BOWMAN:  I know what her position

14   is.

15   CROSS-EXAMINATION

16   BY MR. BOWMAN:

17      Q.    Mr. Callahan, I'm going to ask you to take

18   a look at Exhibit 14, please, which is the draft of

19   the September 22, 1998 letter from Gary Setta to

20   you, and also take out Exhibit 13 which is the

21   December 23, 1998 letter from Setta to you that was

22   signed by you.

23      A.    14 and 13?

24      Q.    Yes.  Do you have them out?

25      A.    Yes.
```

CALLAHAN v. UNISOURCE                                    August 25, 2003

Page 214

1      Q.     With respect to Exhibit 14, dated

2   September 22, 1998, which is a letter addressed to

3   you that was signed by Gary Setta, vice president of

4   human resources, can you tell us whether there's any

5   reference to the 1991 Ikon deferred compensation

6   plan?

7      A.     No, there is not.

8      Q.     And can you tell us whether there was a

9   reference in Exhibit 13, which is the December 23,

10  1998 letter from Mr. Setta to you which you signed,

11  if there is any reference to the 1991 Ikon deferred

12  compensation plan?

13     A.     Yes, there is.

14     Q.     And where is that reference?

15     A.     Paragraph 8.

16     Q.     Now, did you and your lawyer, Mr. McGrail,

17  demand, make a demand of Unisource that the deferred

18  compensation plan be part of your severance?

19     A.     Yes.

20             MR. SPRINGER:   Objection to the form.

21     Q.     Now, with respect to paragraph 8 of

22  Exhibit 13, which is the December 23, 1998 letter,

23  the language that was used, who drafted it?  Do you

24  know?

25     A.     Mr. Setta.

SANDERS, GALE & RUSSELL                          (203)624-4157

CALLAHAN v. UNISOURCE                         August 25, 2003

---

Page 215

1        Q.    And what were you concerned about in

2    demanding that the deferred compensation plan, the

3    '91 plan that is the subject matter of this

4    litigation, that you continued to receive benefits

5    under that plan?

6        A.    What was my concern?

7        Q.    Yes.

8        A.    My concern was the plan could be cancelled

9    at any time by the board of directors.

10       Q.    And was it your understanding that this

11   provision protected you from a cancellation by the

12   board of directors of Ikon of that plan?

13       A.    Yes.

14             MR. SPRINGER:  Objection.

15       Q.    And can you tell us whether this was the

16   biggest and most critical element of the severance

17   package that was being offered to you by Unisource?

18       A.    Yes, it was.

19             MR. SPRINGER:  Objection; and that's

20   to the form.

21             If you'd give me one second to

22   interject.

23       Q.    So is it your testimony that the deferred,

24   1991 plan was the most significant part of the

25   severance offer that was made to you by Unisource?

---

SANDERS, GALE & RUSSELL                        (203)624-4157

CALLAHAN v. UNISOURCE                        August 25, 2003

Page 216

1                 MR. SPRINGER:  Objection to the form.

2       A.    Yes.

3       Q.    And had you known or been under the --

4    withdrawn.

5             Had you understood that this plan that was

6    offered to you in paragraph 8 could be cancelled by

7    the board of directors, would you have signed this

8    severance agreement?

9                 MR. SPRINGER:  Objection.

10      A.    No.

11      Q.    When Mr. Setta used the language in

12   paragraph 8 of Exhibit 13, and I quote, "Benefits

13   under the 1991 Ikon Office Solutions, Inc., formerly

14   Alco Standard Corporation, Deferred Compensation

15   Plan will vest when 100 percent and be distributed

16   to you in the future in accordance with the

17   provisions of the plan," what did you understand

18   that provision to mean?

19      A.    I understood that to mean that as long as

20   I made premium payments, that I would get the

21   benefits from this plan.

22      Q.    And the premium payments, was that under

23   the split dollar life insurance policy?

24      A.    Yes.

25      Q.    And in fact, did Unisource follow through

SANDERS, GALE & RUSSELL                  (203)624-4157

CALLAHAN v. UNISOURCE                    August 25, 2003

Page 217

1    with that commitment they made to you?

2       A.    No.

3       Q.    What was your understanding of the impact

4    of this language in the severance agreement of

5    December 23, 1998, Exhibit 13, as it related to the

6    1991 plan, and specifically the termination by the

7    board of directors provision?

8       A.    We believed that Mr. Setta had the

9    approval and the authority to extend this benefit to

10   me because we had read the plan and it said that you

11   needed the board of directors to approve it, and

12   Mack, Attorney McGrail and I understood that he had

13   that authority.

14      Q.    And did Mr. McGrail ask him that question

15   in your presence?

16      A.    Yes, he did.

17      Q.    And what was the answer?

18      A.    Yes.

19      Q.    In other words, Mr. Setta said he had the

20   authority --

21      A.    Yes.

22            Mr. SPRINGER:  Objection.

23      Q.    -- to extend this benefit to you; is that

24   correct?

25      A.    Yes.

SANDERS, GALE & RUSSELL                    (203)624-4157

CALLAHAN v. UNISOURCE                              August 25, 2003

Page 218

1              MR. SPRINGER:  Objection.

2       Q.    Did you believe you were protected in

3    terms of the actual receipt of the benefits under

4    the deferred compensation plan of 1991 by virtue of

5    the agreement you signed dated December 23, 1998,

6    which is Exhibit 13?

7       A.    Yes.

8       Q.    Now, you testified in response to

9    Mr. Springer's questions that there was some

10   modification of the amount and duration of paragraph

11   1 of the September 22, 1998 draft which is Exhibit

12   14, which appears apparently in paragraph 2 of

13   Exhibit 13, in that they had -- there was some

14   mistake about the amount; is that correct?

15      A.    Yes.

16      Q.    And you've also testified that the other

17   change, in addition to paragraph 8, which was the

18   deferred compensation paragraph, that the noncompete

19   agreement that had been demanded previously by

20   Unisource had been withdrawn, except for the

21   provision on the fourth page, subparagraph 4, which

22   has to do with inducing or encouraging other

23   employees of the company to leave?

24      A.    Yes.

25      Q.    Now, with subparagraph 1 on that same page

SANDERS, GALE & RUSSELL                    (203)624-4157

CALLAHAN v. UNISOURCE                                    August 25, 2003

Page 219

1    of Exhibit 13, that's page 4, and I'm talking about

2    the subparagraph that occurs after the phrase, "by

3    signing this agreement you acknowledge that" --

4    you're with me?

5        A.    Yes.

6        Q.    Now, with respect to subparagraph 1 on

7    page 4 which says, "You have had at least 45 days to

8    consider the terms of this agreement and whether you

9    should sign it," in fact that was not so.  You did

10   not have 45 days to consider the terms of the

11   agreement, did you?

12       A.    No, I did not.

13       Q.    And Unisource knew it, correct?

14       A.    Yes, they did.

15       Q.    And with respect to reliance upon any

16   representation or statement made by the company or

17   any employee or other person on behalf of the

18   company, which is sub 5 on that same page, did you

19   rely upon the representations made by Mr. Setta when

20   you signed this agreement?

21       A.    Yes, I did.

22       Q.    And those were the representations made to

23   you and Mr. McGrail with respect to the deferred

24   compensation provision?

25       A.    Yes.

SANDERS, GALE & RUSSELL                          (203)624-4157

CALLAHAN v. UNISOURCE                                August 25, 2003

Page 220

1            MR. BOWMAN:  Nothing further.

2            MR. SPRINGER:  I just have some

3    questions to follow up.

4    REDIRECT EXAMINATION

5    BY MR. SPRINGER:

6        Q.    With regard to the 1991 plan, the plan's

7    provisions applied to, to your knowledge, everyone

8    who participated in it, did they not?

9        A.    No.  I thought the plan in the December

10   agreement applied to me.

11       Q.    No; but other than the December agreement,

12   are you aware of the plan not applying to anyone

13   else, the plan's provisions?

14           MR. BOWMAN:  Object to the form.

15       A.    You had to be a member.  You had to be

16   participating in the plan.

17       Q.    And if you participated, are you aware of

18   any variance from the plan's termination provision

19   with regard to any other participant, other than

20   you?

21       A.    No.

22       Q.    And you're claiming that only you, as a

23   result of this agreement, severance agreement, were

24   entitled to a variation on the termination

25   provision; is that correct?

SANDERS, GALE & RUSSELL                   (203)624-4157

CALLAHAN v. UNISOURCE                                    August 25, 2003

Page 221

1       A.      Can you repeat that.

2       Q.      Sure.  You're claiming as a result of this

3   agreement that only you are entitled to a variation

4   on the termination provision of the 1991 plan?

5                   MR. BOWMAN:  I object to the term

6   "only you."  He says he has no knowledge about

7   anybody else.

8                   MR. SPRINGER:  That's fine.

9       Q.      Are you aware of anyone else -- and let's

10  just make clear, Mr. Callahan.  Are you aware of

11  anyone else for whom the termination plan was

12  varied?

13      A.      Yes.

14      Q.      Who?

15      A.      ·I don't have their name, but when I got a

16  copy of the Met Life insurance policy in the mail, I

17  think by mistake, I called and asked about that, and

18  the woman whose name is in my documents made a

19  comment to me, she said, "I thought this policy was

20  given to you."

21      Q.      What policy?

22      A.      The 1991 Met Life split life policy.  She

23  made the comment, she said, "I thought that this was

24  given to Ikon employees when they left," and I told

25  her I never worked for Ikon, and that was the end of

CALLAHAN v. UNISOURCE                                    August 25, 2003

Page 222

```
 1    the conversation.

 2          Q.      And who was that woman?

 3          A.      I've got her name in my documents.

 4          Q.      And she said she thought; is that correct?

 5          A.      She said -- I called her and asked her

 6    about the policy, if it was still in effect.  She

 7    said yes.  I asked her if I could have it mailed to

 8    me, and she made a comment, "These were given to you

 9    as a gift when you left Ikon."

10          Q.      A gift.  That was her understanding?

11          A.      That was her words.

12          Q.      And she was a Met Life employee?

13          A.      Yes.

14          Q.      She was not an Ikon employee?

15          A.      Met Life.

16          Q.      She was not a plan administrator; is that

17    correct?

18          A.      I don't know her title.  Her name and

19    phone number are on the letter that I got with

20    the -- I got a policy statement one day recently,

21    and I was surprised because I thought the company

22    had done away with the policy.  I called to see if

23    it was still in effect.

24          Q.      Do you know for whom it is in effect?  Do

25    you know for whom it is in effect, the Met Life
```

SANDERS, GALE & RUSSELL                           (203)624-4157

CALLAHAN v. UNISOURCE                    August 25, 2003

Page 223

1    policy?

2        A.    I know mine is.

3        Q.    Yours is in effect according to what?

4        A.    According to the phone conversation I had

5    with the woman at Met Life.

6        Q.    And is -- just so I'm clear, the life

7    insurance provisions under the 1991 plan are still

8    in effect, is your understanding?

9              MR. BOWMAN:  Yes.

10       A.    Yes.

11             MR. BOWMAN:  They sent him a

12   document.  You're not aware of this?  I'd be happy

13   to provide it to you.

14             MR. SPRINGER:  Well, we'll want to

15   perhaps inquire about that, but I haven't, you know,

16   I have not seen that document.

17             MR. BOWMAN:  When you're finished,

18   I'd be happy to --

19       Q.    Having said that, so there was a document

20   provided.  Have you -- and is it your belief the

21   life insurance provisions are still in effect?

22       A.    Yes.

23       Q.    And what do they provide?

24       A.    Right now there's a cash balance in the

25   policy, and it provides the death benefit that we

SANDERS, GALE & RUSSELL          (203)624-4157

CALLAHAN v. UNISOURCE                          August 25, 2003

Page 224

1    spoke about earlier today.

2        Q.    You think that letter was mailed to you in

3    error?

4                    MR. BOWMAN:  Object.  I don't think

5    he knows.

6        A.    I don't know.

7                    MR. SPRINGER:  Please.

8        Q.    That would certainly contradict what

9    correspondence you had received from the plan

10   administrator, Mr. Hope, wouldn't it?

11       A.    Mr. Hope?  It would, when Ikon sent a

12   letter that the plan has been eliminated, it would

13   contradict that.

14       Q.    Let me go back and ask, then, if you will

15   look at Exhibit 10.

16                   Again, I haven't seen that document, and,

17   you know, I was unaware of it, but again, the

18   language of that document -- let me ask you this.

19   Could you turn to Exhibit 10, and if you look at

20   exhibit -- I'm sorry, it's Exhibit 16.  Do you see

21   it?

22       A.    Not yet.

23       Q.    It's entitled, "1991 Deferred Compensation

24   Plan."  Yes.  If you would turn to item 8.  Turn to

25   item 8 on that, and is there an option for a

SANDERS, GALE & RUSSELL                        (203)624-4157

CALLAHAN v. UNISOURCE                    August 25, 2003

Page 225

1    participant to maintain a portion of the life

2    insurance associated with the plan?  Do you see that

3    heading?

4         A.    I see the question, yes.

5         Q.    It says in the second sentence in the

6    second paragraph:

7              "Recognizing that the life insurance

8    element of the plan may be of particular interest to

9    some participants, Ikon is willing to transfer a

10   life insurance policy to such participants in lieu

11   of the termination benefit enumerated in item 5,

12   above."

13             In fact, you did get the termination

14   benefit, didn't you, Mr. Callahan?

15             MR. BOWMAN:  Object to the form.

16        A.    I didn't get a termination benefit.  I got

17   the deductions and interest.

18        Q.    Isn't that the termination benefit

19   provided for in paragraph 19 of the plan?

20             MR. BOWMAN:  Object to the form.

21        A.    I'm trying to follow you here.  It says

22   they are not entitled to a life insurance plan if

23   the plan is terminated.

24        Q.    And I'm referring to the provision that

25   says, "Ikon is willing to transfer a life insurance

CALLAHAN v. UNISOURCE                    August 25, 2003

Page 226

1    policy to such participants in lieu of the

2    termination benefit enumerated in item 5, above,"

3    and my point, my question to you now is:  Did you

4    not receive the termination benefit?

5                    MR. BOWMAN:  Object to the form.

6        A.    No, I did not receive the termination

7    benefit.  I received my deductions.

8        Q.    Well, isn't that the termination benefit,

9    plus interest?

10                   MR. BOWMAN:  Object to the form.

11       A.    I would have to reread this.

12       Q.    Well, look at number 5.  It says,

13   "Participants," the second part of 5, "Participants

14   who benefit payments have not commenced before

15   December 31, 2000 are entitled to the amount they

16   deferred, plus interest compounded annually at the

17   rate of 6 percent per annum," and that's what you

18   received, did you not?

19       A.    Yes, I did receive that.

20       Q.    And therefore in light of what this says,

21   you're not entitled to any life insurance element if

22   you received the termination benefit; isn't that

23   what this says in provision 8?

24                   MR. BOWMAN:  Object to the form.

25       A.    I did not think this applied to me.

SANDERS, GALE & RUSSELL                    (203)624-4157

CALLAHAN v. UNISOURCE                                    August 25, 2003

Page 227

1      Q.      Why not?

2      A.      Because I had a severance agreement that

3   promised me the benefits of the plan.

4      Q.      And your statement, just so I'm clear, is

5   that Mr. McGrail asked Mr. Setta if he had authority

6   from the board of directors of Ikon to alter the

7   plan and the termination provision of that plan?

8      A.      He did not specify which board of

9   directors.  He asked Gary Setta if he had the

10  authority to promise me the benefits of that plan in

11  a severance letter.

12     Q.      And was there any more explicit talk about

13  what the benefits of that plan were?

14     A.      Yes.

15     Q.      What?

16     A.      $15,000 for ten years at age 65, $95,000

17  paid up, $95,000 cash value, and an insurance policy

18  worth I believe it's $375,000.

19     Q.      Subject to the termination provisions of

20  the plan?

21     A.      No.  The question was, did he have the

22  authority from the board of directors or the

23  permission to promise me the plan benefit as I was

24  leaving the company.

25     Q.      And was there an explicit talk about what

SANDERS, GALE & RUSSELL                          (203)624-4157

CALLAHAN v. UNISOURCE                          August 25, 2003

Page 228

1    that plan benefit was?

2         A.    Yes.

3         Q.    And you're saying that explicitly

4    Mr. McGrail asked whether he had the authority to

5    promise you those --

6         A.    Those three items.

7         Q.    -- those three items, and Mr. Setta said

8    yes?

9         A.    Yes.

10        Q.    And then -- and in that, did he indicate

11   that it was subject to the provisions of the plan?

12        A.    No.

13        Q.    And then you got this agreement which is

14   dated -- I'm sorry, which in paragraph 8, and there

15   it says, "Benefits under the 1991 Ikon Office

16   Solutions, Inc. Deferred Compensation Plan will vest

17   100 percent and be distributed to you in the future

18   in accordance with the provisions of the plan."

19             You see that?

20        A.    Yes, I see it.

21        Q.    And in fact, at the time that you were

22   discussing this with Mr. Setta, you were not vested

23   100 percent; is that correct?

24        A.    I believe I was vested 100 percent.  I had

25   taken my deductions over five years.

SANDERS, GALE & RUSSELL                        (203)624-4157

CALLAHAN v. UNISOURCE                                    August 25, 2003

Page 229

1      Q.    Well, didn't you need to be there in

2   accordance with the terms of the plan ten years to

3   vest?

4      A.    Yes.

5      Q.    Okay.  So you were not vested in

6   accordance with the terms of the plan that required

7   you to be there ten years, were you?

8      A.    No.

9      Q.    And wasn't -- when Mr. Setta said he was

10  providing the benefits of the plan, he was providing

11  that the benefits will vest 100 percent, and so that

12  you will be vested?  Wasn't that what he was

13  providing?

14     A.    No.  He was providing me the benefit of

15  the plan.

16     Q.    And the words he used was he was providing

17  the benefit of the plan; is that correct?

18     A.    Yes, and then Mr. McGrail asked him to

19  specify what those benefits were.

20     Q.    And he specified what they were?

21     A.    Yes, he did, and then Attorney McGrail

22  said something about the language, and in accordance

23  with the plan, and Gary said, "That just means that

24  he has to continue to make the premium payments."

25     Q.    Okay.  Well, it doesn't say here that you

SANDERS, GALE & RUSSELL                    (203)624-4157

CALLAHAN v. UNISOURCE                    August 25, 2003

Page 230

1    will receive the benefits under the plan no matter

2    what the board of directors at Ikon does, does it?

3                    MR. BOWMAN:  Objection.  I object to

4    the form.  It says what it says.

5        Q.    Did Mr. Setta say to you that you will get

6    the benefits of the plan no matter what the board of

7    directors of Ikon will do?

8                    MR. BOWMAN:  Objection.  I think he

9    was asked and he answered exactly what Mr. Setta

10   said.

11                   MR. SPRINGER:  I'd like an answer to

12   that question.

13                   MR. BOWMAN:  Would you reread the

14   question.

15                   (Question read.)

16                   MR. BOWMAN:  There's an objection to

17   the form.

18                   You can answer the question.

19       A.    We were concerned about the board of

20   directors being able to cancel the plan, and that

21   was why the specific question was asked:  Do you

22   have the authority of the board of directors to

23   promise me the benefits of the plan?

24       Q.    And did Mr. Setta say to you that the

25   board of directors of Ikon, that you will get the

SANDERS, GALE & RUSSELL                    (203)624-4157

CALLAHAN v. UNISOURCE                    August 25, 2003

Page 231

1    benefits of the plan no matter what the board of

2    directors of Ikon will do?

3                    MR. SPRINGER:  Objection to form.

4                    You can answer.

5    A.    Mr. Setta said as long as I made the

6    premium payments, I will get the benefits of the

7    plan.

8    Q.    Did he say no matter what the board of

9    directors of Ikon will do?

10                    MR. BOWMAN:  Object to form?

11   A.    I don't remember him saying that.

12   Q.    Did you believe that Mr. Setta had the

13   authority to do something that the board of

14   directors of Ikon had not done?

15                    MR. BOWMAN:  Object to the form.

16   Q.    Go ahead.

17   A.    I can answer?

18   Q.    Yes.

19   A.    I believe he had the authority to promise

20   me the benefit of the plan.

21   Q.    Mr. Setta, to your knowledge, was not at

22   all -- was not an officer of Ikon, was he?

23   A.    No.  He was working for -- I don't know if

24   he was an officer of Ikon or not.  He previously

25   worked for Ikon before he came to Unisource.

SANDERS, GALE & RUSSELL                    (203)624-4157

ce Networth
0 Helmsford Way
Windsor, CT 06095

Tel 860.298.3200
Fax 860.298.3123

**unisource**

September 22, 1998



*Personal and Confidential*

Mr. William E. Callahan
234 East Opal Drive
Glastonbury, CT   06033

Dear Bill:

As you know, Unisource Worldwide, Inc. ("Company") is undergoing a reorganization of its business that requires certain difficult business decisions. As a result, many positions have been combined or eliminated, and your position has been adversely affected. This letter outlines and confirms our agreement of the terms and conditions that will apply in the event of the separation of your relationship with the Company.

1. *Severance Pay*. In consideration of your execution of this agreement the Company shall continue payments to you at your regular semi-monthly rate of $4,354.96 in accordance with the Company's normal payroll procedures for twelve (12) months following your last day of work. The first six (6) months of this severance will be guaranteed, regardless of whether you secure other employment. Beginning with the seventh month of pay, the severance will be subject to a salary offset wherein, if other employment is secured, Unisource will pay the difference between full salary and the lower rate of pay. If the salary for the new position is at a higher rate of pay, the salary offset will not be applicable and the severance benefits will cease as of the date new employment is obtained.

2. *Earned Vacation*. Earned vacation which has not yet been taken will be paid in addition to the severance payments, or as prescribed by state law.

3. *Health Insurance*. If you are currently covered by the Company's medical and dental insurance as well as the Company's Employee Assistance Program (EAP), you will continue to be covered through the period of severance, or until you obtain other employment and are eligible for other coverage, whichever is earlier. This continuation period will run concurrently with the COBRA extension periods. During the period of severance you will be required to make only the same payments as active employees covered under the program under which coverage is offered. Once the period of severance has expired you will be required to pay the normal COBRA premiums in effect at that time for the remainder of the COBRA period

Conversion opportunities which exist under the Company's insurance policy and those that are guaranteed you by the COBRA law may be exercised as indicated in the plan document and the COBRA notices which will be sent to you within fourteen (14) days after your Separation Date or within fourteen (14) days after you sign and return this letter, whichever is later.

4. *Other Insurance*. All insurance's, other than medical and dental, will cease to be effective on your last date of work, if you are currently covered by these programs. You have the right to convert your life insurance to an individual policy and should contact your local human resources professional, if interested

5. *Retirement Savings/Pension Plan*. Contributions under the Unisource Worldwide, Inc. Retirement Savings Plan ("RSP") may continue and benefit accrual under the Unisource Participating Companies Pension Plan ("Pension Plan") will continue throughout the period of salary continuation. If you are not already fully vested in your account under the RSP and your accrued benefit under the Pension Plan, you will become fully vested in both plans as of your "Final Payroll Severance Date." At the end of the salary continuation period you will be entitled to all normal choices outlined in the plan documents in regard to your account under the RSP, if any. Any contributions you may have previously authorized under the RSP will cease effective with your final severance paycheck. When eligible to do so, you may request distribution of your account under the RSP by contacting Benefits Express at 1-888-953-8647.

6. *Other Fringe Benefits*. You will be receive accelerated vesting under the following programs, if applicable: Unisource Partner's Stock Purchase Plan, Unisource Stock Option Plan, Unisource Deferred Compensation Plan(s).

7. *Company Property.* No later than your last day of work, you will be required to return any keys, credit cards, and any other property of the Company which have been issued to you prior to this time.

8. *Outplacement.* Professional outplacement counseling will be provided to you up to an amount determined by the Company, provided that you do not have any other employment commitments. You must advise us within thirty (30) days of your notification of termination if you want to utilize this service.

9. *Employment Letter*. The Company's Human Resources department will provide a letter describing your employment history and responsibilities at the Company, if requested.

10. *Unemployment Compensation*. The Company will support your application for unemployment compensation should you apply, verifying the reason for your displacement as a reduction in workforce.

11. *Cooperation*. It may be necessary from time to time during your salary continuation period and thereafter to call upon you for assistance in connection with your prior

responsibilities. We expect that you will be willing to do so provided, of course, that the same does not unreasonably interfere with your other employment obligations.

12. *Contingency Provisions*. The benefits provided to you in this letter are contingent upon your remaining a full-time employee of the Company until the date established by the Company, performing your job satisfactorily. You will not be eligible for these benefits due to a termination for cause or for performance related issues. In the event you resign from the Company prior to such date, without senior management's written approval, you will not be entitled to the benefits outlined herein.

13. *Confidentiality*. You agree that you will keep the terms, amount, and fact of this Agreement strictly and completely confidential, and that you will not communicate or otherwise disclose to any employee of the Company (past, present, or future) or to any member of the general public (other than your attorney), the terms, amount, or fact of this agreement, except as may be required by law or compulsory process.

You understand and acknowledge that the benefits contained in this letter exceed the benefits to which you would otherwise be entitled upon termination of your employment. In consideration for the additional benefits extended to you in this letter, and intending to be legally bound hereby:

1) you agree to release and hold harmless forever, the Company, its direct and indirect subsidiaries and affiliates, directors, officers and employees from any and all causes of action, known or unknown, arising out of or relating to your association and/or employment with or termination from the Company, which may have existed prior to or contemporaneously with the execution of this agreement, including but not limited to breach of contract, implied or otherwise, impairment of economic opportunity, breach of the covenant of good faith and fair dealing, intentional or negligent infliction of emotional distress, or other contract or tort claims, the Age Discrimination in Employment Act of 1967 as amended, and the Older Workers Benefit Protection Act of 1990, the Fair Labor Standards Act, the Civil Rights Act of 1964 and amendments thereto, the Civil Rights Act of 1991, the Americans with Disabilities Act, Executive Order 11246, the Rehabilitation Act of 1973, and the Vietnam Veterans' Readjustment Assistance Act or any other federal, state, or local law (statutory or common) relating to discrimination in employment;

The Company reciprocally agrees to release and hold you harmless from any and all causes of action, known or unknown, arising out of or relating to your employment with the Company, and shall indemnify you against any expenses, judgments, penalties, fines and amounts paid in settlement in connection with any third party claims arising out of your employment with the Company to the extent that you acted as an authorized representative of the Company in good faith and in the best interests of the Company.

2) you agree you will not disparage in any way the Company or any of its employees to any person, either orally or in writing;

3

3) you hereby waive any right or claim you may have to employment, re-employment, or reinstatement with Company; and

4) you agree you will not, directly or indirectly, for yourself or on behalf of any other person, use or disclose any Confidential Information belonging to the Company. Confidential Information includes, but is not limited to, memoranda, documents or records marked confidential or otherwise considered by the Company to be of a proprietary nature; names, addresses and buying practices of customers; customer service requirements, management practices; selling processes; pricing policies and lists, sources of supply; electronic information formats; business plans; financial policies and non-public financial information.

5) you agree to be bound by the terms and conditions of the attached Unisource Worldwide, Inc. Non-Disclosure and Non-Competition Agreement

By signing this agreement, you acknowledge that

    (1) you have had at least 45 days to consider the terms of this agreement and whether or not you should sign it;

    (2) the Company has advised you that you should consult with an attorney of your own choosing prior to signing this agreement;

    (3) you have consulted with, or have had sufficient opportunity to consult with, an attorney of your own choosing regarding the terms of this agreement;

    (4) you are waiving valuable legal rights and releasing the Company of all claims which may have existed prior to or contemporaneously with the execution of this agreement, except for those obligations expressly stated in this agreement;

    (5) you have not relied upon any representation or statement made by the Company or any employee or other person on behalf of the Company with regard to the subject matter, meaning, or effect of this agreement;

    (6) you have read this agreement and fully understand its terms; and

    (7) except as provided in this agreement, you have no right or claim, contractual or otherwise, to any or all of the benefits described in paragraphs 1, 2, 3, 5, 6, and 7 of this letter; and

    (8) this agreement does not reflect any admission by the Company of any liability or wrongdoing.

You further understand and agree that even if you do sign this agreement, you have the right to revoke it by delivering a notice of revocation in writing to me by mail, personal delivery, or facsimile (at 860-298-3275) within seven (7) calendar days of your signing the agreement. Because you have this right, this agreement will not become effective or enforceable until seven (7) calendar days after it is signed by you.

If the above is consistent with your understanding and if you are in agreement with all of its terms, please sign the enclosed copy of this letter and return it to me.

Sincerely,

Gary J. Setta
Field Vice President
Human Resources

/kmb

enclosure

Agreed to and accepted by the undersigned this _____ day of _____ 1998.

_____          _____
Employee Signature                                         Witness

Unisource Northeast
P.O. Box
Windsor, CT 06095

Tel 860.298.3200
Fax 860.298.3123

December 23, 1998

## *PERSONAL & CONFIDENTIAL*

Mr. William E. Callahan
234 East Opal Drive
Glastonbury, CT   06033

Dear Bill:

As you know, Unisource Worldwide, Inc. ("Company") is undergoing a reorganization of its business that requires certain difficult business decisions. As a result, many positions have been combined or eliminated, and your position has been adversely affected. This letter outlines and confirms our agreement of the terms and conditions that will apply relative to the separation of your relationship with the Company.

1. *Separation Date*. You acknowledge that your employment with the Company will cease as of December 31, 1998 ("Separation Date").

2. *Salary Continuation*. In consideration of your execution of this agreement the Company shall continue payments to you at the semi-monthly rate of $5,188.28 in accordance with the Company's normal payroll procedures through July 31, 1999 ("Final Payroll Severance Date").

3. *Earned Vacation*. Earned vacation which has not yet been taken will be paid in addition to the severance payments, or as prescribed by state law.

4. *Health Insurance*. If you are currently covered by the Company's medical and dental insurance as well as the Company's Employee Assistance Program (EAP), you will continue to be covered through July 31, 1999, provided that you do not receive medical coverage from another employer and provided that any co-payment obligations are maintained. This continuation period will run concurrently with the COBRA extension periods.

5. *Other Insurance*. All insurances, other than medical and dental, will cease to be effective on December 31, 1998, if you are currently covered by these programs. You have the right to convert your life insurance to an individual policy and should contact your local human resources professional, if interested.

{Streamlining/Cat4/O40}

6. _COBRA_. Conversion opportunities which exist under the Company's insurance policy and those that are guaranteed you by the COBRA law may be exercised as indicated in the plan document and the COBRA notices which will be sent to you within fourteen (14) days after your Separation Date or within fourteen (14) days after you sign and return this letter, whichever is later.

7. _Retirement Savings/Pension Plan_. Contributions under the Unisource Worldwide, Inc. Retirement Savings Plan ("RSP") may continue and benefit accrual under the Unisource Participating Companies Pension Plan ("Pension Plan") will continue throughout the period of salary continuation. If you are not already fully vested in your account under the RSP and your accrued benefit under the Pension Plan, you will become fully vested in both plans as of your "Final Payroll Severance Date." At the end of the salary continuation period you will be entitled to all normal choices outlined in the plan documents in regard to your account under the RSP, if any. Any contributions you may have previously authorized under the RSP will cease effective with your final paycheck as provided in paragraph 2. When eligible to do so, you may request distribution of your account under the RSP by contacting Benefits Express at 1-888-953-8647.

8. _Deferred Compensation._ - Benefits under the 1991 IKON Office Solutions, Inc. (formerly Alco Standard Corporation) Deferred Compensation Plan will vest 100% and be distributed to you in the future, in accordance with the provisions of the Plan. You must continue to make the annual premium payments under the 1991 IKON Office Solutions, Inc. Deferred Compensation Plan to your age 65 to perpetuate the lump sum death benefit and age 65 policy transfer thereunder. These will be invoiced to you annually by IKON Office Solutions, Inc.

9. _Other Fringe Benefits._ - You will receive accelerated vesting under the following programs: Unisource Partners' Stock Purchase Plan and Unisource Stock Option Plan.

10. _Leased Vehicle._ - You will be provided the opportunity to purchase the company-leased vehicle you currently have the use of for the sum of $5,000. If you desire to do so, please confirm it with me.

11. _Company Property_. If you have not already done so, please return any remaining keys, credit cards, and any other property of the Company which have been issued to you prior to this time.

12. _Outplacement._ Professional outplacement counseling will be provided to you up to an amount determined by the Company, provided that you do not have any other employment commitments. You must advise us within thirty (30) days of your notification of termination if you want to utilize this service.

13. _Employment Letter_. The Company's Human Resources department will provide a letter describing your employment history and responsibilities at the Company, if requested.

{Streamlining/Cat4/O40}

14. _Unemployment Compensation_. The Company will support your application for unemployment compensation should you apply, verifying the reason for your displacement as a reduction in workforce.

15. _Employee Assistance_. EAP programs, as referenced in paragraph 4, will be provided in conjunction with local unemployment office assistance with resume preparation and other available job search assistance.

16. _Cooperation_. It may be necessary from time to time during your salary continuation period and thereafter to call upon you for assistance in connection with your prior responsibilities. We expect that you will be willing to do so provided, of course, that the same does not unreasonably interfere with your other employment obligations.

17. _Confidentiality_. You agree that you will keep the terms, amount, and fact of this Agreement strictly and completely confidential, and that you will not communicate or otherwise disclose to any employee of the Company (past, present, or future) or to any member of the general public (other than your attorney), the terms, amount, or fact of this agreement, except as may be required by law or compulsory process.

You understand and acknowledge that the benefits contained in this letter exceed the benefits to which you would otherwise be entitled upon termination of your employment. In consideration for the additional benefits extended to you in this letter, and intending to be legally bound hereby:

1) you agree to release and hold harmless forever, the Company, its direct and indirect subsidiaries and affiliates, directors, officers and employees from any and all causes of action, known or unknown, arising out of or relating to your association and/or employment with or termination from the Company, which may have existed prior to or contemporaneously with the execution of this agreement, including but not limited to breach of contract, implied or otherwise, impairment of economic opportunity, breach of the covenant of good faith and fair dealing, intentional or negligent infliction of emotional distress, or other contract or tort claims, including the Age Discrimination in Employment Act of 1967 as amended, and the Older Workers Benefit Protection Act of 1990, the Fair Labor Standards Act, the Civil Rights Act of 1964 and amendments thereto, the Civil Rights Act of 1991, the Americans with Disabilities Act, Executive Order 11246, the Rehabilitation Act of 1973, and the Vietnam Veterans' Readjustment Assistance Act or any other federal, state, or local law (statutory or common) relating to discrimination in employment;

The Company reciprocally agrees to release and hold you harmless from any and all causes of action, known or unknown, arising out of or relating to your employment with the Company, and shall indemnify you against any expenses, judgments, penalties, fines and amounts paid in settlement in connection with any third party claims arising out of your employment with the Company to the extent that you acted as an authorized representative of the Company in good faith and in the best interests of the Company.

2) you agree you will not disparage in any way the Company or any of its employees to any person, either orally or in writing;

3) you hereby waive any right or claim you may have to employment, re-employment, or reinstatement with Company; and

4) you agree you will not induce or encourage any employee of the Company to leave the employment of the Company for a period beginning from the date hereof and continuing through your Final Payroll Severance Date; and

5) you agree you will not, directly or indirectly, for yourself or on behalf of any other person, use or disclose any Confidential Information belonging to the Company. Confidential Information includes, but is not limited to, memoranda, documents or records marked confidential or otherwise considered by the Company to be of a proprietary nature; names, addresses and buying practices of customers; customer service requirements, management practices; selling processes; pricing policies and lists, sources of supply; electronic information formats; business plans; financial policies and non-public financial information.

By signing this agreement, you acknowledge that

(1) you have had at least 45 days to consider the terms of this agreement and whether or not you should sign it;

(2) the Company has advised you that you should consult with an attorney of your own choosing prior to signing this agreement;

(3) you have consulted with, or have had sufficient opportunity to consult with, an attorney of your own choosing regarding the terms of this agreement;

(4) you are waiving valuable legal rights and releasing the Company of all claims which may have existed prior to or contemporaneously with the execution of this agreement, except for those obligations expressly stated in this agreement;

(5) you have not relied upon any representation or statement made by the Company or any employee or other person on behalf of the Company with regard to the subject matter, meaning, or effect of this agreement;

(6) you have read this agreement and fully understand its terms; and

(7) except as provided in this agreement, you have no right or claim, contractual or otherwise, to any or all of the benefits described in paragraphs 2, 3, 4, 5 and 7 of this letter; and

(8) this agreement does not reflect any admission by the Company of any liability or wrongdoing.

{Streamlining/Cat4/O40}

You further understand and agree that even if you do sign this agreement, you have the right to revoke it by delivering a notice of revocation in writing to me by mail, personal delivery, or facsimile (860-298-3275) within seven (7) calendar days of your signing the agreement. Because you have this right, this agreement will not become effective or enforceable until seven (7) calendar days after it is signed by you.

If the above is consistent with your understanding, and if you are in agreement with all of its terms, please sign this letter and return it to me. A fully-executed copy will be returned to you for your files.

Sincerely,

Gary J. Setta
Regional Vice President
Human Resources

/kmb

Agreed to and accepted by the undersigned the 24th day of December, 1998.

William E. Callahan
Employee Signature

Gary J. Setta
Regional Vice President

Kristina M. Beakey
Witness

12/24/98
Date

**ANNUAL STATEMENT**
January 1, 2003
IKON OFFICE SOLUTIONS INC
IKON OFFICE SOLUTIONS INC

**❄ MetLife®**

FOR PERIOD FROM JANUARY 1, 2002 TO DECEMBER 31, 2002

### Information About You

Insured:

WILLIAM E CALLAHAN
234 EAST OPAL DRIVE
GLASTONBURY CT 06033

### Policyowner

Owner:

IKON OFFICE SOLUTIONS INC
70 VALLEY STREAM PARKWAY
MALVERN PA 19355

### Your Policy

Plan of Insurance: . . . . . . . . . .  FLEXIBLE-PREMIUM ADJUSTABLE LIFE

Issue Age and Sex: . . . . . . . . .  42 M

Policy Date: . . . . . . . . . . . . . . .  January 1, 1991

Policy Number: . . . . . . . . . . . .  917390054U

Specified Face Amount: . . . . . . . $  600,000

Death Benefit (Option B): . . . . . . $  846,748 **

** Your Death Benefit is equal to the Specified Face Amount plus the accumulated value. Death proceeds
payable will be reduced by any outstanding policy loan and loan interest.
The Death Benefit Amount shown is the benefit amount as of the end of the current report period.

### Your Cash Value

STATUS OF ACCUMULATION FUND AND CASH VALUE

Accumulation Fund - January 1, 2002  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     $   46,117.55

| | | |
|---|---|---|
| Gross Premiums Paid During Year | $ | .00 |
| Less 4.50% Expense Loading | $ | .00 |
| Net Premiums Added | $ | .00 |
| Plus Interest Credited to your Fund | $ | 2,869.82 |
| Less Insurance Charges Deducted from your Fund | $ | 2,238.48 |
| Less Withdrawals from your Fund | $ | .00 |

Accumulation Fund - December 31, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     $   46,748.89

Less Policy Loan and Loan Interest - December 31, 2002 . . . . . . . . . . . . . . . . . . . . . . .     $       .00

Cash Value (amount available upon surrender) - December 31, 2002 . . . . . . . . . . . . . . . . . .     $   46,748.89

*Accumulation Fund balances always include any outstanding policy loan.*

**ANNUAL STATEMENT**
January 1, 2003
IKON OFFICE SOLUTIONS INC
IKON OFFICE SOLUTIONS INC

 **MetLife**

Insured: WILLIAM E CALLAHAN
Policy Number: 917390054U

### Transaction Activity Summary

FOR PERIOD FROM JANUARY 1, 2002 TO DECEMBER 31, 2002

| Date | Premium Received | Interest Credited | Insurance Charge Basic/ Rider | Expense | Withdrawal | Policy Loan | Accumulation Fund Ending Balance |
|---|---|---|---|---|---|---|---|
| 12/31/2001 | | | | | | | 46,117.55 |
| 01/01/2002 | 0.00 | 8.35 | 186.54 / 0.00 | 0.00 | 0.00 | 0.00 | 45,939.36 |
| 02/01/2002 | 0.00 | 242.64 | 186.54 / 0.00 | 0.00 | 0.00 | 0.00 | 45,995.46 |
| 03/01/2002 | 0.00 | 219.00 | 186.54 / 0,00 | 0.00 | 0.00 | 0.00 | 46,027.92 |
| 04/01/2002 | 0.00 | 242.63 | 186.54 / 0.00 | 0.00 | 0.00 | 0.00 | 46,084.01 |
| 05/01/2002 | 0.00 | 235.01 | 186.54 / 0.00 | 0.00 | 0.00 | 0.00 | 46,132.48 |
| 06/01/2002 | 0.00 | 243.06 | 186.54 / 0.00 | 0.00 | 0.00 | 0.00 | 46,189.00 |
| 07/01/2002 | 0.00 | 235.45 | 186.54 / 0.00 | 0.00 | 0.00 | 0.00 | 46,237.91 |
| 08/01/2002 | 0.00 | 243.67 | 186.54 / 0.00 | 0.00 | 0.00 | 0.00 | 46,295.04 |
| 09/01/2002 | 0.00 | 244.03 | 186.54 / 0.00 | 0.00 | 0.00 | 0.00 | 46,352.53 |
| 10/01/2002 | 0.00 | 238.50 | 186.54 / 0.00 | 0.00 | 0.00 | 0.00 | 46,402.49 |
| 11/01/2002 | 0.00 | 244.74 | 186.54 / 0.00 | 0.00 | 0.00 | 0.00 | 46,460.69 |
| 12/01/2002 | 0.00 | 237.20 | 186.54 / 0.00 | 0.00 | 0.00 | 0.00 | 46,511.35 |
| 12/31/2002 | 0.00 | 237.54 | 0.00 | 0.00 | 0.00 | 0.00 | 46,748.89 |
| Totals: | 0.00 | 2,869.82 | 2,238.48 | 0.00 | 0.00 | 0.00 | 46,748.89 |

### Interest Rate

The interest rate in effect on January 1, 2003 for new premium deposits is 5.50%. The rate will vary from time to time. The guaranteed rate is 4.00%.

### Loans

Outstanding loans and interest will be deducted from benefits due upon termination of the policy.
The policy loan interest rate is 8.00%.
The credited interest rate on loaned amounts is 7.00%.

### Telephone

For questions or service:

Please call 1-732-602-6400.

### Address

Or write to us at:

Metropolitan Life Insurance Company
485-B Route One South, Suite 420
Iselin, NJ 08830