**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| WILLIAM E. CALLAHAN, | ) Civil Action No. 3:01 CV 1205 (CFD) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| UNISOURCE WORLDWIDE, INC., | ) |
| GEORGIA-PACIFIC CORPORATION, | ) |
| ALCO STANDARD CORPORATION and | ) |
| IKON OFFICE SOLUTIONS, INC., | ) |
| | ) |
| Defendants | ) |
| | ) |
| and | ) |
| | ) |
| EUGENE PANECCASIO, | ) Civil Action No. 3:01 CV 2065 (CFD) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| UNISOURCE WORLDWIDE, INC., | ) |
| GEORGIA-PACIFIC CORPORATION, | ) |
| ALCO STANDARD CORPORATION and | ) |
| IKON OFFICE SOLUTIONS, INC., | ) |
| | ) |
| Defendants | ) JUNE 14, 2004 |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO COMPEL**

During his deposition in this case, in order to bolster his claims and defenses against

defendants Georgia-Pacific Corporation ("Georgia-Pacific") and Unisource Worldwide, Inc.

("Unisource) (collectively "Unisource Defendants"), plaintiff William Callahan ("Callahan") deliberately, repeatedly, and without objection waived the attorney-client privilege that shielded communications with his former attorneys from the law firm of McEleney & McGrail.  Following the deposition, implicitly acknowledging the effect of Callahan's deposition testimony, his current counsel provided Unisource Defendants with what purported to be the nearly complete legal file from McEleney & McGrail (the "McGrail File").

Callahan has not, however, produced the entire McGrail File.  Instead, he has omitted several documents from that File, asserting attorney-client privilege, and has refused to produce these documents despite Unisource Defendants' repeated requests.  As set forth below, Callahan has no remaining privilege to assert with respect to the files of his former lawyers, and the entire contents of the McGrail File are clearly relevant to assess the credibility of Callahan's claims and defenses in this case.  Accordingly, this Court should compel Callahan to produce any remaining documents from the McGrail file that have not yet been supplied to Unisource Defendants.

### FACTUAL BACKGROUND

Callahan's complaint against Unisource Defendants alleges, *inter alia*, that they violated age discrimination and  ERISA laws in connection with the December 1998 termination of his employment with Unisource and the subsequent termination of a deferred compensation plan in which he had participated.  Prior to his termination, however, Callahan executed a separation agreement and release (the "Release Agreement") in which he specifically relinquished such

claims in exchange for substantial consideration. Callahan's federal court complaint asserted that he had entered into the Release Agreement under duress, and Unisource Defendants, rejecting that contention, raised the existence of the Release Agreement as a defense to Callahan's claims. Thus, the enforceability of the Release Agreement has been and remains central to this litigation.

In his August 25, 2003 deposition, attempting to support his effort to vitiate the Release Agreement, Callahan testified at length and without objection concerning conversations he purportedly had with his former, now-deceased attorney, Albert McGrail (McGrail) and with McGrail's partner, Stephen McEleney ("McEleney"), who briefly "pinch hit" as Callahan's lawyer after McGrail's death. Specifically, Callahan testified that McGrail had advised him to sign the Release Agreement while at that time intending not to honor it; to accept salary continuation payments and other consideration provided pursuant to the Release Agreement; and subsequently to sue for alleged age discrimination despite having explicitly released this claim in the Release Agreement.

Q:   Did you recognize you were waiving valuable legal rights?

A:   No, because I was told by Attorney McGrail I could sign it and still sue them.

Q:   What did Mr. McGrail say?

A:   What did he say?

Q:   Yes. You could sign this and still sue the company?

A:   Yes.

Q: Did he say anything beyond that?

A: He felt that the company was not negotiating with him in good faith, and that they had lied to him, and that he basically said, you know: Sign this, and you know, we'll consider it that you signed it under duress.

Q: He told you this before you signed it?

A: Yes.

Q: And what did he say with regard to the company not negotiating in good faith?

A: Lack of return phone calls. He made a distinction between tough negotiations and just refusing to negotiate.

Q: Anything more specific about what Attorney McGrail said about the company not acting in good faith?

A: Well, he was concerned that I had been asking during the summertime if I would have continued employment in my position there, and his comment was that he thought they had been fairly reckless.

Q: . . . Anything else that he attributed to the company that indicated they were not acting in good faith?

A: Yes. When we asked if they could add some years to the years of service, the response was, "No, we don't do that"; but it was – and the link to the good faith is that it was in the annual

report that they had done that for some individuals, and the point was even though they were high ranking individuals, under the law he felt that they could add years of service.

Q:    Anything else that indicated, anything else Attorney McGrail said about the company not acting in good faith?

A:    No.

Q:    And he used the words, the company was not acting in good faith against you, and therefore that you were signing this agreement under duress?

A:    Yes.

Q:    He linked the words "duress" to "not acting in good faith?"

A:    Yes, he did. . . .

. . . Q:  What did he tell you?

A:    He told me that he could overturn it, and he had done it before.

(Callahan Dep. at pp. 130-34.)[1]  Callahan also testified that following McGrail's death he had discussed with Stephen McEleney, McGrail's former partner, "Attorney McGrail's thought process for overturning the severance letter."  (Callahan Dep. at pp. 177-79.)  Callahan testified that McEleney took notes of this conversation.  (Callahan Dep. at p. 179.)

---

[1] Copies of the relevant portions of the Callahan Dep. are attached hereto as Exhibit A.

During the deposition, counsel for Unisource Defendants inquired about the existence of any notes or legal files that might support Callahan's contention that he had had such discussions, or received such advice, from McGrail. Callahan at first insisted that no such documents existed:

Q: Do you know what's happened to [McGrail's] file?

A: I don't think there's much of a file, other than some of the billing records.

Q: And you have the billing records, right?

A: Yes.

Q: Do you know if you have Attorney McGrail's notes?

A: I have no notes.

Q: Do you know what happened to any of his notes, on the presumption that he did take some notes?

A: No, I don't. . . . .

Q: You had testified earler that you had at one point picked up Attorney McGrail's file in order to provide Attorney Bowman with the employment handbook, employee handbook. Did you take the entire file when you picked up that file?

A: I took everything that they had. . . .

Q: Did you know whether that was the entire file or not?

A: I believe it was . . . .

Q: What did you do with the file, leave it with the secretary, Mr. McGrail's secretary?

A:     No. I went over to Attorney McGrail's office and asked for the file, and all that was in it was the employee handbook, and a handwritten note from me to Attorney McGrail. That was it.

Q:     You don't remember seeing anything else?

A:     No. There was nothing else.

(Callahan Dep. at 146-47, 174-77.)

After the deposition, however, Callahan changed his tune about the existence of a legal file from his former attorneys. Indeed, he produced a substantial volume of documents, purporting to be nearly the entire contents of the McGrail File. The portion of the McGrail File produced to Unisource Defendants included what appear to be McGrail's handwritten notes concerning his discussions with Callahan, as well as notes of McGrail's negotiations on the terms of the Release Agreement with Unisource Defendants' representatives. Callahan also produced several pieces of correspondence between himself and both McGrail and McEleney, both before and after McGrail's death. The contents of the McGrail File produced to Unisource Defendants thus included a number of documents that, prior to Callahan's blanket waiver at deposition, ostensibly would have been protected by attorney-client and/or work-product privilege.

Callahan did not, however, produce all of the documents in the McGrail File. According to the accompanying cover letter, the document production omitted the following documents: "undated letter from Callahan to McEleney regarding strategy substantially after Mac McGrail's death; letter dated July 2, 1999 from Callahan to Mac advising of a call from CHRO asking about

settling; handwritten notes of attorney McEleney, one page; one page note regarding Callahan after Mac's death; note dated 3/28/00 from Callahan to Steve [McEleney] enclosing a response." (See Oct. 29, 2003 Letter from Andrew Bowman to Felix Springer, a copy of which is attached hereto as Exhibit B.)  In a Response to a related Subpoena Duces Tecum issued to the law firm of McEleney & McGrail, Callahan clarified that he was withholding these documents "on the ground of attorney-client privilege." (See April 28, 2004 Reponse to Subpoena Duces Tecum, a copy of which is attached hereto as Exhibit C.)

Unisource Defendants have attempted on several occasions to confer with Callahan concerning the refusal to produce these documents, inexplicable in light of Callahan's blanket waiver of privilege at deposition, his subsequent production of both attorney-client and work-product privileged materials, and the fact that the withheld materials clearly involve the same issues as Callahan's deposition testimony. (See Affidavit of Felix J. Springer, attached hereto as Exhibit D.)  Callahan has not responded to Unisource Defendants' attempts to resolve this dispute. (See Ex. D hereto.)

## ANALYSIS

Following deposition testimony in which he repeatedly and without objection waived his attorney-client privilege, expounding at length at conversations he purportedly had with his former attorneys in order to bolster his case that the Release Agreement was unenforceable, Callahan is now attempting to withhold from production a number of documents that might allow Unisource

Defendants to test the credibility of these assertions. His only asserted rationale for the failure to produce these documents is that they are "within the attorney-client privilege," notwithstanding the fact that, as Callahan impliedly has conceded through his production of the remainder of the McGrail File, his deposition testimony effectively waived that privilege.

Callahan's effort to hold back a portion of the McGrail File based on an assertion of privilege, while producing other portions and after testifying at length as to conversations with his former lawyers, is completely untenable as a matter of law and unreasonable as a matter of simple fairness. It is black-letter law that "[t]he attorney-client privilege is waived if the holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the matter or communication over which the privilege is claimed." Fullerton v. Prudential Ins. Co., 194 F.R.D. 100, 102 (S.D.N.Y. 2000) (quoting United States v. International B'hood of Teamsters, 961 F. Supp. 665, 673 (S.D.N.Y. 1997). Where the privilege holder has put the communications in issue by virtue of his claims or defenses, fairness concerns dictate that such testimony waives the privilege as to "all other otherwise privileged communications about the same subject matter." See EEOC v. Johnson & Higgins, Inc., 1998 U.S. Dist. LEXIS 17612, at *27-28 (S.D.N.Y. Nov. 6, 1998).[2] A party is not permitted to use the privilege as both a "sword" and a "shield"; when he attempts to make testimonial use of material otherwise protected by privilege, his opponent is entitled to all matter "related to the testimony and necessary and proper to the evaluation of it."

---

[2] Copies of unreported cases are attached hereto as Exhibit E.

Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc., 1997 U.S. Dist. LEXIS 20692, at *3 (S.D.N.Y. Dec. 31, 1997) (citation omitted). Indeed, in the context of disclosures made during litigation, the scope of waiver is even broader. It may be found "even if the privilege holder does not attempt to make use of a privileged communication; he may waive the privilege if he makes actual assertions the truth of which can only be assessed by examination of the privileged communication." Id. at *7 (citation omitted).

In this case, Callahan's deposition testimony clearly sought to make affirmative use of his previously privileged communications with McEleney and McGrail. He brandished these purported discussions as a sword, trying to establish the *bona fides* of his defense against enforcement of the Release Agreement. Indeed, Callahan made numerous, specific claims about advice purportedly rendered to him by McGrail, as well as about his conveyance of that advice to McEleney.

Under the applicable case law, Callahan's affirmative disclosures have a bright-line result: they preclude him from asserting attorney-client privilege as to the remainder of his communications with McGrail and McEleney. It would be grossly unfair to allow Callahan to waive privilege when it redounds to his benefit, while asserting privilege to prevent Unisource Defendants from testing the credibility of his testimony. As such, Unisource Defendants are entitled to view all of the McGrail File, not just those portions that Callahan decides selectively to disclose, in order to evaluate Callahan's testimony.

## CONCLUSION

For the reasons set forth above, Defendants Unisource Worldwide, Inc. and Georgia-Pacific Corporation respectfully request that this Court enter an order (1) compelling Callahan to produce any and all withheld documents in the McGrail File, (2) awarding Unisource Defendants their reasonable attorneys' fees and costs incurred in connection with bringing this motion; and (3) granting such other and further relief as the Court deems just and proper.

                                        Respectfully submitted,

                                        THE DEFENDANTS
                                        UNISOURCE WORLDWIDE, INC.
                                        GEORGIA-PACIFIC CORPORATION

                                        _____
                                        Felix J. Springer (ct 05700)
                                        Jennifer L. Sachs (ct 20684)
                                        Day, Berry & Howard, LLP
                                        CityPlace I
                                        Hartford, CT  06103-3499
                                        Tel:  860/275-0100
                                        Fax: 860/275-0343
                                        E-mail: fjspringer@dbh.com
                                        jlsachs@dbh.com

>Rayne Rasty (ct 24918)
>Georgia-Pacific Corporation
>133 Peachtree St. NE
>Atlanta, GA  30303
>Tel:  404/652-4972
>Fax:  404/584-1461
>E-mail:  rmrasty@gapac.com

**CERTIFICATE OF SERVICE**

This is to certify that on this date, I served a copy of the foregoing via first-class mail, postage prepaid to:

>Andrew B. Bowman, Esq.
>1804 Post Road East
>Westport, CT 06880
>
>Kay Kyungsun Yu
>Joseph Costello
>S. Elizabeth Hamilton
>Morgan, Lewis & Bockius
>1701 Market Place
>Philadelphia, PA  19103
>
>Robert L. Wyld
>Patrick Fahey
>Shipman & Goodwin
>1 American Row
>Hartford, CT  06103
>
>_____
>Jennifer L. Sachs