# EXHIBIT A

```
 1   IN THE UNITED STATES DISTRICT COURT
 2   FOR THE DISTRICT OF CONNECTICUT
 3   - - - - - - - - - - - - - - - x
 4   WILLIAM E. CALLAHAN,            :
 5              Plaintiff,           : Civil Action No.
 6        vs.                        :    3:01CV1205
 7   UNISOURCE WORLDWIDE, INC.,      :      (CFD)
 8   GEORGIA-PACIFIC CORPORATION     :
 9   and IKON OFFICE SOLUTIONS,      :
10   INC.,                           :
11              Defendants.          :
12   - - - - - - - - - - - - - - - x
13                  Deposition of WILLIAM E. CALLAHAN,
14   taken pursuant to the Federal Rules of Civil
15   Procedure at the law offices of Day, Berry &
16   Howard, CityPlace, Hartford, Connecticut,
17   before Elizabeth A. Zawacki, LSR #00087, a
18   Registered Merit Reporter and Notary Public in
19   and for the State of Connecticut, on Monday,
20   August 25, 2003, at 9:37 a.m.
21
22
23
24
25
```

Page 130

1  rights?
2    A.  No, because I was told by Attorney McGrail
3  I could sign it and still sue them.
4    Q.  What did Mr. McGrail say?
5    A.  What did he say?
6    Q.  Yes.  You could sign this and still sue
7  the company?
8    A.  Yes.
9    Q.  Did he say anything beyond that?
10   A.  He felt that the company was not
11 negotiating with him in good faith, and that they
12 had lied to him, and that he basically said, you
13 know: Sign this, and, you know, we'll consider it
14 that you signed it under duress.
15   Q.  He told you this before you signed it?
16   A.  Yes.
17   Q.  And what did he say with regard to the
18 company not negotiating in good faith?
19   A.  Lack of return phone calls.  He made a
20 distinction between tough negotiations and just
21 refusing to negotiate.
22   Q.  Anything more specific about what Attorney
23 McGrail said about the company not acting in good
24 faith?
25   A.  Well, he was concerned that I had been

Page 131

1  asking during the summertime if I would have
2  continued employment in my position there, and his
3  comment was that he thought they had been fairly
4  reckless.
5    Q.  Anything else that he said that indicated,
6  that stated that the company was not acting in good
7  faith?  And let me rephrase that.
8        Anything else that he attributed to the
9  company that indicated they were not acting in good
10 faith?
11   A.  Yes.  When we asked if they could add some
12 years to the years of service, the response was,
13 "No, we don't do that"; but it was -- and the link
14 to the good faith is that it was in the annual
15 report that they had done that for some individuals,
16 and the point was even though they were high ranking
17 individuals, under the law he felt that they could
18 add years of service.
19   Q.  Anything else that indicated, anything
20 else Attorney McGrail said about the company not
21 acting in good faith?
22   A.  No.
23   Q.  And he used the words, the company was not
24 acting in good faith against you, and therefore that
25 you were signing this agreement under duress?

Page 132

1    A.  Yes.
2    Q.  He linked the words "duress" to "not
3  acting in good faith"?
4    A.  Yes, he did.
5    Q.  When was the occasion for this
6  conversation?
7    A.  It was a phone conversation I had with
8  him.  I don't know the exact date, I would have to
9  look at my billing records, but it was several days
10 before I signed it.
11   Q.  What was -- how did the conversation start
12 where he indicated that the company was not acting
13 in good faith?
14   A.  How did it start?
15   Q.  Yes.  Just tell me how the subject came
16 up.
17   A.  He was upset that they had asked me to
18 stay on indefinitely, with no position, and that
19 they wouldn't take or return his calls, but yet they
20 would approach me and tell me that it was time to
21 leave.
22   Q.  When did Mr. -- was it Mr. Keneally who
23 told you it was time to leave?
24   A.  Mr. Setta.
25   Q.  And when did he say that?  Do you remember

Page 133

1  when?
2    A.  It was early December.
3    Q.  December; and by the way, did this -- how
4  many conversations had Attorney McGrail had with
5  Mr. Setta at the time that he was telling you that
6  the company was not acting in good faith?  Two or
7  three?
8    A.  I don't know.
9    Q.  You don't know how many?
10   A.  I don't know.
11   Q.  You still have the billing records?
12   A.  Yes.
13   Q.  Anything else that you remember about that
14 conversation with Mr. McGrail where he alleged the
15 company was not acting in good faith?
16   A.  No.
17   Q.  And that gave you the chance to vitiate
18 this agreement?
19   A.  No.
20   Q.  So he told you two or three days but you
21 signed it that you could sign it and you would be
22 able to get out of it; is that correct?
23       MR. BOWMAN:  Object to the form.  He
24 testified to what he said.
25       MR. SPRINGER:  I'm just not clear

Page 134

1  about what it was.
2  Q. What did he tell you?
3  A. He told me that he could overturn it, and
4  he had done it before.
5  Q. And then he proceeded to tell you the
6  bases for his being able to overturn it?
7  A. Yes.
8  Q. And have you relayed all the bases he told
9  you for his ability to overturn it?
10 A. Have I relayed them to who?
11 Q. Today. Have you testified to all the
12 bases that he told you that he could overturn this
13 agreement?
14 A. Let me review, then. He was concerned
15 that I had made the financial investment based on
16 promises. He was concerned that they were acting
17 reckless with me. He was concerned that the
18 comment, the answer to extended years of service for
19 the pension was just dismissed, that, "We don't do
20 that type of thing."
21 Q. Anything else?
22 A. That would be it.
23 Q. Those are the only reasons he told you he
24 felt he could overturn it; is that correct?
25 A. Yes.

Page 135

1      MR. BOWMAN: In addition to whatever
2  else he's testified to.
3  Q. Were there any other reasons he told you
4  that he could overturn it?
5  A. He thought -- well, he thought that I was
6  signing it under duress, and that he could overturn
7  it.
8  Q. What was the duress that -- did
9  Mr. McGrail discuss with you the duress?
10 A. The broken promise of continued
11 employment.
12 Q. And that was Mr. Cramp and Mr. Keneally
13 indicating to you in the summer of 1998 that things
14 looked okay?
15 A. It was more than that. They told me I
16 would be in my job.
17 Q. Okay. Did they tell you how long you
18 would be in your job?
19 A. No.
20 Q. Okay. Anything else that he thought was,
21 that he told you he thought was duress?
22 A. The fact that I was showing up for work
23 every day with nothing to do.
24 Q. Anything else that he told you he thought
25 was duress?

Page 136

1  A. The fact that my son was getting ill, we
2  attributed it to this uncertainty.
3  Q. Tell me what the situation was with your
4  son.
5  A. My son had, he had a problem with some
6  type of a breathing type of an issue that was under
7  control with an inhaler, and he was very concerned
8  that we were going to have to pull him out of
9  college, so much so that he had to take his exams in
10 the infirmary in front of a doctor.
11 Q. And when was this?
12 A. It was in December of '98.
13 Q. And had you told Attorney McGrail this?
14 A. Yes, I did.
15 Q. And you attributed your son's -- he did
16 take the exam?
17 A. Yes, he did.
18 Q. In the infirmary?
19 A. Yes.
20 Q. What was wrong with him?
21 A. He was having trouble breathing.
22 Q. Does he have asthma?
23 A. I don't believe he has asthma.
24 Q. But he had breathing difficulties before,
25 didn't he?

Page 137

1  A. He had some breathing difficulties, but it
2  was under control.
3  Q. With an inhaler?
4  A. They weren't sure if it was an anxiety or
5  what it was.
6  Q. "They" being the doctors, weren't sure
7  what it was?
8  A. Yes.
9  Q. Any other reason you felt you were --
10 withdraw that.
11     Any other reason Attorney McGrail
12 indicated to you that he thought this was being
13 signed under duress?
14 A. No.
15 Q. Those are all the reasons --
16 A. Yes.
17 Q. -- that you have for indicating it was
18 signed under duress.
19     MR. SPRINGER: Why don't we take a
20 short break and come back. Ten minutes or so.
21     THE VIDEOGRAPHER: We are off the
22 record.
23     (Recess: 2:05 to 2:19 p.m.)
24     THE VIDEOGRAPHER: We are back on the
25 record at 2:19.

Page 146

1   A.  Out of the house? The agreement was if we
2   could buy the land, we had to agree to build with
3   him.
4   Q.  But if you didn't buy the land, there was
5   no agreement with him; is that correct?
6   A.  I believe we had verbally agreed to build
7   with him.
8   Q.  When did you enter into a written
9   contract?
10  A.  I don't have that with me.
11  Q.  Did you give him any deposit?
12  A.  Yes, we did.
13  Q.  When was that given?
14  A.  I don't have that.
15  Q.  And when did you start building?
16  A.  We started building the following calendar
17  year.
18  Q.  When in 1999?
19  A.  I believe it was April or May.
20  Q.  Did you do anything to ensure that
21  Attorney McGrail's file would go to Attorney Bowman?
22  A.  (No response.)
23  Q.  In other words, did you transfer that file
24  to Attorney Bowman, Attorney McGrail's file?
25  A.  I believe I did.

Page 147

1   Q.  Do you remember signing a --
2   A.  No, I did not. I went and picked up the
3   file because I wanted to get a copy of the employee
4   handbook, and then I gave the employee handbook to
5   Attorney McGrail -- Attorney Bowman.
6   Q.  Did you transfer any other part of the
7   file to Attorney Bowman, to your knowledge?
8   A.  No.
9   Q.  To your knowledge, has Attorney Bowman
10  obtained that file from --
11  A.  No.
12  Q.  -- the office of Attorney McGrail?
13  A.  I don't believe so.
14  Q.  Do you know what's happened to that file?
15  A.  I don't think there's much of a file,
16  other than some of the billing records.
17  Q.  And you have the billing records, right?
18  A.  Yes.
19  Q.  Do you know if you have Attorney McGrail's
20  notes?
21  A.  I have no notes.
22  Q.  Do you know what happened to any of his
23  notes, on the presumption that he did take some
24  notes?
25  A.  No, I don't.

Page 148

1   I believe the bank that held my first
2   mortgage was First Federal.
3   Q.  In Glastonbury?
4   A.  In Glastonbury.
5   Q.  I'm going to go back to the agreement and
6   the page we were looking at, the severance
7   agreement.
8   A.  Okay.
9   Q.  I hope you're not writing on those
10  exhibits.
11  A.  I did write on the back of it, yeah.
12  Q.  We ought to give you a piece of paper to
13  write on, if you need to write.
14  A.  I don't need to write. I was just trying
15  to figure out what year he was in college, that's
16  all.
17      MR. BOWMAN: Just for the record,
18  it's Exhibit 14, September 22, 1998. It's the
19  signature page. You can substitute that at your
20  convenience.
21  Q.  Now I'm back to the agreement, and I'm
22  still on that same page that we were looking at a
23  little while ago.
24  A.  What number?
25  Q.  It is document 13, page 4.

Page 149

1   A.  All right.
2   Q.  You stated, I believe that, and I asked
3   you, had you read, "You are waiving valuable legal
4   rights and releasing the company of all claims," and
5   you said that that is when you had the conversation
6   with Attorney McGrail; is that correct?
7   A.  Yes.
8   Q.  But you did read this, did you?
9   A.  Yes.
10  Q.  And you read paragraph 5, that, "You have
11  not relied upon any representation or statement made
12  by the company or any employee or other person on
13  behalf of the company with regard to the subject
14  matter, meaning, or effect of this agreement"? Do
15  you see that?
16  A.  Do I see it? Yes.
17  Q.  And you read it?
18  A.  Yes.
19  Q.  And you understood what that meant, didn't
20  you?
21  A.  Other than the representation made by
22  Mr. Setta, yes.
23  Q.  Well, it doesn't say that -- it does not
24  carve out an exception for the representation made
25  by Mr. Setta, does it?

Page 174

1 before, correct.
2  Q. But you've listed them all? There's
3 nothing else?
4  A. Yes.
5  Q. There is nothing else; is that correct?
6  A. Correct.
7  Q. Were you at all involved in enforcing
8 noncompetes with regard to other employees?
9  A. No.
10  Q. Were you aware that the company required
11 noncompetes of other employees?
12  A. At what point in time?
13  Q. '97, '98.
14  A. I was aware the company wanted to start
15 getting noncompetes from the salespeople.
16  Q. And was that true for all employees,
17 older, younger, middle?
18  A. That was a request that was made of all
19 employees, yes.
20  Q. Was any particular group singled out for
21 noncompetes, to your mind?
22  A. Anyone who was going to be given accounts
23 during an account review or new hires.
24  Q. You had testified earlier that you had at
25 one point picked up Attorney McGrail's file in order

Page 175

1 to provide Attorney Bowman with the employment
2 handbook, employee handbook. Did you take the
3 entire file when you picked up that file?
4  A. I took everything that they had.
5  Q. Do you remember reviewing that file?
6  A. I just opened it up with the secretary and
7 said, "Is this it?"
8  Q. Do you remember what was in it?
9  A. The employee handbook, and I believe there
10 was a handwritten note from me to Mack or Attorney
11 McGrail about trying to define exactly what I wanted
12 from this 1991 deferred comp.
13  Q. Anything else?
14  A. No.
15  Q. Do you remember anything else that was in
16 the file?
17  A. No.
18  Q. Do you remember how thick it was?
19  A. It was not thick at all.
20  Q. Did you know whether that was the entire
21 file or not?
22  A. I believe it was, based on the fact that
23 Attorney McEleney asked me if I had anything when he
24 was writing this letter to try to -- Attorney
25 McGrail had passed away, and he was trying to

Page 176

1 understand his thought process.
2  Q. Did you supply information to Attorney
3 McEleney?
4  A. I had nothing to give.
5  Q. How did he -- was it based solely on your
6 oral conversation, as far as you know, with regard
7 to -- that he wrote Exhibit 16?
8  A. I believe so.
9  Q. Do you know if he reviewed any documents
10 by Attorney McGrail?
11  A. He said that there wasn't any.
12  Q. What happened with the rest of the file?
13 You said you reviewed it in the office; is that
14 correct?
15  A. When you asked for the documents, I
16 produced the employee handbook. It's a copy of a
17 handwritten note to Attorney McGrail.
18  Q. Anything else you remember?
19  A. No.
20  Q. What did you do with it? Just leave it
21 with the secretary?
22  A. What did I do with what, please?
23  Q. What did you do with the file, leave it
24 with the secretary, Mr. McGrail's secretary?
25  A. No. I went over to Attorney McGrail's

Page 177

1 office and asked for the file, and all that was in
2 it was the employee handbook and a handwritten note
3 from me to Attorney McGrail. That was it.
4  Q. You don't remember seeing anything else?
5  A. No. There was nothing else.
6  Q. Was Attorney McEleney present for any of
7 the discussions with Attorney McGrail about what
8 you've claimed is the unenforcibility of the
9 agreement?
10  A. He wasn't present at any of the meetings I
11 had with Attorney McGrail.
12  Q. You don't know what they discussed between
13 themselves; is that correct?
14  A. Correct.
15  Q. Did you ever discuss the unenforcibility
16 separately with Attorney McEleney?
17  A. No.
18  Q. Never did?
19  A. Not that I can recall.
20  Q. Did you ever discuss with him what
21 Attorney McGrail said about the unenforcibility?
22  A. I discussed with Attorney McEleney
23 Attorney McGrail's thought process for overturning
24 the severance letter.
25  Q. For what?

Page 178

1  A. For being able to overturn the severance
2  letter.
3  Q. So you did discuss that with Attorney
4  McEleney?
5  A. I discussed what I thought was Attorney
6  Mack McGrail's thought process for turning over the
7  severance, yes.
8  Q. What did you tell Attorney McEleney?
9  A. That according to Attorney McGrail, I had
10 signed this under duress.
11 Q. And did you explain what Attorney McGrail
12 explained to you, why he thought it was under
13 duress?
14 A. I kind of hit the bullets of what we
15 already discussed here this afternoon.
16 Q. Just tell me in bullet fashion, then, what
17 you said to -- well, tell me what you said to
18 Attorney McEleney about Attorney McGrail's thought
19 process?
20 A. The promises that were made that weren't
21 kept, the request to keep coming in with nothing to
22 do, the illness of my son, the purchase of the land.
23 I believe that's it.
24 Q. Anything else that you remember?
25 A. I don't remember anything else.

Page 179

1  Q. Do you remember when this conversation
2  occurred with Attorney McEleney?
3  A. It was right around the holiday. I
4  believe it was Labor Day weekend.
5  Q. Of 1999?
6  A. I believe so, yes. Whenever he wrote the
7  letter.
8  Q. The letter is dated September 3, 1999, so
9  it was before he wrote the letter that you had this
10 conversation?
11 A. Yes. I believe the letter had to be
12 delivered the Friday of Labor Day weekend.
13 Q. And did you have a discussion with --
14 withdraw that.
15     Did Attorney McEleney respond in any way
16 when you told him what Attorney McGrail's thought
17 process was?
18 A. No. He just made notes.
19 Q. Did he respond at all verbally that you
20 remember?
21 A. No.
22 Q. Did you ever tell anyone at the company
23 that you believed you were signing under duress or
24 being coerced to sign?
25 A. No.

Page 180

1  Q. Or being coerced to sign?
2  A. No.
3  Q. Did you ever tell anyone at the company
4  you didn't believe the agreement was at all binding
5  or enforceable on you?
6  A. No.
7  Q. Did either -- well, let me start with one,
8  just so we know. Did Attorney McGrail advise you
9  that you could keep the severance and other benefits
10 under the severance agreement while rejecting it at
11 the same time?
12 A. No. He said there was a chance that they
13 would stop making payments.
14 Q. But you never told them you thought it was
15 unenforceable, did you?
16 A. I never told who?
17 Q. The company or anyone at the company.
18 A. They were talking about two different
19 things. Attorney McGrail's opinion was when we
20 filed with the Commission on Human Rights, that the
21 company may stop making payments.
22 Q. But at that point nobody advised the
23 company that they thought the agreement was
24 unenforceable, did they?
25 A. We never signed the agreement because it

Page 181

1  was withdrawn.
2  Q. The severance agreement was signed by you.
3  A. The severance was signed. The noncompete
4  was not included.
5  Q. I understand, but did you ever advise the
6  company -- let me go back.
7     Did Attorney McGrail ever advise you that
8  you could keep all the dollars and the other
9  benefits under the agreement while at the same time
10 deeming it unenforceable?
11 A. No. He thought that when we filed with
12 the commission, that they would stop making the
13 payments.
14 Q. What about getting back the payments they
15 had already made? Did he ever advise you in that
16 regard and say that you could keep them?
17 A. He thought, no, he thought I might be
18 liable for that.
19 Q. He said that to you?
20 A. Yes.
21 Q. What was your response?
22 A. That I understood.
23 Q. Did you ever -- the company, of course,
24 never did stop the payments, did it?
25 A. No.