LEXSEE 1997 U.S. DIST LEXIS 19751

JOHN S. PEREIRA, ESQ., AS CHAPTER 11 TRUSTEE OF ESTATE OF
PAYROLL EXPRESS CORPORATION, ET AL., Plaintiff, -against- UNITED
JERSEY BANK, Defendant. JOHN S. PEREIRA, ESQ., AS CHAPTER 11
TRUSTEE OF ESTATE OF PAYROLL EXPRESS CORPORATION, ET AL.,
Plaintiff, -against- NATIONAL WESTMINSTER BANK NEW JERSEY, Defendant.

94 Civ. 1565 (LAP), 94 Civ. 1844 (LAP)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

1997 U.S. Dist. LEXIS 19751

December 9, 1997, Decided
December 11, 1997, Filed

**DISPOSITION:** [*1] UJB's motions for protective order granted in part and denied in part.

**LexisNexis(R) Headnotes**

**COUNSEL:** For JOHN S. PEREIRA, plaintiff (94-CV-1565): Roy Babitt, ANDERSON KILL OLICK & OSHINSKY, New York, NY.

For PAYROLL EXPRESS CORPORATION, debtor (94-CV-1565): Roy Babitt, Anderson Kill Olick & Oshinsky, New York, NY.

For UNITED JERSEY BANK, bankruptcy movant (94-CV-1565): Lawrence E. Miller, LeBoeuf, Lamb, Leiby & MacRae, New York, NY.

For UNITED JERSEY BANK, bankruptcy movant (94-CV-1565): Peter A. Ivanick, LeBoeuf, Lamb, Greene & MacRae, New York, NY.

For JOHN S. PEREIRA, Esq., plaintiff (94-CV-1844): Jack H. Hall, Shaw, Licitra, Parente, Esernio & Schwartz, Garden City, NY.

For NATIONAL WESTMINSTER BANK, N.J., defendant (94-CV-1844): Robert S. Fischler, Winston & Strawn, New York, NY.

For NATIONAL WESTMINSTER BANK, N.J., bankruptcy movant (94-CV-1844): Robert S. Fischler, Winston & Strawn, New York, NY.

**JUDGES:** LORETTA A. PRESKA, United States District Court Judge.

**OPINIONBY:** LORETTA A. PRESKA

**OPINION:**

MEMORANDUM AND ORDER

LORETTA A. PRESKA, United States District Court Judge:

Defendant United Jersey Bank ("UJB"), seeks an order pursuant to Fed. R. Civ. P. 26(c) prohibiting John S. [*2] Pereira ("the Trustee") from deposing UJB's attorneys and preventing the disclosure of any attorney-client communications. For the reasons set forth below, the motion is granted in part and denied in part. n1

n1 The following submissions have been considered in resolving this motion: Declaration of Thomas G. Griggs, dated September 15, 1997 ("Griggs Dec."); Defendant United Jersey Bank's Memorandum Of Law In Support Of Motion For Protective Order, dated September 17, 1997 ("UJB Mem."); Affidavit Of Susan G. Papano In Opposition To United Jersey Bank's Motion For

A Protective Order, dated September 24, 1998 [sic] ("Papano Aff."); Trustee's Memorandum Of Law In Opposition To United Jersey Bank's Motion For A Protective Order, dated September 24, 1997 ("Trustee Mem."); Memorandum Of Law Of United Jersey Bank In Reply To The Opposition To Its Motion For A Protective Order, dated September 30, 1997 ("UJB Reply Mem.").

## BACKGROUND

The background to this action is set forth in Pereira v. United Jersey Bank, [*3] N.A., 201 B.R. 644 (S.D.N.Y. 1996), familiarity with which is assumed. Briefly summarized, the facts necessary to resolve the instant motion are set forth herein.

This matter arises from the Chapter 11 bankruptcy of Payroll Express Corporation and Payroll Express Corporation of New York (collectively, "Payroll"). Payroll operated a check cashing and payroll distribution business. Payroll's bankruptcy arose after the discovery that Payroll had engaged in a check-kiting scheme to hide Payroll's unlawful diversion of cash to the personal accounts of Payroll's owners and business entities in which Payroll's owners had a financial interest. UJB, along with defendant National Westminster Bank New Jersey ("NatWest"), are banks with whom Payroll maintained checking accounts.

Pursuant to 11 U.S.C. §§ 547(b) and 550(a), the Trustee brought an action to avoid and recover allegedly preferential transfers to UJB and NatWest within the ninety-day time period immediately prior to Payroll's filing for protection under the bankruptcy laws; in particular, the period between May 22, 1992 through June 5, 1992 ("the Relevant Time Period"). In defending this claim, UJB asserted, inter alia, a defense [*4] of setoff. In denying cross-motions for summary judgment on these respective claims, I held that a number of genuine issues of material fact precluded the granting of summary judgment, including issues with respect to the circumstances surrounding UJB's setoff and UJB's intentions and knowledge. See Pereira, 201 B.R. at 663. More specifically, a critical issue is when UJB first became aware of Payroll's check-kiting scheme, as such knowledge will be material in resolving whether UJB asserted the right to setoff in good faith.

After the cross-motions for summary judgment were denied, discovery continued. UJB personnel have been deposed for nine days, and thousands of pages of documents have been produced. The current dispute focuses on a notice of deposition and subpoena served by the Trustee on August 14, 1997. The notice of deposition sought the oral deposition of "an attorney employed in the legal department of UJB" and the production of "all documents concerning, reflecting, relating or referring to any of Payroll Express Entities, the [owners of Payroll] or the Payroll Express Accounts." The subpoena named the law firm "Riker, Danzig, Scherer, Highland [sic] & Perretti, [*5] L.L.P." ("Riker, Danzig") and sought the production of a similarly broad range of documents. Riker, Danzig represented UJB during the Relevant Time Period.

UJB and Riker, Danzig seek entry of a protective order with respect to both the depositions and the document production. In opposing the motion, the Trustee makes three arguments. First, the Trustee argues that UJB has waived any claim of privilege under what is commonly referred to as the "at issue" waiver doctrine. Second, the Trustee asserts that UJB has asserted an overly broad claim of privilege insofar as UJB's attorneys were providing business, not legal, advice and insofar as UJB has attempted to prevent disclosure of underlying facts. Third, the Trustee maintains that deposing a UJB attorney is appropriate because the information sought cannot be obtained from other sources, is both relevant and non-privileged and is crucial to preparation of the case.

## DISCUSSION

I. The "At Issue" Waiver Doctrine

In Hearn v. Rhay, 68 F.R.D. 574, 581 (E.D. Wash. 1975), the court first articulated what has since come to be known as the "at issue" waiver doctrine. There, plaintiff brought a civil rights action against [*6] various prison officials. Defendants claimed, inter alia, that they were immune from suit under the good faith immunity defense. See id. at 580-81. The court held that defendants had implicitly waived the attorney-client privilege and, in so holding, examined the following factors:

> (1) assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to his defense.

Id. at 581.

The Court of Appeals cited Hearn with approval in United States v. Bilzerian, 926 F.2d 1285 (2d Cir.), cert. denied, 502 U.S. 813, 116 L. Ed. 2d 39, 112 S. Ct. 63 (1991). In Bilzerian, defendant was charged with a series of securities related offenses and sought to defend the charges, in part, by relying upon his good faith attempts

Case 3:01-cv-01205-CFD   Document 75-3   Filed 07/14/2004   Page 3 of 11

Page 3
1997 U.S. Dist. LEXIS 19751, *

to comply with the securities laws. In connection with asserting this defense, defendant sought a ruling permitting him to testify to his purported good faith without [*7] being subject to cross-examination concerning his communications with counsel. The district court refused to enter such an order, and, on appeal from the conviction, the Court of Appeals affirmed the district court's ruling. See id. at 1291-94.

Defendant contended that his testimony as to his good faith would not have implicated the attorney-client privilege and, therefore, that the district court erred in refusing to grant the requested order. The Court of Appeals disagreed and, citing Hearn, indicated that "the privilege may implicitly be waived when defendant asserts a claim that in fairness requires examination of protected communications." Id. at 1292. Holding that this standard was applicable to defendant's argument, the Court of Appeals reasoned and held:

> Bilzerian's testimony that he thought his actions were legal would have put his knowledge of the law and the basis for his understanding of what the law required in issue. His conversations with counsel regarding the legality of his schemes would have been directly relevant in determining the extent of his knowledge and, as a result, his intent.

Id.

The precise limits of the Hearn doctrine [*8] continue to perplex both courts and commentators. See generally Liberty Environmental Sys., Inc. v. County of Westchester, 1997 U.S. Dist. LEXIS 12200, No. 94 Civ. 7431 (WK)(MHD), 1997 WL 471053, at *3 (S.D.N.Y. Aug. 18, 1997) (characterizing the holding in Hearn as "the subject of continuing debate"); Sequa Corp. v. Gelmin, 1994 U.S. Dist. LEXIS 14005, No. 91 Civ. 8675 (CSH)(MHD), 1994 WL 538124, at *2 (S.D.N.Y. Oct. 3, 1994) (noting that Hearn is "controversial"). As a number of courts have recognized, Hearn is problematic insofar as there are very few instances in which the Hearn factors, taken at face value, do not apply and, therefore, a large majority of claims of privilege would be subject to waiver. See, e.g., Rhone-Poulenc Rorer Inc. v. Home Indemnity Co., 32 F.3d 851, 863-64 (3d Cir. 1994) (stating that the holding in Hearn is of "dubious validity" inasmuch as it extends the doctrine of implied waiver to cases in which the client's state of mind is at issue); Allen v. West Point-Pepperell Inc., 848 F. Supp. 423, 429 (S.D.N.Y. 1994) (not citing or discussing Bilzerian but noting that "expansive interpretations of 'at issue' waiver under Hearn and its progeny has recently been the subject [*9] of significant legal and academic criticism") (citations omitted).

In this circuit, relying upon the Court of Appeals' reasoning in Bilzerian, courts appear to have resolved that while explicit reliance upon advice of counsel is not necessary to trigger waiver, implied waiver under Hearn will lie where a party asserts a position "'the truth of which can only be assessed by examination of the privileged communication.'" Liberty, 1997 WL 471053, at *3 (quoting In re Kidder Peabody Secs. Litig., 168 F.R.D. 459, 470 (S.D.N.Y. 1996)); accord Bowne of New York City, Inc. v. AmBase Corp., 150 F.R.D. 465, 488 (S.D.N.Y. 1993) (first adopting this standard). Thus, the rule in this circuit is different from the rule adopted by the court in Rhone-Poulenc, which appears to require overt and explicit reliance upon advice of counsel prior to a finding of waiver. See Rhone-Poulenc, 32 F.3d at 863-64 (distinguishing cases in which a party affirmatively places the advice of counsel at issue from cases, such as Hearn, in which a party's state of mind is at issue and holding that waiver should not apply to the latter). But see Glenmede Trust Co. v. Thompson, 56 F.3d [*10] 476, 486 (3d Cir. 1995) (noting that the holding in Rhone-Poulenc that waiver is not established when a party's state of mind is placed at issue "was premised upon the unique facts of that case"). Although one court has indicated that, in light of Bilzerian, the law in this circuit is equivalent to the rule rejected by Rhone-Poulenc, see Matsushita Electronics Corp. v. Loral Corp., 1995 U.S. Dist. LEXIS 12880, No. 92 Civ. 5461 (SAS)(MHD), 1995 WL 527640, at *2 n.2 (S.D.N.Y. Sept. 7, 1995) ("It bears mentioning that the Second Circuit appears, at least by implication, to have adopted the broad waiver-by-assertion theory that the Third Circuit rejected in Rhone-Poulenc."), I do not read the case law in this circuit quite so broadly.

More specifically, to the extent that Hearn, as interpreted by Rhone-Poulenc, stands for the proposition that the mere act of placing a party's state of mind at issue supports a finding of waiver, the law in this circuit does not support such a result. See, e.g., Sequa, 1994 WL 538124, at *2 (indicating, where defendants asserted waiver claim based upon plaintiff's merely placing its state of mind at issue, that "the Second Circuit has apparently adopted [*11] a variant of the Hearn analysis, although it is open to question whether Bilzerian would compel us to go as far as defendants here urge"). On the other hand, to the extent that Rhone-Poulenc requires a party to overtly and explicitly rely upon the advice of counsel in order to trigger Hearn, the law in this circuit does not support such a result. See, e.g., Liberty, 1997 WL 471053, at *3 (stating, with respect to waiver based upon advice of counsel, that the Court of Appeals has recognized a "somewhat broader variant" of the implied

waiver doctrine); Kidder, Peabody & Co. v. IAG Int'l Acceptance Group., 1997 U.S. Dist. LEXIS 7108, No. 94 Civ. 4725 (CSH)(SEG), 1997 WL 272405, at *4 (S.D.N.Y. May 21, 1997) (observing that in Bilzerian, the Court of Appeals upheld a finding of implied waiver "even [though] the defendant did not expressly testify that he relied on any advice from his attorney"); cf. United States v. Premises Known as 281 Syosset Woodbury Road, 71 F.3d 1067, 1072 (2d Cir. 1995) (holding that it was unnecessary to resolve, in a civil forfeiture action filed against the spouse of a convicted drug dealer, whether spouse automatically waived confidential marital communications [*12] privilege by virtue of merely asserting an innocent owner defense and whether Bilzerian was distinguishable from this matter).

Rather, between these extreme positions of mere assertion and overt reliance, Hearn is triggered "'even if the privilege holder does not attempt to make use of the privileged information; . . . the privilege [may be waived] if [the privilege holder] makes factual assertions the truth of which can only be assessed by examination of the privileged communication.'" Liberty, 1997 WL 471053, at *3 (quoting In re Kidder Peabody Secs. Litig., 168 F.R.D. at 470; accord Bowne, 150 F.R.D. at 488; see also Paramount Comm., Inc. v. Donaghy, 858 F. Supp. 391, 397 (S.D.N.Y. 1994) (analyzing leading cases in this circuit, including Bilzerian, and concluding that waiver is appropriate where "the attorney-client relationship was itself relied upon, in some fashion, affirmatively to support the asserting party's claims, or [where] their [sic] was evidence that the attorneys themselves independently took actions or made decisions relevant to the case"); Standard Chartered Bank PLC v. Ayala Int'l Holdings Inc., 111 F.R.D. 76, 83 (S.D.N.Y. [*13] 1986) (noting three factors which appear to be prevalent in cases finding waiver, including that "the very subject of privileged communications was critically relevant to the issue to be litigated" and that "there was no other source of proof on the issue"); Chase Manhattan Bank v. Drysdale Sec. Corp., 587 F. Supp. 57, 58 (S.D.N.Y. 1984) (not finding waiver in part because privileged communications were not "essential" to establish party's claim).

Applying this standard here, at times, the Trustee asserts the type of broad arguments which have been rejected in this circuit. See, e.g., Trustee Mem. at 10 ("Courts have held that where a party affirmatively places its knowledge or intent at issue, that party has waived the attorney-client privilege with respect to attorney-client communications relating to such knowledge or intent."); id. at 11 ("By relying upon [various] statutes, UJB as put its understanding of its obligations under the law directly in issue."). The problem with both of these arguments is that a finding of waiver under either circumstance would require a finding of waiver in virtually every litigation, for in almost all actions a party either "affirmatively [*14] place[s] its knowledge or intent at issue" or "relies upon . . . statues" and thereby puts "its obligations under the law directly in issue." As set forth above, the law in this circuit requires something more; namely, that a party make "'factual assertions the truth of which can only be assessed by examination of the privileged communication.'" Liberty, 1997 WL 471053, at *3 (quoting In re Kidder Peabody Secs. Lit., 168 F.R.D. at 470; accord Bowne, 150 F.R.D. at 488. Therefore, to the extent that the Trustee relies upon these types of arguments, UJB's motion is granted.

At the same time, however, the Trustee also makes a more refined argument. Relying upon both Bilzerian and Bowne, and the deposition testimony of various UJB employees, the Trustee argues that because "UJB's in-house counsel played a major role in shaping and informing UJB's knowledge and intent[,]" this Court should find that UJB has placed its attorneys' knowledge and intent "at issue" and uphold a finding of waiver. See Trustee Mem. at 12. Based upon the deposition testimony thus far, it appears that UJB's attorneys did indeed play a significant role during the Relevant Time Period in [*15] terms of evaluating and formulating strategy as to the circumstances surrounding the Payroll account.

For example, Tracy Tripucka ("Tripucka"), an account officer at UJB, testified at his deposition that on May 26, 1992, Richard Neale ("Neale"), a Vice President at UJB, told Tripucka to contact UJB's legal department with respect to the overdraft situation. Tripucka further testified that other than speaking to Neale and UJB's attorneys, he did not recall any other conversations concerning the Payroll account. See Papano Aff. P 7. Moreover, after Tripucka testified that on May 27 he had some concern that Payroll's owner was engaging in a check-kiting scheme, in response to a question regarding the reason for this concern and what facts Tripucka had considered, Tripucka testified that "most all of my facts [concerning the check-kiting scheme] would concern conversations with the UJB attorney." Id. P 9. Further inquiry into this matter was blocked by UJB's assertion of the attorney-client privilege. See id. P 10. Tripucka also testified, regarding a letter which NatWest requested from UJB in which UJB agreed not to dishonor approximately $ 30 million in checks drawn on [*16] the Payroll account at UJB, that his discussions as to whether UJB was willing to issue such a letter were with UJB's attorneys. See id. P 19.

Similarly, Michael Donnelly ("Donnelly"), senior vice president of the financial Institutions Department at UJB, testified at his deposition that he only recalled having discussions with counsel regarding the proper

Case 3:01-cv-01205-CFD    Document 75-3    Filed 07/14/2004    Page 5 of 11

Page 5
1997 U.S. Dist. LEXIS 19751, *

method for handling funds that were wired to UJB on May 27 and May 28 by customers of Payroll. See id. P 15. On these same dates, UJB began to receive an "intense volume" of telephone calls from customers of Payroll. Tripucka testified that he spoke with Donnelly regarding how best to handle these calls. See id. P 22. Donnelly in turn testified that he was "waiting for advice from the Legal Department on what to do about anything with the relationship at this point." Id. P 23. Neale testified that he was instructed not to respond to customer inquiries and that this instruction came from Donnelly. In response to an instruction from UJB's attorney not to answer a question concerning what Donnelly said to Neale to the extent that what Donnelly said concerned discussions with counsel, Neale stated that he therefore could [*17] not answer the question. See id. P 24.

The net effect of this testimony reveals the critical role that UJB's counsel played in matters intimately related to the setoff defense. Thus, although it is indeed conceivable that a setoff defense could be asserted without implicating counsel and the legal advice given by counsel, that is not the case here. Under the circumstances, "fairness" requires that the Trustee be allowed to inquire into every aspect of the advice given by counsel with respect to the setoff defense. See Bilzerian, 926 F.2d at 1292. UJB cannot be permitted, on the one hand, to argue that it acted in good faith and without an improper motive and then, on the other hand, to deny the Trustee access to the advice given by counsel where that advice, based upon this deposition testimony, played a substantial and significant role in formulating the actions taken by UJB. See Bowne, 150 F.R.D. at 489 (indicating that it was "arguable" that the "at issue" waiver doctrine applied where counsel played a "major role" in critical events).

In opposing the Trustee's arguments, UJB provides a detailed summary of its version of the facts during the relevant time period and [*18] disputes the Trustee's contention that UJB's counsel played a major role. See UJB Reply Mem. at 3-7. In brief, UJB argues that Donnelly, Neale and Tripucka were responsible for the Payroll account and that UJB's attorneys were consulted only after the important steps were taken and only after the Payroll account was closed to post. See UJB Reply Mem. at 11. While the timing issue with respect to when the Payroll account was closed raises some concern about the significance of counsel's role, this fact does not overcome the clear testimony that UJB's counsel were significantly involved in the events surrounding this matter. For example, this fact does not diminish Tripucka's testimony that the factual basis for his concern regarding Payroll's check-kiting scheme came from his conversations with counsel. This testimony is particularly important in light of the significance of determining precisely when UJB first became aware of Payroll's check-kiting scheme. Thus, I disagree with UJB's contention that its counsel did not play a major role. While some of UJB's assertions may affect the ultimate weight given to the Trustee's arguments, it does not diminish the role UJB's counsel [*19] played.

In sum, this is a case in which the factual assertions surrounding the setoff defense can only be fully assessed by examining UJB's otherwise privileged communications with counsel. Had counsel played a less significant role, the case may well have been different. But based upon the record before me, that is simply not the case. Therefore, and for this reason, UJB's motion for a protective order is denied.

II. UJB's Assertions of Privilege

In light of my conclusion that the "at issue" waiver doctrine applies with respect to UJB's assertion of the setoff defense, I need not determine whether UJB's counsel were providing business, rather than legal, advice, nor need I determine the extent to which UJB has prevented the Trustee from inquiring into the underlying facts surrounding that defense. Even assuming that, in some instances, UJB properly asserted the attorney-client privilege, that privilege has been waived. I pause, however, only to note that at the depositions of UJB's employees, counsel for UJB asserted the attorney-client privilege far too broadly. In many instances, counsel for UJB failed to distinguish between instances where UJB's attorneys were providing [*20] business, as opposed to legal, advice and prevented the Trustee from inquiring into non-privileged areas. See, e.g., Papano Aff. P 7 (counsel for UJB instructing witness that "any discussion" with, or "anything to do with the conversation with," UJB's attorney, or any conversation in which UJB's attorney "was involved," would be privileged); id. P 15 (counsel for UJB taking the position that "to the extent that those conversations are with counsel, I instruct the witness not to answer").

The law in this area is well-settled that in-house counsel's communications with its client concerning business advice are not privileged, nor does the fact that in-house counsel "was involved" in a conversation render that conversation privileged. See, e.g., In re Grand Jury Subpoena, 599 F.2d 504, 511 (2d Cir. 1979) ("Participation of the general counsel does not automatically cloak the investigation with legal garb."); United States Postal Service v. Phelps Dodge Refining Corp., 852 F. Supp. 156, 160 (E.D.N.Y. 1994) ("The mere fact a communication is made directly to an attorney, or an attorney is copied in on a memorandum, does not mean that the communication is necessarily privileged."). [*21] Although distinguishing between

instances in which in-house counsel provided business, in contrast to legal, advice is admittedly oftentimes difficult, both court and counsel alike are better served in this task if, in the first instance, inquiries into the role played by an attorney are not cut off by broad and tenuous claims of privilege. Rather, and for future reference, the better course is to permit limited inquiry into this area so that a factual record may be developed to resolve the issue.

III. Deposition of UJB's Attorneys

The standard for determining whether it is appropriate to depose an opposing party's attorney was set forth in Shelton v. American Motors Corp., 805 F.2d 1323 (8th Cir. 1986), and contains three elements which must be satisfied before such a deposition is permitted:

> (1) no other means exist to obtain the information than to depose opposing counsel; (2) the information sought is relevant and nonprivileged; and (3) the information is crucial to the preparation of the case.

Id. at 1327 (citation omitted). Although the Court of Appeals has not explicitly adopted the Shelton factors, it has twice cited Shelton approvingly. [*22] See United States v. Yonkers Board of Ed., 946 F.2d 180, 185 (2d Cir. 1991) (citing Shelton for the proposition that "depositions of opposing counsel are disfavored"); Gould Inc. v. Mitsui Mining & Smelting Co., 825 F.2d 676, 680 n.2 (2d Cir. 1987) (noting the Shelton majority's "disfavor" of deposing opposing counsel, but noting that even the Shelton majority recognized circumstances where such a deposition "would be appropriate"). Lower courts in this circuit have relied upon the Shelton factors to resolve this issue. See, e.g., In re County of Orange, 208 B.R. 117, 120 (Bankr. S.D.N.Y. 1997); Niagara Mohawk Power Corp. v. Stone & Webster Engineering Corp., 125 F.R.D. 578, 593 (N.D.N.Y. 1989).

Here, although my ruling regarding the "at issue" waiver doctrine resolves the second and third Shelton factors in the Trustee's favor, the information sought is relevant, nonprivileged and crucial to the preparation of the Trustee's case, I find that the first factor, that no other means exist to obtain the information, has not been satisfied. As discussed supra, parts I & II, the Trustee has deposed a number of UJB employees and, in addition to continuing [*23] with these depositions, the Trustee intends to depose a number of other UJB employees. See UJB Mem. at 1. The witnesses deposed thus far have revealed that they had, or were informed by others about matters addressed in, discussions with UJB's in-house counsel. The Trustee was foreclosed from further inquiry into these matters by virtue of UJB's broad assertions of attorney-client privilege. There is no indication that upon further examination these witnesses will not recall these conversations, or otherwise be unable to address these matters. In addition, the Trustee has not demonstrated that it has exhausted other methods of discovery. See, e.g., Niagara Mohawk, 125 F.R.D. at 594 (granting motion for a protective order preventing deposition of plaintiff's attorneys in part because acquiring the information via interrogatories had not been attempted); West Peninsular Title Co. v. Palm Beach County, 132 F.R.D. 301, 302 (S.D. Fla. 1990) ("The party seeking a deposition [of opposing counsel] must demonstrate that the deposition is the only practical means of obtaining the information. Other methods, such as written interrogatories, should be employed.") (citation omitted). [*24]

In sum, UJB's motion for a protective order with respect to the deposition of its in-house counsel is granted without prejudice to the Trustee's right to re-notice the deposition in the event that further discovery fails to yield the information sought.

**CONCLUSION**

For the reasons set forth above, UJB's motion for a protective order is denied insofar as UJB argues that the "at issue" waiver doctrine does not apply to UJB's assertion of the setoff defense. UJB's motion for a protective order seeking to avoid the deposition of its in-house counsel is granted, without prejudice to the Trustee's right to re-notice that deposition at a later time.

SO ORDERED:

Dated: New York, New York

    December 9, 1997

    LORETTA A. PRESKA, U.S.D.J.

LEXSEE 2000 U.S. DIST. LEXIS 17537

IN RE GAMING LOTTERY SECURITIES LITIGATION; THIS DOCUMENT RELATES TO: PROSKAUER ROSE LLP against GALAXIWORLD.COM LTD.; In the Matter of the Application of Judgment Creditor PROSKAUER ROSE LLP, Petitioner, pursuant to CPLR § § 5225 and 5227 for a Turnover Order and Judgment against G.CASH LIMITED and HSBC BANK USA, Respondents, GALAXIWORLD.COM LTD, Additional Respondent.

96 Civ. 5567 (RPP)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2000 U.S. Dist. LEXIS 17537

December 5, 2000, Decided
December 7, 2000, Filed

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] Robert C. Finkel, Wolf Popper LLP, Deborah Clark-Weintraub, Millberg Weiss Bershad Hynes & Lerach LLP, New York, NY.

For Judgment Creditor: Bart Schectman, Esq., Proskauer Rose LLP, New York, NY.

For Jack Banks and Larry Weltman: Sheldon Eisenberger, Esq., New York, NY.

For G.Cash Limited: Peter S. Herman, Esq., McLaughlin & Stern, LLP, New York, NY.

**JUDGES:** ROBERT P. PATTERSON, JR., U.S.D.J.

**OPINIONBY:** ROBERT P. PATTERSON, JR.

**OPINION:**

   **OPINION AND ORDER**

**ROBERT P. PATTERSON, JR., U.S.D.J.**

   Proskauer Rose, LLP ("Proskauer") renews its application n1 for (1) an order pursuant to Federal Rule of Civil Procedure ("FED. R. CIV. P.") 69(a) and New York Civil Practice Law and Rules ("CPLR") § § 5201, 5222, 5225, 5227, and 5240, restraining G.Cash Limited ("G.Cash"), as cashier of judgment debtor GalaxiWorld.com Limited ("GalaxiWorld"), from making or suffering any sale, assignment or transfer, or any interference with, any property in which GalaxiWorld has an interest, or paying over or otherwise disposing of any debt owed to GalaxiWorld, to any person other than Proskauer, pending satisfaction of its judgment against GalaxiWorld; and (2) an order pursuant to FED. R. CIV. P. 69(a) [*2] and CPLR § § 5201, 5225, 5227 and 5240, requiring G.Cash to turn over and pay to Proskauer any property in which GalaxiWorld has an interest and any debt owed to GalaxiWorld, including but not limited to all monies due or coming due to GalaxiWorld pursuant to any contract or agreement between G.Cash and GalaxiWorld, and any "advance float" or deposit of monies held by G.Cash pursuant to any such contract or agreement, pending satisfaction of Proskauer's judgment against GalaxiWorld. G.Cash cross-moves to vacate the restraint and for a protective order.

   n1 Although this is a renewed application, it should be pointed out that Proskauer's original application, filed by order to show cause on February 10, 2000, was for a restraining order on a bank account belonging to G.Cash at HSBC Bank, USA. In its reply papers in that motion filed on February 23, 2000, Proskauer broadened its request to include a general restraint on and

Case 3:01-cv-01205-CFD    Document 75-3    Filed 07/14/2004    Page 8 of 11

Page 2
2000 U.S. Dist. LEXIS 17537, *

turn over of funds by G.Cash. In its decision denying the motion, the Court did not rule on that broadened request since it was not part of the original application and G.Cash had not responded to it. In its March 13, 2000, motion for reconsideration, Proskauer included its broadened request for a general restraint and turn over of funds by G.Cash. The Court in its decision of May 30, 2000, treated the motion as only for reconsideration of the original application and determined to restrain the funds held in G.Cash's account at HSBC pending a showing of Proskauer's right to a turn over order.

[*3]

For the following reasons, an evidentiary hearing will be held to determine (1) whether HSBC should turn over the funds held in the G.Cash account to Proskauer and (2) whether G.Cash has sufficient "minimum contacts" with New York to support *in personam* jurisdiction such that the Court can issue a general restraint and a turn over order upon G.Cash with respect to any property in which GalaxiWorld would have an interest.

## BACKGROUND

### A. The Relationship Between G.Cash and GalaxiWorld

GalaxiWorld requires its customers who wish to gamble on its website to purchase G.Cash (electronic gambling currency) to do so. (Certification of Levy Benaim on Behalf of G.Cash Limited, In Opposition to Order to Show Cause ("Benaim Cert.") dated February 16, 2000, P 9.) Customers may purchase G.Cash either by credit card or by wire transfer into G.Cash's bank account at HSBC Bank USA ("HSBC"). (Affirmation of Bruce E. Boyden ("Boyden Aff."), dated February 9, 2000, P 8.) G.Cash must pay those players who win and distribute to GalaxiWorld its portion of the proceeds. (Benaim Cert. P 12.) G.Cash pays some refunds of gambling winnings and unused gambling currency from the HSBC bank account [*4] in cases where the customer paid by wire transfer or if a refund cannot be made to the customer's credit card. (Id. P 10.)

G.Cash retains five percent of the credit card transactions and one percent of other transactions such as wire transfers as its compensation, pursuant to the Customer Merchant Agreement (hereinafter, "the contract") between G.Cash and GalaxiWorld. (Id. P 8, see Benaim Cert., Exh. 4 for the Customer Merchant Agreement.) After making payments to its customers, G.Cash then pays the balance of the transactions to GalaxiWorld. (Id.) In December 1999 and January 2000, which are the only months for which data has been provided, credit card sales exceeded $ 1.1 million per month. (Id. P 12.) G.Cash generally owes money to GalaxiWorld at the end of the month because "the house" (GalaxiWorld) usually wins. (Id. P 12.)

### B. Procedural Background

This is a "turnover proceeding" seeking payment of property of a judgment debtor allegedly in the possession of a third party. On January 26, 2000, Proskauer was awarded a judgment of $ 569,536.48 for legal fees in connection with its representation of GalaxiWorld. (See Order and Judgment, dated [*5] January 26, 2000.) That judgment was later amended on March 6, 2000, to increase Proskauer's award of fees owed to $ 654,412.58. (See Amended Judgment, dated March 6, 2000, at 2.) On February 2, 2000, Proskauer served a restraining notice pursuant to CPLR § 5222(b) upon G.Cash's account at HSBC. On February 10, 2000, by order to show cause returnable February 15, 2000, Proskauer sought an order directing HSBC to turn over funds held in an account in the name of G.Cash Limited, which Proskauer alleged was an alias and/or a d/b/a of GalaxiWorld. Proskauer also sought an order restraining HSBC from disbursing or transferring any funds or other assets held in the name of G.Cash until Proskauer's judgment against GalaxiWorld was fully satisfied. On February 16, 2000, G.Cash responded to the order to show cause, arguing that it was a separate entity from GalaxiWorld, that G.Cash was not GalaxiWorld's agent, and denying Proskauer's allegation that G.Cash was a fraudulent transferee of funds from GalaxiWorld. On February 22, 2000, Proskauer in its reply papers and without further service to G.Cash expanded its requested relief, asking that G.Cash "turn over to Proskauer all property in [*6] which judgment debtor GalaxiWorld.com Limited has an interest and pay to Proskauer any debt due or coming due to GalaxiWorld.com Limited." On February 23, 2000, G.Cash filed a memorandum of law in further opposition to Proskauer's order to show cause.

On February 24, 2000, this Court denied Proskauer's application for a turn over order and vacated the restraints and executions on the G.Cash account at HSBC, based on Mr. Benaim's affidavit and the Court's analysis of the outstanding checks which showed that there was no balance in the HSBC account in which GalaxiWorld could have had an interest. See In Re Gaming Lottery Securities Litigation, 2000 U.S. Dist. LEXIS 1863, No. 96 Civ. 5567 (RPP), 2000 WL 222860 (S.D.N.Y. February 25, 2000).

On March 13, 2000, Proskauer moved for reconsideration of the February 24, 2000, Opinion and Order, arguing that: (1) the Court overlooked controlling law; (2) the Court overlooked controlling facts; (3) the

Case 3:01-cv-01205-CFD   Document 75-3   Filed 07/14/2004   Page 9 of 11

Page 3
2000 U.S. Dist. LEXIS 17537, *

order was a product of mistake; and (4) Proskauer's request for a turn over order compelling G.Cash to turn over to Proskauer GalaxiWorld's other assets, beyond the HSBC account, was overlooked. On March 28, 2000, G.Cash responded, arguing that: (1) the [*7] motion was untimely; (2) no mistake had been made as to material facts or controlling principles of law; and (3) "Proskauer only acquired ancillary jurisdiction over the bank account, based on Proskauer's assertion that the account belonged to its judgment-debtor, GalaxiWorld." (Certification of Peter S. Herman In Opposition to Proskauer's Motion for Reconsideration, dated March 28, 2000, P 17.) G.Cash further responded that "Proskauer never acquired personal jurisdiction over G.Cash, which is a Gibraltar corporation with no office or place of business in the State of New York." Id. On May 30, 2000, the Court found upon reconsideration that there had been a positive account balance in G.Cash's account at HSBC in which GalaxiWorld could have had an interest at the time of the restraining order and that Proskauer was entitled to a hearing to determine whether HSBC must turn over to Proskauer the funds in G.Cash's account. See In re Gaming Lottery Securities Litigation, 2000 U.S. Dist. LEXIS 7349, No. 96 Civ. 5567 (RPP), 2000 WL 702978 (S.D.N.Y May 31, 2000). The Court did not rule on Proskauer's request for a general restraint and turn over order on G.Cash's assets in which GalaxiWorld would [*8] have an interest, but limited its opinion to reconsideration of the relief which was the object of the original order to show cause. See id. Proskauer took an appeal and the hearing has not been held to date.

On September 19, 2000, Proskauer withdrew its appeal. On September 27, 2000, at Proskauer's application, the Court reinstated the restraint on G.Cash's account at HSBC. On September 28, 2000, Proskauer moved by order to show cause, returnable October 6, 2000, pursuant to FED. R. CIV. P. 26(b) and 69(a) and CPLR § § 408 and 5223 for discovery against GalaxiWorld, G.Cash, HSBC, and defendants Jack Banks and Larry Weltman. (See Order to Show Cause, Sept. 28, 2000.) Defendants GalaxiWorld, Banks and Weltman opposed Proskauer's discovery motion. (See Memorandum In Opposition to Proskauer Rose LLP's Motion to Compel, dated October 4, 2000.)

On October 6, 2000, a hearing was held on Proskauer's discovery motion. Proskauer agreed to participate in the post-judgment discovery of GalaxiWorld, Banks and Weltman to be conducted by class counsel in In re Gaming Lottery Securities Litigation and further agreed that Proskauer would serve discovery requests upon G.Cash in accordance [*9] with the Federal Rules of Civil Procedure and the CPLR. (October 6, 2000, Transcript ("Tr.") at 17, 55.)

At that hearing, Proskauer also renewed its request for a general restraint and turn over order against G.Cash as to any present or future property in which GalaxiWorld has or will have an interest. (Tr. at 45.) G.Cash objected that the Court did not have jurisdiction over G.Cash to impose a general restraint or turn over order. Id. The Court ordered the parties to brief the issue. Id.

## DISCUSSION

Judgment creditor Proskauer contends that (1) G.Cash's accounts at HSBC are property subject to restraint and execution and that GalaxiWorld has a substantial interest in those accounts because of the Customer Merchant Agreement (hereinafter "the contract") (see Benaim Cert., Exh. 4) between G.Cash and GalaxiWorld; (2) the Court should restrain G.Cash from transferring any money due or coming due to GalaxiWorld pursuant to the contract between G.Cash and GalaxiWorld, whether it is a present or a future right or interest; and (3) because G.Cash regularly makes payments to GalaxiWorld, the Court should direct G.Cash to turn any future payments over to Proskauer in [*10] satisfaction of its judgment. (See Memorandum of Petitioner-Judgment Creditor Proskauer Rose LLP in Further Support of its Renewed Application for a General Restraint on Judgment Debtor's Cashier, Respondent G.Cash ("Proskauer Mem."), dated Oct. 12, 2000, at 1-2.)

In response, G.Cash contends that (1) the Court has only *quasi in rem* jurisdiction over G.Cash and that G.Cash has made a limited appearance only to defend the HSBC account and has not consented to *in personam* jurisdiction; (2) G.Cash's contacts with New York are insufficient to support *in personam* jurisdiction; (3) the account at HSBC is a debt owed to G.Cash in which GalaxiWorld does not have a cognizable interest; and (4) any future debt that G.Cash may owe to GalaxiWorld is too contingent to be the basis of a restraint or turn over order. (See Memorandum of Respondent G.Cash, Limited in Opposition to Renewed Application of Proskauer Rose, LLP, ("G.Cash Mem.") at 2.)

In its May 30, 2000, Opinion, the Court ordered an evidentiary hearing to determine whether there were funds in G.Cash's HSBC account in which GalaxiWorld might have an interest. See May 30, 2000, Opinion and Order at 3. The Court [*11] further specified that the issue of "whether or not Proskauer is entitled to an order restraining any of G.Cash's funds other than those in the account at HSBC" could also be addressed at that hearing. Id. at 3 n.3. The Court then stated that "this Court has the authority to issue such an order, upon the requisite factual showing by Proskauer, because the Court has personal jurisdiction over G.Cash." n2 Id.

Case 3:01-cv-01205-CFD   Document 75-3   Filed 07/14/2004   Page 10 of 11

Page 4
2000 U.S. Dist. LEXIS 17537, *

n2 The word "because" was a mistake. It should have read "that."

G.Cash argues that the Court's conclusion that it possessed personal jurisdiction over G.Cash was both factually and legally erroneous in that (1) this proceeding is based on *quasi in rem* jurisdiction over an account that belongs to G.Cash; and (2) G.Cash's contacts with New York are insufficient to support *in personam* jurisdiction, which is required for a general restraint on G.Cash. See G.Cash Mem., at 3.

Federal Rule of Civil Procedure 69 provides that the procedure to enforce a judgment "shall be in accordance with the [*12] practice and procedure of the state in which the district court is held, existing at the time the remedy is sought, except that any statute of the United States governs to the extent that it is applicable." FED. R. CIV. P. 69(a).

Under New York CPLR § 320(c)(1), an "appearance," which includes the filing of an answer, "is not equivalent to personal service upon the defendant ... if jurisdiction is based solely upon a levy on defendant's property within the state pursuant to an order of attachment." CPLR § 320(c)(1); see Cargill, Inc. v. Sabine Trading & Shipping Co., Inc., 756 F.2d 224, 227-28 (2d Cir. 1985) (holding that New York law permitting a limited appearance applies in a federal court diversity action). Under New York law, when jurisdiction over a non-resident is based on attachment of property within the state, the defendant's appearance is "limited" to defending the attached property. n3 See Gager v. White, 53 N.Y.2d 475, 488-89 & n.10, 442 N.Y.S.2d 463, 468-69 & n.10, 425 N.E.2d 851 (1981). Thus the defendant may protect his interest in attached property without submitting to full *in personam* jurisdiction. Id.

n3 The New York Court of Appeals has explained that "historically, where the initial jurisdiction was in rem or quasi in rem, an appearance, followed by a defense upon the merits, automatically transformed the jurisdictional basis to one that was in personam. Later, this practice was replaced by CPLR 320 (subd. [c]), which provides that when jurisdiction is quasi in rem, the appearance remains a limited one. Under these circumstances, the defendant is now permitted to defend without submitting to in personam jurisdiction." Gager v. White, 53 N.Y.2d 475, 488 & n.10, 442 N.Y.S.2d 463, 469 & n.10, 425 N.E.2d 851 (1981) (internal citations omitted).

[*13]
G.Cash contends that it has made a limited appearance only and thereby is not exposed to personal jurisdiction or a restraint on its assets beyond the HSBC bank account which is currently subject to restraint. Proskauer's initial February 10, 2000, order to show cause was for a restraint on G.Cash's bank account at HSBC. G.Cash responded on the merits to that order to show cause, thereby submitting to *quasi in rem* jurisdiction. In its reply however, Proskauer sought a general restraint on G.Cash's assets beyond the HSBC account. The expanded relief was not properly noticed in the February proceeding, and G.Cash submitted to only *quasi in rem* jurisdiction by responding on the merits to the order to show cause.

In its March 13, 2000, motion for reconsideration, Proskauer requested a general restraint on G.Cash's assets beyond the HSBC bank account. In its March 29, 2000, reply, G.Cash objected, arguing that the court did not have *in personam* jurisdiction over G.Cash.

Where state or federal substantive law provides a basis for an objection to jurisdiction, that objection must be made pursuant to the procedural requirements of FED. R. CIV. P. 12 or it is waived. See e. [*14] g. Harris Corp. v. Nat'l Iranian Radio & Television, 691 F.2d 1344, 1351 (11th Cir. 1982); Rauch v. Day & Night Mfg. Corp., 576 F.2d 697, 701 (6th Cir. 1978) ("Where defendant files a pre-answer motion to dismiss or an answer, without raising the defense of a lack of in personam jurisdiction, he waives any objection to that defect."); see also SEC v. Broadwall Sec., Inc., 514 F. Supp. 488, 492 (S.D.N.Y. 1981). Here, G.Cash properly raised its objection to *in personam* jurisdiction in its March 29, 2000, answer to Proskauer's March 13, 2000, motion for reconsideration. In its current motion papers, G.Cash continues to argue that the Court does not have *in personam* jurisdiction over G.Cash. Thus G.Cash has not waived its objection to *in personam* jurisdiction. Accordingly, until it is determined that G.Cash is subject to personal jurisdiction, it will be treated as having made a limited appearance.

Federal law controls the exercise of personal jurisdiction and requires that any such exercise of jurisdiction must meet the "minimum contacts" standards set forth in Int'l Shoe Co. v. Washington, 326 U.S. 310, 90 L. Ed. 95, 66 S. Ct. 154 (1945), [*15] and its progeny. n4 Since G.Cash objected to jurisdiction in its answer to Proskauer's motion for reconsideration filed in March 2000, a "minimum contacts" evidentiary hearing will be held to determine whether the Court has personal jurisdiction over G.Cash as well as to determine whether G.Cash holds assets in which GalaxiWorld has an

interest sufficient to allow the Court to order a turnover of funds to Proskauer. Pending a determination of whether G.Cash has sufficient minimum contacts with New York to support personal jurisdiction, judgment is reserved on Proskauer's request for a general restraint on G.Cash and on G.Cash's motion to vacate the restraint on its account at HSBC.

n4 Federal law similarly controls whether the exercise of *quasi in rem* jurisdiction over a defendant violates the due process clause of the United States Constitution. See Shaffer v. Heitner, 433 U.S. 186, 212, 53 L. Ed. 2d 683, 97 S. Ct. 2569 (1977).

**CONCLUSION**

For the foregoing reasons, an evidentiary [*16] hearing will be held to determine (1) whether HSBC should turn over the funds held in the G.Cash account to Proskauer and (2) whether G.Cash has sufficient "minimum contacts" with New York to support *in personam* jurisdiction such that the Court can issue a general restraint and a turn over order upon G.Cash with respect to any property in which GalaxiWorld would have an interest.

IT IS SO ORDERED.

Dated: New York, New York

December 5, 2000

Robert P. Patterson, Jr.

U.S.D.J.