UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

2004 AUG 17 A 10: 26

U.S. DISTRICT COURT
HARTFORD, CT.

WILLIAM E. CALLAHAN,

    - Plaintiff

    v.                                NO. 3:01CV1205(CFD)(TPS)

UNISOURCE WORLDWIDE, INC.
ET AL.,

    - Defendant

and

EUGENE PANECCASIO,

    - Plaintiff

    v.                                NO. 3:01CV2065(CFD)(TPS)

UNISOURCE WORLDWIDE, INC.
ET AL.,

    - Defendant

## RULING ON DEFENDANTS' MOTION TO COMPEL

Plaintiff William Callahan ("Callahan") initiated this action claiming, <u>inter alia</u>, that Defendants Unisource Worldwide, Inc. ("Unisource") and Georgia-Pacific Corporation ("Georgia-Pacific") (collectively, the "Unisource Defendants") violated age discrimination and ERISA laws in connection with the December 1998 termination of his employment with Unisource and the subsequent termination of a deferred compensation plan in which he had participated. (Ds.' Mem. Supp. Mot., 6/15/04, at 2). Pending

before the court is the defendants' motion to compel **(Dkt. #67)** which seeks the production of certain documents withheld by Callahan on attorney-client privilege grounds. For the reasons set forth below, the motion is **GRANTED**.

The relevant facts are as follows. Prior to his termination from Unisource in December of 1998, Callahan executed a separation agreement and release (the "Agreement") in which he allegedly relinquished the claims that form the basis of this action. (Ds.' Mem. Supp. Mot., 6/15/04, at 2-3). However, Callahan claims that he had entered into the Agreement under duress, and, as such, is not precluded from bringing the action. Id. at 3.

In an August 25, 2003 deposition, the plaintiff testified that, when he signed the Agreement, he did not recognize that he was waiving valuable legal rights because his attorney, Albert McGrail ("McGrail"), had advised him that he could "sign [the Agreement] and still sue the company." (Id. at 3, Ex. A). He testified at length about his conversations with McGrail regarding this subject. (See id. at 3-5, Ex. A). The parties do not dispute that Callahan waived the attorney-client privilege with respect to his communications with McGrail regarding the same. (See Pl.'s Mem. Opp. Mot., 6/29/04, at 4).

About six months after the Agreement was signed, McGrail, who had suffered from a long-term illness, was unable to act as counsel for Callahan. His partner, Stephen McEleney ("McEleney"), acted in

his stead. The record reflects that McEleney had not hitherto been involved in any facet of Callahan's representation. As the plaintiff points out, McEleney was not involved in any pre-Agreement discussions with Callahan, "and there is absolutely no evidence that Mr. McGrail shared with McEleney any conversations McGrail had with Mr. Callahan through the signing of the [Agreement] and throughout 1999." (Pl.'s Mem. Opp. Mot., 6/29/04, at 4). Moreover, "[a]n examination of attorney McEleney's notes showed no familiarity with Mr. Callahan's case and no familiarity with the negotiations and thought processes of either Mr. Callahan or attorney McGrail well into 1999." (Id.).

However, at the deposition, Callahan discussed his post-Agreement conversations with McEleney:

> Q. Did you ever discuss with [McEleney] what Attorney McGrail said about the unenforcibility [of the Agreement]?
>
> A. I discussed with Attorney McEleney Attorney McGrail's thought process for overturning the severance letter?
>
> . . . .
>
> Q. What did you tell Attorney McEleney?
>
> A. That according to Attorney McGrail, I had signed this under duress.
>
> Q. And did you explain what Attorney McGrail explained to you, why he thought it was under duress?
>
> A. I kind of hit the bullets of what we already discussed here this afternoon.
>
> Q. Just tell me in bullet fashion, then, what you said to -- well, tell me what you said to Attorney McEleney about Attorney McGrail's thought process?

-3-

> A. The promises that were made that weren't kept, the request to keep coming in with nothing to do, the illness of my son, the purchase of the land. I believe that's it.
>
> . . . .
>
> Q. Do you remember when this conversation occurred with Attorney McEleney?
>
> A. It was right around the holiday, I believe it was Labor Day weekend.
>
> Q. Of 1999?
>
> A. I believe so, yes. Whenever he wrote the letter.

(Ds.' Mem. Supp. Mot., 6/15/04, at Ex. A).

After the deposition, the plaintiff produced a substantial portion of McGrail's files, however he omitted several documents:

> undated letter from Callahan to McEleney regarding strategy substantially after Mac McGrail's death; letter dated July 2, 1999 from Callahan to Mac advising of a call from CHRO asking about settling; handwritten notes of attorney McEleney, one page; one page note regarding Callahan after Mac's death; note dated 3/28/00 from Callahan to Steve [McEleney] enclosing a response.

(D.'s Mem. Supp. Mot., 6/15/04, at 7-8, Ex. B). The defendants seek the production of these documents in light of Callahan's "blanket waiver of privilege at deposition, his subsequent production of both attorney-client and work-product privileged materials, and the fact that the withheld materials clearly involve the same issues as Callahan's deposition testimony." (Id. at 8).

The court finds the defendants' reliance on Bank Brussels Lambert v. Credit Lyonnais (Suisse), S.A., 210 F.R.D. 506 (S.D.N.Y. 2002) to be misplaced. The court recognizes the "subject matter

waiver" doctrine which "applies where the privilege holder puts privileged communications in issue by virtue of his claims or defenses and prejudices the opposing party . . . ." EEOC v. Johnson & Higgins, Inc., No. 93 Civ. 5481, 1998 U.S. Dist LEXIS 17612, at *27-28 (S.D.N.Y. Nov. 6, 1998). See also In re von Bulow, 828 F.2d 94, 101 (2d Cir. 1987)(noting that the subject matter waiver doctrine "aim[s] to prevent prejudice to a party and distortion of the judicial process that may be caused by the privilege-holder's selective disclosure during litigation of otherwise privileged information").

The defendants cite Bank Brussels Lambert for the proposition that where a party claims reliance on the advice of a lawyer, "the legal advice it received from any other lawyers on that subject relates to the reasonableness of [its] reliance and is not subject to the attorney/client privilege." 210 F.R.D. at 510. However, that case is clearly distinguishable. At issue in both Bank Brussels Lambert and the present case is a party's reliance on the advice of counsel in acting one way or another. To rely on advice, one must have obtained it prior to acting (or failing to act). Ex post facto communications may only serve to confirm or disconfirm that a course of action had been appropriate and perhaps suggest new courses of action to pursue (on which one may then rely in pursuing this new course of action). Logically, reliance on advice that one has yet to receive is not possible.

In Bank Brussels Lambert, the advice of other attorneys

-5-

regarding the proper course of action was put at issue where the nonmoving party claimed fraud and malpractice. Where the third-party defendant's legal advice was filtered through in-house counsel, to adequately prepare its case, the third-party defendant needed to know how its advice was related to the third-party plaintiff. In fact, in that case, the moving party specifically sought documents exchanged with other counsel "*while* [the nonmoving party] considered [a certain type of] financing, and *during the underlying litigation*," as it would "aid in its defense, prove that it did not defraud [the nonmoving party] and prove [the nonmoving party's] state of mind *during the crucial events of the underlying litigation*." Id. at 508 (emphasis added). Here, however, the defendants seek to compel the production of communications with another attorney[1] *after* the alleged reliance which the plaintiff has put at issue. Such communications could not serve as a basis upon which Callahan could have relied at the time he entered into the Agreement since they hadn't occurred yet. That "McEleney necessarily became privy to McGrail's purported advice and acted in furtherance of that advice" (Ds.' Reply Mem. Supp. Mot., 6/14/04, at 3) has no bearing upon that which Callahan put at issue; namely,

---

[1] The defendants make much of the fact that McEleney was McGrail's partner. However, they point to no precedent, and the court is unaware of any, which states that, solely on this basis, communications with one partner may be bootstrapped to communications with another partner when the privilege as to one is waived.

whether he believed, at the time he entered into the Agreement, that he was relinquishing the right to pursue his claim.

That said, the court recognizes that "[t]he attorney-client privilege is waived if the holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the matter or communication over which the privilege is claimed." Fullerton v. Prudential Ins. Co., 194 F.R.D. 100, 102 (S.D.N.Y. 2000)(quoting United States v. Int'l Bhd. of Teamsters, 961 F. Supp. 665, 673 (S.D.N.Y. 1997). While the plaintiff contends that he "gave no detail" about his discussions with McEleney regarding McGrail's thought processes for overturning the Agreement (Pl.'s Mem. Opp. Mot., 6/29/04, at 2-3), this contention ignores the rest of his testimony, which outlined, in bullet-form, the contents of the rest of the communication.  While he may not have gone into great detail, the court finds that Callahan voluntarily disclosed enough of the communication to effectively waive its privileged status.  As such, he is obligated to produce those materials which relate to its subject matter.  On this basis, the defendants' motion to compel is **GRANTED**.

At the conclusion of all proceedings, on application, the court will consider the amount of attorney's fees, if any, that should be awarded in connection with this motion. Fed. R. Civ. P. 37(a).

IT IS SO ORDERED at Hartford, Connecticut this 17th day of August, 2004.

                                              /s/ Thomas P. Smith
                                              Thomas P. Smith
                                              United States Magistrate Judge