UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| WILLIAM E. CALLAHAN, | ) | |
| | ) | Civil Action No. 301 CV1205 (CFD) |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| UNISOURCE WORLDWIDE, INC., | ) | |
| GEORGIA-PACIFIC CORPORATION, | ) | |
| ALCO STANDARD CORPORATION and | ) | |
| IKON OFFICE SOLUTIONS, INC., | ) | |
| | ) | |
| Defendants. | ) | October 29, 2004 |

## UNISOURCE DEFENDANTS' MEMORANDUM
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

### PRELIMINARY STATEMENT

In December 1998, plaintiff William Callahan ("Callahan") left his at-will employment

with defendant Unisource Worldwide, Inc. ("Unisource").  Almost since the date of his departure,

Callahan has engaged in litigation against Unisource and any other entity with a connection to his

former employer – including Georgia-Pacific Corporation ("Georgia-Pacific"), which acquired

Unisource months after Callahan's 1998 departure (Unisource and Georgia-Pacific referred to

collectively as the "Unisource Defendants").  Callahan has also sued IKON Office Solutions, Inc.

("IKON"), which as Alco Standard Corporation ("Alco Standard") owned Unisource until January

1, 1997.[1]

---

[1] IKON is, of course, represented by separate counsel in this case.

Callahan makes two claims against the Unisource Defendants. The uncontroverted facts established during discovery in this case demonstrate, as a matter of law, that neither can be sustained:

First, Callahan alleges that his employment with Unisource ended as the result of age discrimination and that he is entitled to press this claim. However, there is no dispute that Callahan signed a release and separation agreement (the "Release Agreement") that explicitly waived any such action in exchange for substantial consideration including approximately $70,000 in salary continuation. Moreover, it is clear that Callahan himself decided to leave his employment at Unisource, and that there is no factual basis for his claim of age discrimination.

Second, Callahan claims that the decision by IKON's Board of Directors in December 2000 to terminate a deferred compensation plan (the "1991 Plan" or the "Plan"), in which he was a participant by virtue of his prior employment with Unisource, constituted age discrimination and violated the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. He further claims that the Unisource Defendants somehow are culpable for this decision. However, there is no dispute that the Plan was terminated, as to all participants, some two years after he left his employment with Unisource; that its termination was legal and appropriate under ERISA as well as the Plan's own provisions; and, perhaps most importantly, that the Unisource Defendants had no control over the Plan's operation, its termination, or the distribution of payments to former participants.

Simply put, Callahan is wrong on the facts, wrong on the law, and wrong to have pursued his purported claims against the Unisource Defendants notwithstanding his execution of the Release Agreement, his acceptance of $70,000 in salary continuation payments from Unisource, and the utter absence of any rationale for attempting to hold the Unisource Defendants liable for

IKON's legally proper termination of the 1991 Plan.  He has no basis for his action against the

Unisource Defendants, and they are entitled, as a matter of law, to summary judgment in this case.

## FACTUAL BACKGROUND

**I.      Callahan Signed Up To Participate In The 1991 Plan After Being Fully Advised As To Its Provisions And The Possibility That It Could Legally Be Terminated.**

In 1980, Callahan began his employment in sales at a company called Rourke Eno, which

was owned at the time by Alco Standard.[2]  (Callahan Dep. at 39, Ex. A to Rule 56(a)(1)

Statement.[3])   Rourke Eno subsequently changed its name to Unisource.  (See id.)  Effective

January 1, 1997, Alco Standard spun off Unisource, which became a separate corporate entity

unrelated to Alco Standard; Alco Standard changed its name to IKON Office Solutions, Inc.

("IKON") at the same time.  (Hope Dep. at 15, Ex. B to Rule 56(a)(1) Statement[4]; see also Special

Report to Shareholders, attached as Exhibit R to Rule 56(a)(1) Statement.)  Unisource remained an

independent entity until July 1999, when it was acquired by Georgia-Pacific.  (See Affidavit of

Gary Melampy ("Melampy Aff.") at ¶ 4, attached as Ex. C to Rule 56(a)(1) Statement.)  Unisource

remained a separate legal corporate entity following the acquisition.  (Id. at ¶¶ 4- 5.)

In or about November 1990, Callahan elected to participate in a deferred compensation

plan offered to employees of Alco Standard and its subsidiaries, effective commencing January 1,

1991.  (Callahan Dep. at 24-25, Ex. A to Rule 56(a)(1) Statement; Alco Standard Corporation

1991 Deferred Compensation Plan and Prospectus ("Plan and Prospectus"), attached as Ex. D to

---

[2] A chronology of events in this case is attached hereto as Exhibit 1.

[3] Relevant portions of the August 25, 2003 Deposition of William E. Callahan ("Callahan Dep.") are attached as Exhibit A to Defendant's Rule 56(a)(1) Statement of Undisputed Material Facts ("Rule 56(a)(1) Statement").

[4] Relevant portions of the July 6, 2004 Deposition of Walter J. Hope, Jr. ("Hope Dep.") are attached as Exhibit B to Rule 56(a)(1) Statement.

Rule 56(a)(1) Statement.)  The Plan was offered only to certain "highly compensated" employees of Alco Standard and its subsidiaries who met a qualifying income threshold of $100,000.  (Plan and Prospectus at 1, Ex. D to Rule 56(a)(1) Statement.)  It permitted these highly compensated employees to defer a portion of their income until retirement, and additionally to purchase life insurance pursuant to a "split-dollar" arrangement with Alco Standard.  (Id. at 2-3.)

The Plan and Prospectus, provided to prospective participants including Callahan (see Callahan Dep. at 24-25, Ex. A to Rule 56(a)(1) Statement), clearly explained how the Plan was to operate.  Two provisions are especially relevant here.  First, the Plan provided that employees whose employment terminated prior to "vesting," which ordinarily occurred after ten calendar years of service beginning with the effective date of the Plan, would not be entitled to remain in the Plan.  Instead, they would receive the amount of their deferrals, without interest.  (See Plan and Prospectus at 11, Ex. D to Rule 56(a)(1) Statement.)

Second, the Plan contained a provision explicitly permitting its termination at the sole discretion of Alco Standard's Board of Directors.  In the case of Plan termination, participants would receive distributions based not on whether they were "vested" (had completed ten calendar years of service from January 1, 1991), but on whether they had begun to receive benefits at the time of the Plan's termination:

> 19.    Termination.  The Board of Directors of Alco shall have the right to terminate the Plan in its entirety and not in part at any time it determines that proposed or pending tax changes or other events cause, or are likely in the future to cause, the Plan to have an adverse financial impact upon Alco.  In such event, Alco shall have no liability or obligation under the Plan or the Participant's Participation Agreement (or any other document), provided that 1) Alco distributes, in lump sum to any Participant whose benefit payments have not commenced, the value of the amount of the Participant's deferrals to the date of termination plus interest (compounded annually) at a rate of 6% per annum; and 2) Alco distributes, in a lump sum, to any Participant whose benefit payments have commenced, all amounts thereafter due . . . .  Such lump-sum distribution, at Alco's election, may be made in the form of cash, or life insurance, or both.

Plan and Prospectus at 14, Ex. D to Rule 56(a)(1) Statement (emphasis added).

## II.    When Callahan's Employment at Unisource Ended, He Signed A Release Agreement In Which He Waived Claims Against Unisource And Its Affiliates In Exchange For Substantial Consideration.

In 1998, Callahan was employed by Unisource as a Vice President of Customer Service. (Callahan Dep. at 78, Ex. A to Rule 56(a)(1) Statement.)  As set forth above, Unisource was at the time a separate corporate entity unrelated either to IKON (which had spun off the company almost two years earlier) or to existing or future affiliates (including Georgia-Pacific, which would acquire Unisource almost 8 months later).  (See Hope Dep. at 14-16, Ex. B to Rule 56(a)(1) Statement; Melampy Aff. at ¶ 4, Ex. C to Rule 56(a)(1) Statement.)

Until 1995, Callahan had been employed solely in sales positions, where he had enjoyed significant success and a number of promotions over the years.  (See May 27, 1999 Unisource Position Statement ("Position Statement") at 1, attached as Ex. E to Rule 56(a)(1) Statement.)  His tenure in customer service was much less successful.  (See id. at 1-2.)  Indeed, Callahan's supervisors repeatedly had occasion to question Callahan's leadership potential in the customer service position and his suitability for that line of work.  (Id.)  Ultimately, Callahan's supervisors determined that it was not in the company's interest for Callahan to continue in customer service, but that he should return to sales where he had previously excelled.  (Id.)

In September of 1998, Callahan's supervisor, Michael Keneally ("Keneally"), informed Callahan that he had decided to remove him from the customer service position.  (Callahan Dep. at p. 78, Ex. A to Rule 56(a)(1) Statement.)  Keneally offered Callahan the option of taking a position in sales at the same base salary, but Callahan declined.  (Callahan Dep. at pp. 78, 81-82; Position Statement at 2, Ex. E to Rule 56(a)(1) Statement.)  Following his meeting with Keneally in September 1998, Callahan voluntarily decided to leave his employment with Unisource rather than

accept continued employment in another position.  (Callahan Dep. at 97, Ex. A to Rule 56(a)(1) Statement, Position Statement at 2, Ex. E to Rule 56(a)(1) Statement.)

At this point, as of September 1998, Callahan testified that he believed that he was being replaced with a younger employee (see Callahan Dep. at 153, Ex. A to Rule 56(a)(1) Statement), and was aware of comments that allegedly had been made by Unisource executives, which he believed suggested age-discriminatory animus on the company's part.  Specifically, at the time of his resignation, Callahan was aware of a comment allegedly made by Unisource CEO Raymond Mundt in July 1998 that "the company was mired in old ways" and that Mundt wanted to introduce "the bright young leaders of our company."  (Callahan Dep. at 192, Ex. A to Rule 56(a)(1) Statement; see Setta Dep.[5] at 43-46, Ex. F to Rule 56(a)(1) Statement.)  At the time of his resignation, Callahan was also aware of a comment allegedly made by Unisource President Charles White to the effect that "being at Unisource for over 15 years . . . was a kiss of death." (Callahan Dep. at 196, Ex. A to Rule 56(a)(1) Statement.)  Finally, Callahan purportedly heard from a colleague prior to his resignation that, of five marketing vice presidents, three older ones were being terminated while two younger ones were being retained.  (Callahan Dep. at 202-03, Ex. A to Rule 56(a)(1) Statement.)

Once Callahan made clear that he was not interested in the sales position and was instead intending to leave his employment with Unisource, Keneally provided him with a draft Release Agreement, which included a severance benefits package.  (Callahan Dep. at 84, Ex. A to Rule 56(a)(1) Statement.)  Callahan received this document in September 1998.  (Id.)  Within a few days, Callahan had retained an attorney, Albert McGrail ("Attorney McGrail"), to advise him with

---

[5] Relevant portions of the April 8, 2004 Deposition of Gary Setta (" Setta Dep.") are attached as Exhibit F to Rule 56(a)(1) Statement.

respect to the Release Agreement and severance package. (Callahan Dep. at 87, Ex. A to Rule 56(a)(1) Statement.) Significantly, Callahan testified that he and Attorney McGrail discussed the allegedly discriminatory comments by Unisource executives and his alleged replacement by a younger employee at their very first meeting, some time in October or November of 1998. (Callahan Dep. at 191, Ex. A to Rule 56(a)(1) Statement.)

Over the next weeks, Callahan, Attorney McGrail, and Gary Setta ("Setta"), the Vice President of Human Resources for Unisource, discussed the terms of the Release Agreement in at least one lengthy meeting and on numerous telephone conferences. (Callahan Dep. at 89, Ex. A to Rule 56(a)(1) Statement; see also January 13, 1999 Invoice of McEleney & McGrail, attached as Exhibit G to Rule 56(a)(2) Statement.) One issue of particular concern for Callahan was the non-compete language in the draft Release Agreement, which would preclude him from competing with Unisource in the future. (Callahan Dep. at 90-91, Ex. A to Rule 56(a)(1) Statement.) Following negotiations between Callahan, Attorney McGrail and Setta, Unisource removed the non-compete language from the Release Agreement. (Callahan Dep. at 91, Ex. A to Rule 56(a)(1) Statement.) Callahan also sought and received other concessions from Unisource, including the right to purchase his company car. (Compare draft Release Agreement, attached as Ex. H to Rule 56(a)(1) Statement, with executed Release Agreement, attached as Exhibit I to Rule 56(a)(1) Statement).

On or about December 24, 1998, Callahan executed a finalized copy of the negotiated Release Agreement. The Release Agreement that Callahan ultimately signed included a generous salary continuation package equating to seven months' salary and various other substantial benefits. (See Release Agreement, Ex. I to Rule 56(a)(1) Statement.)

The Release Agreement also included specific language concerning Callahan's continued participation in the 1991 Plan. As set forth above, under the terms of the Plan, an employee whose employment terminated prior to "vesting" would receive his contributions, without interest, in a lump-sum payment. (See Plan and Prospectus at 11, Ex. D to Rule 56(a)(1) Statement.) Paragraph 8 of the Release Agreement, which related to the 1991 Plan, provided that Callahan would be fully vested in the Plan, which meant that his contributions would not be returned to him upon the termination of his employment with Unisource. (See id.; see also Hope Dep. at 76-77, Ex. B to Rule 56(a)(1) Statement.) Instead, as set forth in the Release Agreement:

> 8.   *__Deferred Compensation__*. Benefits under the 1991 IKON Office Solutions, Inc. (formerly Alco Standard Corporation) Deferred Compensation Plan will vest 100% and be distributed to you in the future, in accordance with the provisions of the Plan. You must continue to make the annual premium payments under the 1991 IKON Office Solutions, Inc. Deferred Compensation Plan to your age 65 to perpetuate the lump sum death benefit and age 65 policy transfer thereunder. . . .

Release Agreement at 2 (emphasis added), Ex. I to Rule 56(a)(1) Statement. Accordingly, this provision allowed Callahan to remain a participant in the 1991 Plan, instead of having his deferrals returned to him in lump sum and with no accumulated interest. (Id.; see also Hope Dep. at 76-77, Ex. B to Rule 56(a)(1) Statement; Callahan Dep. at 103-04, Ex. A to Rule 56(a)(1) Statement.)

W.J. Hope, an IKON employee who was at the time the Plan Administrator for the 1991 Plan, testified that this type of "vesting," to prevent an immediate lump-sum distribution of deferrals, was not uncommon:

> It is possible, and it has [been done] in various agreements, for an agreement to give, quote, vesting, closed quote, and thereby protect one from an immediate payout and preserve whatever rights they might otherwise have under the plan.

(Hope Dep. at 78, Ex. B to Rule 56(a)(1) Statement.)

In exchange for all of the consideration extended to him under the terms of the Release Agreement, Callahan executed a general release in which he agreed that:

In consideration for the additional benefits extended to you in this letter, and intending to be legally bound hereby: (1) you agree to release and hold harmless forever [Unisource], its direct and indirect subsidiaries and affiliates [including but not limited to Georgia-Pacific], directors, officers and employees **from any and all causes of action, known or unknown, arising out of or relating to your association and/or employment with or termination from the Company, which may have existed prior to or contemporaneously with the execution of this agreement, including but not limited to . . . the Age Discrimination in Employment Act of 1967 as amended,** and the Older Workers Benefit Protection Act of 1990 . . . or any other federal, state, or local law (statutory or common) relating to discrimination in employment.

Release Agreement at 3, Ex. I to Rule 56(a)(1) Statement (emphasis added).

**III.     Callahan Immediately Breached The Release Agreement By Bringing A Discrimination Claim Against Unisource.**

In March 1999, practically before the ink had dried on his signature to the Release Agreement, Callahan breached it by bringing a claim of age discrimination against Unisource (not Georgia-Pacific) before the Connecticut Commission on Human Rights and Opportunities.  (See Affidavit of Illegal Discriminatory Practice, attached as Exhibit J to Rule 56(a)(1) Statement.)  In proceedings before the CHRO, Callahan claimed that he entered into the Release Agreement under duress and as a result of coercion by Unisource – all claims that the CHRO rejected.  (See August 23, 1999 Notice of Final Agency Action, attached as Exhibit K to Rule 56(a)(1) Statement, and March 21, 2000 Merit Assessment Review Reconsideration Form, attached as Exhibit L to Rule 56(a)(1) Statement.)  CHRO ultimately allowed the case to proceed only after the termination, by IKON, of the 1991 Plan, a termination that Callahan insisted could somehow be linked to Unisource.  (See December 13, 2000 Letter from William Callahan, attached as Exhibit M to Rule 56(a)(1) Statement.)  Prior to having to make any such showing of nexus between IKON's termination of the Plan and Unisource, Callahan filed this case in federal court, resulting in the dismissal of the CHRO action.

Callahan acknowledged that his breach of the Release Agreement was intentional and premeditated. Indeed, he testified explicitly and unambiguously that he intended at the time he executed it to violate the Release Agreement and to sue Unisource:

Q:    Did you recognize you were waiving valuable legal rights?

A:    No, because I was told by Attorney McGrail I could sign it and still sue them.

Q:    What did Mr. McGrail say?

A:    What did he say?

Q:    Yes. You could sign this and still sue the company?

A:    Yes.

(Callahan Dep. at 130-34, Ex. A to Rule 56(a)(1) Statement.)

## IV.    IKON Terminated The 1991 Plan Pursuant To Its Explicit Provisions And Made Distributions As Required Under The Plan, Including To Callahan.

In 2000, the IKON Board of Directors (formerly the Alco Standard Board of Directors) decided to terminate the Plan, pursuant to its conclusion that "tax law changes or other events [have] cause[d], or are likely in the future to cause, the Plan to have an adverse financial impact upon Alco." (Plan and Prospectus at 14, Ex. D to Rule 56(a)(1) Statement.) The decision to terminate was made exclusively and solely by the Board of Directors, with input limited to a few other employees of IKON. (Hope Dep. at 43-50, Ex. B to Rule 56(a)(1) Statement.) Through the Plan Administrator, W.J. Hope, IKON notified Plan participants, including Callahan, of the pending termination, which was to be effective as of December 31, 2000. (Undated Termination Letter, attached as Exhibit N to Rule 56(a)(1) Statement.)

Upon termination, the Plan provided for all participants (whether "vested" or not) whose benefit payments had not yet commenced to receive their deferrals plus 6 percent interest. (Plan and Prospectus at 14, Ex. D to Rule 56(a)(1) Statement.) Callahan, whose benefit payments had

not commenced at the time of Plan termination, accordingly was issued a lump-sum distribution

comprising his deferrals plus 6 percent interest.  (Callahan Dep. at 64, Ex. A to Rule 56(a)(1)

Statement.)[6]

IKON's calculation of Callahan's termination benefit payment was in accordance with the

plain language of the Plan document, and was entirely proper.  (See September 13, 2004 Opinion

and Order in Holcomb v. IKON Office Solutions, Inc., No. 2:03-CV-106 (copy attached hereto as

Exhibit 2).)  In Holcomb, the plaintiff claimed that the IKON Board's decision to terminate the

Plan was improper.  Id.  The Court rejected this claim, granting summary judgment to IKON.  Id.

Importantly, the Court noted that, for purposes of determining a Plan participant's entitlement to

benefits upon termination of the Plan, the participant's "vested" status had no relevance:

> Vesting would have determined what benefits [a participant] would have received
> upon retirement or age 65, even if he left the company, if the Plan had continued. . .
> . The termination clause in the Plan governed the benefits he would receive in the
> event that the Plan was terminated, even if he had been fully vested at the time of
> termination.

Id. at 4 n.1 (emphasis added).

Neither Unisource nor Georgia-Pacific, which had in the meantime acquired Unisource,

had any involvement in the November 2000 decision to terminate the 1991 Plan or in the

calculation of payments due to Plan participants.  (See Melampy Aff. at ¶ 9, Ex. C to Rule 56(a)(1)

Statement.)  Indeed, the Plan documents did not on their face afford any role in this decision to

either of the Unisource Defendants, and in fact no agent of Unisource or Georgia-Pacific

---

[6] Some 25 other former Plan participants were "vested" at the time of termination due to various separation or early retirement agreements, but all similarly received in a lump-sum distribution their deferrals plus 6 percent interest.  (See Hope Dep. at 122-23, Ex. B to Rule 56(a)(1) Statement; see also January 3, 2001 E-mail from Woody Hope to Carol McGowan, attached as Exhibit O to Rule 56(a)(1) Statement; June 21, 2000 Letter from W.J. Hope to Gary Melampy, attached as Exhibit P to Rule 56(a)(1) Statement.)

participated in the decision.  (Plan and Prospectus, Ex. D to Rule 56(a)(1) Statement; Melampy

Aff. at ¶ 9, Ex. C to Rule 56(a)(1) Statement; see also June 23, 2000 Letter from Gary Melampy to

W.J. Hope, attached as Exhibit Q to Rule 56(a)(1) Statement**.**)  Hope, the Plan Administrator, met

with some employees of Georgia-Pacific concerning the pending termination only <u>after</u> the

decision to terminate had been made, and pursuant to a notice requirement that stemmed from

Alco Standard's spinoff of Unisource.  (Hope Dep. at 53, 62, Ex. B to Rule 56(a)(1) Statement.)

In his opposition to a motion to dismiss filed by the Unisource Defendants, Callahan

promised that he could and would demonstrate the Unisource Defendants' "relationship" with

IKON and facts by which either Unisource or Georgia-Pacific could be held liable under either an

age discrimination or an ERISA theory.  Importantly, no such evidence of a nexus between these

corporations emerged during more than two years of discovery in this case.  It is clear and

undisputed that:

- When Callahan signed up to participate in the 1991 Plan, it was through Alco Standard (later IKON).  Georgia-Pacific had no part whatsoever in that transaction.

- When Callahan left his employment at Unisource, neither IKON nor Georgia-Pacific had any corporate affiliation, of any kind, with Unisource.

- When IKON terminated the 1991 Plan, IKON had no corporate affiliation, of any kind, with either Unisource or Georgia-Pacific.

## ARGUMENT

**I.    The Unisource Defendants Are Entitled To Summary Judgment On Callahan's Age Discrimination Claim.**

Although Callahan's age discrimination claim is somewhat difficult to parse, it appears to

stem both from the end of his employment with Unisource in December 1998, and from the fact

that IKON subsequently terminated the 1991 Plan.  As to the first, he makes some allegations

concerning his purportedly unfair treatment at the hands of supervisors and his alleged termination in favor of a younger employee. As to the second, he claims that the Unisource Defendants misrepresented what he would be entitled to under the 1991 Plan, and "direct[ed] and/or permit[ted]" IKON to terminate the Plan to his alleged detriment. (See Am. Compl. at 5.)

Neither claim can survive scrutiny. To the extent that Callahan had a viable claim of discrimination resulting from his treatment while an employee at Unisource – and, as set forth below, his allegations do not support such a claim – he clearly and unequivocally waived any age discrimination claim when he signed the Release Agreement. As for an age discrimination claim stemming from IKON's termination of the 1991 Plan, Callahan cannot point to a shred of evidence (1) that the Unisource Defendants made any misrepresentations about this termination or about its potential to occur; or (2) that the Unisource Defendants were involved in any way with IKON's decision to terminate the Plan. Finally, Callahan can point to no coherent or plausible basis for holding Georgia-Pacific liable for alleged discrimination on the part of Unisource that took place well before Georgia-Pacific acquired Unisource. Because Callahan's claim of age discrimination is predicated on faulty legal assumptions and on wildly speculative factual assertions that have turned out, after years of discovery, to have no basis whatsoever, this claim should be dismissed.

**A.    Legal Standard.**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "A motion for summary judgment will be granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law." Russell v. Eldridge, 832 F. Supp. 535, 537 (D. Conn. 1993)(citation omitted);

see also Richardson v. Selsky, 5 F.3d 616, 621 (2d Cir. 1993).  Summary judgment is not a

disfavored procedural shortcut, but is rather "an integral part of the Federal Rules as a whole,

which are designed to 'secure the just, speedy and inexpensive determination of every action.'"

Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (citations omitted).  It is a tool designed to

"winnow out from the trial calendar those cases whose facts predestine them to result in a directed

verdict."  United Nat'l Ins. Co. v. Tunnel, Inc., 988 F.2d 351, 355 (2d Cir. 1993).  "Properly used,

summary judgment permits a court to streamline the process for terminating frivolous claims and

to concentrate its resources on meritorious litigation."  Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12

(2d Cir. 1986).

A plaintiff may not defeat summary judgment by resting on "mere allegations or denials,"

see St. Pierre v. Dyer, 208 F.3d 394, 404 (2d Cir. 2000), but must set forth specific facts showing

that there is a genuine issue for trial.  See Fed. R. Civ. P. 56(e).  Thus, a plaintiff cannot defeat a

motion for summary judgment by "offering purely conclusory allegations of discrimination, absent

any concrete particulars. . . ."  Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985); see also

Bickerstaff v. Vassar Coll., 196 F.3d 435, 452 (2d Cir. 1999) (holding that "[s]tatements that are

devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly

supported motion for summary judgment").  If the evidence presented by the non-moving party is

"merely colorable, or is not significantly probative, summary judgment may be granted."  Scotto v.

Almenas, 143 F.3d 105, 114 (2d Cir. 1998) (citation and internal quotations omitted).  Mere

conjecture or speculation will not create a genuine issue of material fact.  Manessis v. N.Y. City

Dep't of Transp., No. 02 Civ. 359, 2003 U.S. Dist. Lexis 1921, at *9 (S.D.N.Y. Feb. 10, 2003)

(citation omitted), aff'd, 86 Fed. Appx. 464 (2d Cir. 2004).[7]

---

[7] Copies of unreported cases are attached hereto as Exhibit 3.

Regardless of the substance of a plaintiff's allegations, a defendant employer is entitled to summary judgment where the plaintiff has signed a release explicitly waiving such claims. See Rice v. Pratt & Whitney, Civ. No. H:90-704 (AVC), 1996 U.S. Dist. LEXIS 16911, at *12 (D. Conn. Sept. 27, 1996) (granting summary judgment with respect to ADEA claims where plaintiff "clearly and unambiguously" released employer from all such claims), Nicholas v. NYNEX, Inc., 929 F. Supp. 727, 733 (S.D.N.Y. 1996) (same). Moreover, a corporate entity that did not employ the plaintiff in an age discrimination case cannot as a matter of law be held liable on that ground. See 29 U.S.C. §§ 623, 630(b).

**B.    Callahan Clearly Waived Any Age Discrimination Claim Stemming From His Voluntary Departure From Employment at Unisource.**

As set forth above, Callahan admits that, upon leaving his employment with Unisource and while represented by counsel, he negotiated and signed a Release Agreement that explicitly waived any claim of age discrimination against Unisource or an existing or future affiliate, including Georgia-Pacific. (See Release Agreement at 3, Ex. I to Rule 56(a)(1) Statement.) This Release Agreement is valid, effective, and should be enforced by this Court as a basis for granting summary judgment to the Unisource Defendants on Callahan's age discrimination claim.

1.    Callahan's Waiver Was Knowing And Voluntary.

Courts in the Second Circuit routinely grant summary judgment to employers whose employees have knowingly and voluntarily released claims. For example, in Yablon v. Stroock & Stroock & Lavan Retirement Plan and Trust, 98 Fed. Appx. 55, 57 (2d Cir. 2004), the plaintiff executed a release in his separation agreement that waived all future claims, including those under ERISA. Id. The Court stated that such a waiver, even for ERISA claims, was valid if it was "knowing and voluntary," and held that it clearly would be found both knowing and voluntary where, as here, the plaintiff was educated, well-versed in business, had three months to consider

the agreement, negotiated its terms (including a substantial severance package), and – perhaps most important – was represented throughout by counsel.  See id.; see also Bachiller v. Turn On Products, Inc., 86 Fed. Appx. 465, 466-67 (2d Cir. 2004) (upholding a valid waiver of any claims, including those under the ADEA, when the waiver gave time to consider and consult an attorney and thus was "knowing and voluntary"); Yablon v. Stroock & Stroock & Lavan Retirement Plan and Trust, 2002 U.S. Dist. LEXIS 10528 at *1-18 (S.D.N.Y. 2002) (upholding "knowing and voluntary" waiver on similar showing).

Throughout proceedings before the CHRO and this Court, Callahan has argued that the Release Agreement is unenforceable, contending that it was entered into under duress and coercion and as a result of misrepresentations by Unisource.  Again, neither claim survives scrutiny.

a.    As A Matter Of Law, There Was No Duress Or Coercion.

Callahan has explained in exhaustive detail his claim that his execution of the Release Agreement was the result of duress or coercion:

- Callahan first identified his recent purchase of a vacation home.  Specifically, in August 1998, Callahan paid $500 in earnest money toward the purchase of a vacation home and committed to pay approximately $5,800 more in October. (Callahan Dep. at 119-20, 134, Ex. A to Rule 56(a)(1) Statement.)

- Second, Callahan claimed that Unisource made a "broken promise of continued employment," by telling him that he would remain in his job shortly before removing him from the customer service position.  (Callahan Dep. at 135, Ex. A to Rule 56(a)(1) Statement.)

- Third, Callahan stated that "[t]he fact that I was showing up for work every day with nothing to do" between September 1998, when he was removed from the

customer service position, and his departure from Unisource in December 1998, constituted duress.  (Callahan Dep. at 135, Ex. A to Rule 56(a)(1) Statement.)

- Fourth, Callahan claimed that Unisource's refusal to provide him with some of the consideration that he requested during the negotiation of the Release Agreement, such as years of service for pension purposes, was unfair and entitled him to vitiate the Release Agreement.  (Callahan Dep. at 134, Ex. A to Rule 56(a)(1) Statement.)

- Finally, Callahan claimed as duress "[t]he fact that my son was getting ill, we attributed it to this uncertainty [about his economic situation]." (Callahan Dep. at 136, Ex. A to Rule 56(a)(1) Statement.)

As a matter of law, these factors are not legally sufficient to invalidate the Release Agreement.  Under Connecticut law, in order to establish duress, a plaintiff must prove "(1) a wrongful act or threat (2) that left the victim with no reasonable alternative, and (3) to which the victim in fact acceded, and that (4) the resulting transaction was unfair to the victim." Weisman v. Kaspar, 233 Conn. 531, 549 n.15 (1995).  Absent some predicate act that is legally impermissible, no claim for duress can stand.  Twachtman v. Hastings, No. CV 9557307S, 1997 Conn. Super. LEXIS 2014, at *25 (Conn. Super. July 23, 1997) (holding that a claim of duress cannot be "predicated on a demand which is lawful or upon the assertion of a legal right").  Moreover, the wrongful conduct "must induce a fearful state of mind in the other party, which makes it impossible for him to exercise his own free will." Zebedeo v. Martin E. Segal Co., 582 F. Supp. 1394, 1417 (D. Conn. 1984).  Finally, and of particular importance in this case, "[i]n the absence of threats of actual bodily harm, *there can be no duress where the contracting party is free to consult with counsel*." Lawler v. Blazawski, No. CV 940056909S, 1998 Conn. Super. LEXIS 392, at *25 (Conn. Super. Feb. 11, 1998) (emphasis added) (citations omitted).

Based on these factors, Second Circuit courts have had no trouble in routinely rejecting a defense of duress to a validly executed waiver.  See, e.g., Williams v. Parkell Products, Inc., 91 Fed. Appx. 707, 708-09 (2d Cir. 2003) (affirming that a "threat of termination" is insufficient for duress); Morganti National, Inc. v. Petri Mechanical Co., Inc., 2004 U.S. Dist. LEXIS 8659 at *15-18 (D. Conn. May 13, 2004) (granting summary judgment and stating that "financial pressure is insufficient" for a defense of duress to a validly executed waiver); Morales v. Rent-A-Center, Inc., 306 F. Supp. 2d 175, 181-82 (D. Conn. 2003) (internal citations omitted) (stating it is "not sufficient to show that consent was secured by the pressure of financial circumstances" or that the employee would merely have faced "financial repercussions" if he left his job).

Here, Callahan's assertion of duress falls short in every respect.  First and foremost, his representation by counsel throughout negotiations over the content of the Release Agreement precludes him from claiming duress.  As set forth above, Callahan sought and obtained counsel shortly after being presented with a draft Release Agreement in September 1998.  Attorney McGrail, along with Callahan himself, was actively involved in negotiations that included at least one lengthy meeting and numerous telephone calls.[8]  Under Connecticut law, this fact alone bars any claim that Callahan entered into the Agreement under duress.  See Lawler, 1998 Conn. Super. LEXIS 392, at *25; see also Zebedeo, 582 F. Supp. at 1417 (finding that evidence of "ongoing, active negotiation" between the defendant and a plaintiff who was represented throughout by counsel precluded a finding that the plaintiff had executed the parties' agreement under duress).  Indeed, as in Zebedeo, "nothing in the substantive terms of the Agreement displays duress."  Id.

---

[8] Indeed, Callahan testified that he discussed with his counsel his intention to sign the Release Agreement and then to breach it.  (See Callahan Dep. at 130-34, Ex. A to Rule 56(a)(1) Statement.)  This testimony, in and of itself, demonstrates that Callahan was not feeling coerced but was, instead, thoughtfully considering a variety of options (legitimate or not).

The terms of the final Release Agreement, particularly as compared with the original draft proposal, manifest Callahan's direct and meaningful participation. In addition to seven months of guaranteed salary continuation, its new terms (the opportunity to purchase his company car) and omissions (the non-compete provision that Callahan had objected to) are telling indicia that Callahan had bargaining power, and used it to his benefit. Far from demonstrating an absence of free will, the Release Agreement evidences an abundance of it.

Even if Callahan had not been represented by counsel during negotiations, as he concededly was, as a matter of law he cannot claim duress where there is no evidence that Unisource engaged in any unlawful activity with respect to the Release Agreement or that Callahan lacked any reasonable alternative but to sign it. Indeed, most of Callahan's allegations concern pressures he purportedly felt stemming from external circumstances, such as his son's illness and his concern about his ability to consummate the vacation home purchase. While such concerns may have been real and pressing to Callahan, they are not circumstances that can form the basis for invalidating his Release Agreement with Unisource. See Lawler, 1998 Conn. Super. LEXIS 392, at *26-27 (to establish duress, "it is not sufficient to show that consent was secured by the pressure of financial circumstances"); In re Travis R., 2002 Conn. Super. LEXIS 3933, at *13 (Conn. Super. 2002) (emotional pressures that had no relationship to wrongdoing by other party cannot constitute duress); Morales, 306 F. Supp. 2d at 181-82 (D. Conn. 2003) (external financial circumstances cannot support claim of duress); Morganti, 2004 U.S. Dist. LEXIS 8659 at *15-18 (same).

The remainder of Callahan's allegations, such as that he was "showing up for work every day with nothing to do," that his request for additional compensation in the Release Agreement was rejected, and that his supervisors had broken a "promise" of employment, simply do not

evidence an unlawful act on the part of Unisource.[9]  And while Callahan's alternatives – which included accepting the sales position at Unisource for the same salary, forgoing the vacation home opportunity, or leaving his employment at Unisource without the benefit of the salary continuation provided pursuant to the Release Agreement – may not have been attractive to him, they were real options, which as a matter of law eviscerate any claim of duress.

b.    As A Matter of Law, There Were No Misrepresentations By Unisource.

In a last-ditch effort to salvage his age discrimination claim, Callahan claimed that the Release Agreement is unenforceable because Unisource misrepresented the benefits that would be available to him by signing it, specifically benefits pursuant to the IKON Plan.  His claim founders, however, due to the complete absence of evidence of any such written or oral misrepresentation.  Indeed, the record is clear that there were no such misrepresentations.

First, there are no misrepresentations in the Release Agreement.  Under its explicit language, the only thing that Callahan contracted for was the right to receive benefits pursuant to the IKON Plan "in accordance with the provisions of the Plan."  (See Release Agreement at 2, Ex. I to Rule 56(a)(1) Statement.)  It is clear from the face of the IKON Plan that those "provisions" included the right of the IKON Board of Directors to terminate.  (See Plan and Prospectus at 14, Ex. D to Rule 56(a)(1) Statement.)   Accordingly, on its face the Release Agreement contains no misrepresentations.  Callahan did, in fact, receive benefits from the IKON Plan "in accordance with the provisions of the Plan": When the Plan was terminated, he received the termination benefit of deferrals plus 6 percent interest, exactly as did the other participants, "vested" or

_____

[9] Any such alleged "promise," of course, also would be waived by the Release Agreement, in which Callahan waived "any and all causes of action, known or unknown, arising out of or relating to [his] association and/or employment with or termination from the Company."  (See Release Agreement at 3, Exhibit I to Rule 56(a)(1) Statement.)

unvested, whose benefit payments had not commenced. (See Hope Dep. at 122-23, Ex. B to Rule 56(a)(1) Statement; Callahan Dep. at 65, Ex. A to Rule 56(a)(1) Statement; see also January 3, 2001 E-mail from Woody Hope to Carol McGowan, Ex. O to Rule 56(a)(1) Statement; June 21, 2000 Letter from W.J. Hope to Gary Melampy, Ex. P to Rule 56(a)(1) Statement.) This distribution was appropriate and legal under the terms of the Plan. (See Holcomb, Ex. 2 hereto.) That Callahan's legal distribution was less than he had hoped for does not in any way impugn the veracity of the Release Agreement.

Second, there is no evidence of oral misrepresentation. Callahan has suggested that Unisource knew at the time it entered into the Release Agreement that IKON, a wholly unrelated corporate entity, would terminate the IKON Plan and provide participants with the predesignated termination benefit rather than the benefits they would have received had the Plan remained in effect. (See, e.g., Pl.'s Mem. in Support of Obj. to Def.'s Mot. to Dismiss at 7.) This allegation requires evidence of a conspiracy on a grand scale, given that (1) the IKON Plan was not terminated until a full two years after Callahan left employment with Unisource; (2) IKON and Unisource were unrelated corporate entities; and (2) the Plan was terminated by the IKON Board of Directors, not either of the Unisource Defendants.

Not a shred of such evidence exists. Indeed, after two years of discovery, Callahan has absolutely no support for the contention that the Unisource Defendants could have predicted the demise of the 1991 Plan, that they were related in any way to Unisource, or that they were involved in any way in its termination. (See Callahan Dep. at 70-71, Ex. A to Rule 56(a)(1) Statement.) That is because these claims, always wildly speculative, are demonstrably untrue. Neither of the Unisource Defendants was ever involved in the administration of the 1991 Plan, which instead was administered at all times by Alco Standard (later IKON). (See Melampy Aff.

at ¶ 9, Ex. C to Rule 56(a)(1) Statement.)  Moreover, neither of the Unisource Defendants had the right to decide to terminate the Plan.  (<u>See id.</u>; Plan and Prospectus, Ex. D to Rule 56(a)(1) Statement.)  Accordingly, neither of the Unisource Defendants was (or could have been) involved in the decision to terminate the 1991 Plan and to make distributions to former Plan participants. (<u>See id.</u>; <u>see also</u> June 23, 2000 Letter from Gary Melampy, Ex. Q to Rule 56(a)(1) Statement.)

Absent any evidence that Unisource knew or should have known that the Plan would be terminated years after Callahan's departure from employment and his execution of the Release Agreement, there can obviously be no claim of misrepresentation.  Falsity is "an essential element of a negligent misrepresentation claim, and . . . [plaintiff] bears the burden of demonstrating that the defendants made certain representations . . . that were in fact untrue." <u>Daley v. Aetna Life & Cas. Co.</u>, 249 Conn. 766, 793 (Conn. 1999), <u>citing</u> <u>Beverly Hills Concepts, Inc. v. Schatz & Schatz, Ribicoff & Kotkin</u>, 247 Conn. 48, 57, 717 A.2d 724 (1998); <u>Williams Ford, Inc. v. Hartford Courant Co.</u>, 232 Conn. 559, 575, 657 A.2d 212 (1995).  Callahan has not pointed to a single false statement made by the Unisource Defendants, and his attempt to invalidate the Release Agreement on the ground of an alleged misrepresentation simply fails.

Given the uncontroverted facts of this case, there is no basis for this Court to overlook the parties' validly negotiated, validly executed Release Agreement.  Accordingly, the Court should dismiss Callahan's age discrimination claim.

     2.    <u>Callahan Ratified The Release Agreement Through His Acceptance Of More Than $70,000 In Salary Continuation Payments And His Failure To Tender Back Any Of That Consideration.</u>

As set forth above, Callahan testified that he accepted more than $70,000 in salary continuation payments provided to him by Unisource, and that he never sought to return any portion of that money to Unisource.  (Callahan Dep. at p. 181, Ex. A to Rule 56(a)(1) Statement.)

This fact, alone, serves to bar Callahan from maintaining any action for age discrimination against either of the Defendants.

It is boilerplate law that:

if a party enters a contract under duress, once the duress is removed the party claiming duress must choose either to repudiate the contract promptly or to acquiesce to its terms pursuant to the doctrine of ratification. . . . In addition, a party seeking to avoid enforcement of a release must satisfy the "tender-back requirement . . . . Under the tender back requirement, one who seeks to avoid the effect of a release must first return or tender the consideration paid him in connection with his execution of a release.

Harless v. Research Inst., 1 F. Supp. 2d 235, 242 (S.D.N.Y. 1998) (citation and internal quotations omitted) (granting summary judgment on a finding that plaintiff had ratified any defect in release by his failure to return consideration paid to him by defendant).  While a defendant may be precluded from enforcing a release against an ADEA plaintiff or demanding tender back if the defendant has failed to comply with the requirements of the Older Workers Benefit Protection Act ("OWBPA"), 29 U.S.C. § 626(f), see Oubre v. Entergy Ops., Inc., 522 U.S. 422, 428-29 (1998), absent such a defect releases of ADEA claims are fully enforceable.  See, e.g., Faris v. Williams WPC-I, Inc., 332 F.3d 316, 321 (5th Cir. 2003) (noting that courts readily enforce waivers of the right to bring suit under the ADEA and that such waivers are not void as against public policy).

In this case, it is uncontroverted that Callahan failed to tender back any of the more than $70,000 in salary continuation payments – money to which he would not have been entitled absent his execution of the Release Agreement – to Unisource.  Moreover, the record is devoid of any evidence that the Release Agreement fell short of the OWBPA requirements.  Accordingly, any claim that existed at the time that Callahan entered into the Release Agreement – including any claim that the Defendants discriminated against him on the basis of his age – was released by Callahan's retention, to this date, of salary continuation payments from Unisource.

3.    <u>Even If The Release Agreement Was Somehow Defective, Callahan Is Equitably Estopped From Challenging It Where He Fraudulently Induced Unisource Into Providing Him With Salary Continuation Payments.</u>

Finally, even if the Release Agreement was otherwise voidable, Callahan should be equitably estopped from challenging it given his sworn testimony that he entered into it with the full and conscious intention of violating its terms, and the undisputed fact that he lived up to his intention just three months later by filing an age discrimination complaint with the CCHRO.

Under Second Circuit law, "the doctrine of equitable estoppel is properly invoked where the enforcement of the rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct." <u>Kosakow v. New Rochelle Radiology Assocs.</u>, 274 F.3d 706 (2d Cir. 2001)  The <u>Kosakow</u> court explained that:

> Under federal law, a party may be estopped from pursuing a claim or defense where: (1) the party to be estopped makes a misrepresentation of fact to the other party with reason to believe that the other party will rely upon it; (2) and the other party reasonably relies upon it; (3) to her detriment.

<u>Id</u>. (citations omitted).  Accordingly, a party who induces the other party to enter into an agreement by making a misrepresentation of fact will be estopped from later challenging its terms. <u>See, e.g.</u>, <u>Meyerson v. Werner</u>, 683 F.2d 723, 728 (2d Cir. 1982).

In this case, it is uncontroverted that Callahan deliberately mispresented to Unisource his intentions regarding the Release Agreement, and that Unisource relied on Callahan's misrepresentation to its detriment by providing him with over $70,000 in salary continuation payments.  Given these facts, the doctrine of equitable estoppel must operate to bar Callahan from challenging the enforceability of the Release Agreement and its waiver of any ADEA claim.

**C.**   **Callahan Has No Evidence To Support His Claim of Age Discrimination.**

Even if Callahan had not executed the Release Agreement waiving the very claim he now purports to bring, as a matter of law, he cannot sustain this claim given the facts that emerged during discovery.

1.   Callahan Cannot Establish A Prima Facie Case Of Age Discrimination.

In order to prevail on his claim for age discrimination, Callahan would first have to establish a prima facie case that (1) he is a member of a protected class; (2) he is qualified for his position; (3) he has suffered adverse employment action; and (4) the circumstances surrounding that action give rise to an inference of discrimination.  See Blught v. Consol. Edison Co., No. 00 Civ. 3309, 2002 U.S. Dist. Lexis 1845, at *12 (S.D.N.Y. Feb. 5, 2002).  While it is undisputed that Callahan is over 40 and therefore a member of a protected class, Callahan cannot meet the remaining requirements of a prima facie case.

a.   Callahan Was Not Qualified For The Customer Service Position, But Rejected An Offer To Return To Sales And Instead Voluntarily Left Employment At Unisource.

The record is undisputed that Callahan, who had worked his entire career at Unisource in sales, shifted in 1995 to a customer service position where he was markedly less successful. Indeed, Callahan's supervisors repeatedly expressed concern about his ability to show the necessary leadership skills in that position.  (See Position Statement at 1-2, Exhibit E to Rule 56(a)(1) Statement.)  In 1998, as part of a corporate reorganization, Callahan was told that he would be replaced as vice president of customer service because of these concerns about his leadership ability.  (See id.)  Notably, Callahan was not fired.  Instead, he was offered an opportunity to return to his old field, sales, where he previously had been very successful.  (See id.)  Callahan declined this offer, instead leaving his employment at Unisource.  (Id.)

Given these undisputed facts, Callahan cannot establish either that he was qualified for his position or that he suffered an adverse employment action. Indeed, the record is clear that Callahan did not suffer any such adverse action; he was offered a position in sales, his field of expertise, at no reduction in base pay. It was Callahan's choice to reject this offer and instead to leave his employment at Unisource. He cannot now translate this choice into a legal cause of action against the Unisource Defendants. See, e.g., Warren v. Chemical Bank, 1999 U.S. Dist. LEXIS 19732, at * 2, 8-9 (S.D.N.Y. Dec. 22, 1999) (granting summary judgment on discrimination claim, finding that plaintiff had not suffered any adverse employment action where she voluntarily resigned); Leson v. ARI of CT, Inc., 51 F. Supp. 2d 135, 139, 142 (D. Conn. 1999) (holding that an employee who resigned could not claim that she had suffered an adverse action, and noting that "an adverse action is not every action that the employee dislikes or disagrees with."); Sedotto v. Borg-Warner Protective Services Corp., 94 F. Supp. 2d 251, 268 (D. Conn. 2000) (an employee who intended to resign could not claim an adverse employment action by her employer).

    b.    <u>The Circumstances Of This Case Do Not Give Rise To An Inference Of Discrimination.</u>

Not only can Callahan not show that he was qualified and that he suffered an adverse employment action, he is completely unable to demonstrate any facts tending to give rise to an inference of discrimination. As set forth above, Unisource's conduct in the events surrounding Callahan's departure from employment was exemplary. Unisource made every effort to retain Callahan, to place him back in the environment in which he had excelled, and at no diminution in salary. (See Position Statement at 1-2, Ex. E to Rule 56(a)(1) Statement.) This is simply not a case where discrimination can be inferred.

2.      Callahan Rejected The Sales Position And Decided Of His Own Volition To Leave
        Employment at Unisource.

Even if Callahan were able to establish a prima facie case of discrimination, which as set

forth above he cannot do, his discrimination claim fails where the record is clear that it was his

own choice to reject the sales position offered to him by Unisource and instead to leave his

employment.  (See id.; see also Callahan Dep. at 78, 81-2, Ex. A to Rule 56(a)(1) Statement.)

Callahan's decision to leave Unisource certainly constitutes a legitimate, nondiscriminatory reason

for the termination of his employment, see Bluight, 2002 U.S. Dist. Lexis 1845, at *8, and

precludes him from claiming discrimination now.

Because it was Callahan's decision to leave his employment at Unisource notwithstanding

the fact that the company offered to return him to sales with no reduction in pay, none of the

allegedly discriminatory remarks about which he complains have any relevance whatsoever in this

case.  It is clear that "stray remarks, even if made by a decisionmaker, do not constitute sufficient

evidence to make out a case of employment discrimination . . . such comments, without more,

cannot get a discrimination suit to a jury."  Id. at *18, citing Danzer v. Norden Sys., Inc., 151 F.3d

50, 56 (2d Cir. 1998). In this case, given that Callahan voluntarily left his employment with

Unisource, these alleged remarks cannot even be said to have been made by a "decisionmaker."

The only "decision" in this case was made by Callahan, to leave his employment.  The alleged

remarks thus do not even rise to the level of stray comments.  They are completely irrelevant, and

should not be considered by the Court as evidence of anything nor as support for an age

discrimination claim.

**D.    IKON's Termination Of The 1991 Plan Cannot Support A Claim Of Age
        Discrimination.**

Apart from the conduct that preceded his departure from employment, which as set forth above cannot support a claim for age discrimination given both its substance and his execution of the Release Agreement, Callahan suggests that the termination of the 1991 Plan itself constituted age discrimination. Specifically, he claims that the Unisource Defendants "direct[e]d and/or permit[ted]" IKON to terminate the Plan, and that the Unisource Defendants failed to protect his rights under the Plan. (See Am. Compl. at 5.)

As set forth above, this claim finds no support whatsoever in fact. There is no evidence that the Unisource Defendants "directed" IKON to terminate the Plan, or that they "permitted" IKON to do so. Instead, the record is clear that the Unisource Defendants had no power or authority whatsoever over the administration or termination of the Plan, and that the Release Agreement stated as much by making clear that any benefits would be provided pursuant to the provisions of the Plan. (See Melampy Aff. at ¶ 9, Ex. C to Rule 56(a)(1) Statement; Release Agreement at 2, Ex. I to Rule 56(a)(1) Statement; see also June 23, 2000 Letter from Gary Melampy to W.J. Hope, attached as Exhibit Q to Rule 56(a)(1) Statement.) Moreover, as set forth above, it is undisputed that when the Plan was terminated by IKON (for all participants, regardless of their respective ages), Callahan received precisely what he was entitled to as a "vested" participant whose benefits had not yet commenced. (See Hope Dep. at 122-23, Ex. B to Rule 56(a)(1) Statement; Callahan Dep. at 65, Ex. A to Rule 56(a)(1) Statement; see also January 3, 2001 E-mail from Woody Hope to Carol McGowan, Ex. O to Rule 56(a)(1) Statement; June 21, 2000 Letter from W.J. Hope to Gary Melampy, Ex. P to Rule 56(a)(1) Statement.)

Even if Callahan could prove that he was entitled to more as a vested participant, he has failed to explain how this entitlement would translate into culpability, or liability, on the part of either of the Unisource Defendants. Again, such a scenario relies on the predicate assumption that

IKON's termination of the Plan was at the behest of the Unisource Defendants, and done to deprive Callahan of his rights.  Not only is there no evidence to support such a claim and ample evidence to rebut it, it flies in the face of reason and logic.  Simply put, there is no way to connect IKON's termination of the 1991 Plan with Callahan's purported age claim against the Unisource Defendants, and they are entitled to summary judgment on this claim.

**E.    Georgia-Pacific Cannot Be Held Liable For Age Discrimination Where It Never Employed Callahan.**

It is undisputed that Callahan was employed by Unisource, not Georgia-Pacific; that his employment with Unisource terminated as of December 1998; and that Georgia-Pacific did not acquire Unisource until July 1999, some seven months after his departure.  (See Callahan Dep. at 39, Ex. A to Rule 56(a)(1) Statement; Release Agreement, Ex. I to Rule 56(a)(1) Statement; Melampy Aff. at ¶ 4, Ex. C to Rule 56(a)(1) Statement.)  Under these facts, as a matter of law, Georgia-Pacific cannot be held liable for age discrimination, where it never employed Callahan.

The reach of the ADEA and Title VII, with respect to discriminatory employment practices, is limited to "employers."  See 29 U.S.C. § 630(b).  In determining whether an affiliated corporation is an "employer" for purposes of liability under the ADEA, a court should examine whether the entity "made the final decisions regarding employment matters related to the person claiming discrimination."  Cook v. Arrowsmith Shelburne, Inc., 69 F.3d 1235, 1240 (2d Cir. 1995).

In this case, it is clear and undisputed that Georgia-Pacific never made any decisions concerning Callahan's employment, because he had left his employment at Unisource before the company's acquisition by Georgia-Pacific.  (See Release Agreement, Ex. I to Rule 56(a)(1) Statement; see also Melampy Aff. at ¶ 4, Ex. C to Rule 56(a)(1) Statement.)  As such, under

Second Circuit law, Georgia-Pacific cannot be considered an "employer" of Callahan and accordingly cannot be liable for age discrimination.

## II. The Unisource Defendants Are Entitled To Summary Judgment On Callahan's Claims Under ERISA.

Callahan is vague as to the nature of his purported ERISA cause of action against the Unisource Defendants, and has never specified under which provision of ERISA it purportedly arises. However, the facts of this case do not support an action against the Unisource Defendants under any relevant provision of ERISA, and they are entitled to summary judgment as a result.

### A. ERISA's Civil Enforcement Provision is Exclusive.

Section 502(a) of ERISA, the civil enforcement provision, sets forth with great precision and detail the types of actions that are permissible, and places express limits on the potential plaintiffs who have standing to bring such claims. The Supreme Court repeatedly has cautioned courts against expanding in any way these carefully delineated statutory provisions, stating that "Congress did <u>not</u> intend to authorize other remedies that it simply forgot to incorporate expressly." <u>Mertens v. Hewitt Assocs.</u>, 508 U.S. 248, 254 (1993) (emphasis in original) (<u>quoting</u> <u>Mass. Mut. Life Ins. Co. v. Russell</u>, 473 U.S. 134, 146-47 (1985); <u>see also</u> <u>Pilot Life Ins. Co. v. Dedeaux</u>, 481 U.S. 41, 54 (1987) (stating that "[t]he deliberate care with which ERISA's civil enforcement remedies were drafted and the balancing of policies embodied in its choice of remedies argue strongly for the conclusion that ERISA's civil enforcement remedies were intended to be exclusive").

Indeed, courts continue to emphasize their belief that "ERISA's express remedies, as the product of long and careful study and compromise, should remain exclusive." <u>Gerosa v. Savasta</u>, 329 F.3d 317, 322 (2d Cir. 2003) (<u>citing</u> <u>Rush Prudential HMO, Inc. v. Moran</u>, 536 U.S. 355, 375-76 (2002); <u>Great-West Life & Annuity Ins. Co. v. Knudson</u>, 534 U.S. 204, 209 (2002). The

Second Circuit has concluded that there is "little room in this framework for judicially-created, 'interstitial' remedies." Gerosa, 329 F.3d at 322. Thus, if a plaintiff cannot sue under one of the provisions of § 502(a), he has no remedy under ERISA. In re Enron Corp. Sec., 284 F. Supp. 2d 511, 603-12 (S.D. Tex.. 2003).

**B.**    **The Unisource Defendants Are Not Proper Defendants Under § 502(a)(1) of ERISA.**

Conceivably, Callahan may be seeking to proceed under § 502(a)(1) of ERISA, 29 U.S.C. § 1132(a)(1), which provides a cause of action for a participant in an ERISA-governed plan "to recover benefits due . . . under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." Id.

Actions under this section, however, are expressly limited to administrators or trustees of ERISA plans. They are not permitted against employers who did not have any role in administering the plan in question nor any control over it. It is well settled that "In a recovery of benefits claim, only the plan and the administrators and trustees of the plan in their capacity as such may be held liable." Leonelli v. Pennwalt Corp., 887 F.2d 1195, 1199 (2d Cir. 1989); see also Crocco v. Xerox Corp., 137 F.3d 105, 107-08 (2d Cir. 1998) (same).

In this case, it is undisputed that neither of the Unisource Defendants acted as administrator of the 1991 Plan or had any control over it. (See Melampy Aff. at ¶ 9, Ex. C to Rule 56(a)(1) Statement; see also June 23, 2000 Letter from Gary Melampy to W.J. Hope, Ex. Q to Rule 56(a)(1) Statement.) As such, even given that Unisource formerly employed Callahan and even if Georgia-Pacific could be deemed Callahan's employer, which as set forth above it cannot, this status is not sufficient to vest Callahan with standing to pursue a claim under § 502(a)(1) as against either of the Unisource Defendants.

**C.**    **The Unisource Defendants Are Not Proper Defendants Under § 502(a)(2) of ERISA.**

Callahan also might be seeking to vindicate his purported rights under § 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), which allows an action by a plan participant, on behalf of an ERISA plan, for an alleged breach of fiduciary duty. Initially, it is clear that Callahan has not brought this action on behalf of the 1991 Plan, but on his own behalf. Such individual actions are clearly proscribed under § 502(a)(2). Under ERISA, a plan participant may bring a claim under § 502(a)(2) only on behalf of the plan itself. The statute, and the cases interpreting it, flatly preclude individual suits for damages. See Mass. Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 142 (1985) (holding that it was "abundantly clear" that § 502(a)(2) addressed "remedies that would protect the entire plan, rather than . . . the rights of an individual beneficiary"); see also Farrell v. Auto. Club of Mich., 870 F.2d 1129, 1133 (6th Cir. 1989) (noting that § 502(a)(2) "authorizes relief only to the plan itself, not to individual beneficiaries").

Moreover, it is undisputed that this case does not involve allegations of fiduciary breach. First, the dispute in this case involves the termination of the 1991 Plan. Under well-established law, the decision to terminate an ERISA plan is not a fiduciary act, but a "settlor" function to which fiduciary liability cannot attach. See Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 433-44 (1999); Lockheed Corp. v. Spink, 517 U.S. 882, 890-91 (1996); Suozzo v. Bergreen, 2002 U.S. Dist. LEXIS 11726 at **34-36 (S.D.N.Y. June 27, 2002). Indeed, the United States Supreme Court has made clear that a plan administrator can terminate a plan at any time under ERISA without implicating fiduciary liability. Lockheed Corp., 517 U.S. at 890-91.

Second, even if the termination of an ERISA plan was a fiduciary act, this particular 1991 Plan was not subject to general ERISA fiduciary requirements. Under its plain terms, the 1991 Plan was a "Top Hat" plan, defined under ERISA as "a plan which is unfunded and is maintained

by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1). It is well settled that Top Hat plans are excluded from ERISA's fiduciary responsibility obligations, because "Congress deemed top-level management, unlike most employees, to be capable of protecting their own pension expectations." Campbell v. Computer Task Group, Inc., No. 00 Civ. 9543 (RWS), 2001 WL 815575, at *3 (S.D.N.Y. July 19, 2001) (dismissing breach of fiduciary duty claim against Top Hat plan); see also Pereia v. Cogan, 200 F. Supp. 2d 367, 371, 375 (S.D.N.Y. 2002) (noting that Top Hat plans are "governed by contract law as opposed to trust or fiduciary principles under ERISA").

By its express terms, which track the Top Hat definitions set forth in ERISA, the 1991 Plan qualified as a Top Hat plan. Accordingly, any claim based on an alleged breach of fiduciary duty must fail because the 1991 Plan did not impose such duties.

Finally, even if the 1991 Plan was not a Top Hat plan, which as set forth above it clearly and incontrovertibly was, the Unisource Defendants cannot be held liable under § 502(a)(2) where they were not fiduciaries of the 1991 Plan and accordingly had no fiduciary duties. The Unisource Defendants had no connection with the 1991 Plan other than to employ some of the participants in that Plan. They cannot be charged with a duty in connection with the Plan, and any such cause of action against them must be dismissed.

**D.     The Unisource Defendants Are Not Proper Defendants Under § 502(a)(3) of ERISA.**

Given that §§ 502(a)(1) and (2) clearly do not provide him with a right of action against the Unisource Defendants, the only other potential source of such a private right of action for Callahan would be under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3). That provision permits an action "by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any

provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."  29 U.S.C. § 1132(a)(3).

However, Callahan is not seeking equitable relief in this case.  He is seeking money damages – the additional benefits he claims to have been entitled to by virtue of his participation in the 1991 Plan.  (See Am. Compl. at 9.)  Under United States Supreme Court precedent, this claim is not tenable under Section 502(a)(3).  Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204 (2002).[10]    In Great-West, the Supreme Court categorically rejected the argument that § 502(a)(3), which is limited on its face to equitable relief, encompasses the type of action that Callahan has brought, in which he claims that the Unisource Defendants' alleged, unspecified fiduciary and non-fiduciary breach entitles him to compensation.  Although the petitioners in Great-West had characterized their suit as one seeking restitution and therefore equitable, the Supreme Court was unpersuaded.  In a lengthy discussion, the Court explained why a suit that, like this one, seeks to recover monetary damages for an alleged breach of duty is not equitable and cannot proceed under section 502(a)(3):

> Thus, "restitution is a legal remedy when ordered in a case at law and an equitable remedy . . . when ordered in an equity case," and whether it is legal or equitable depends on "the basis for [the plaintiff's] claim" and the nature of the underlying remedies sought.  Reich v. Continental Casualty Co., 33 F.3d 754, 756 (7th Cir. 1994) (Posner, J.).

_____

[10] Great-West overruled an earlier Second Circuit decision that had held that restitution under § 502(a)(3) could include the kind of "make-whole" relief arguably sought by Callahan.  See Strom v. Goldman, Sachs & Co., 202 F.3d 138 (1999).  Although the Second Circuit has not had occasion to reconsider its holding in Strom, numerous courts have confirmed that Justice Scalia's opinion in Great-West directly rejected its reasoning and its result.  See, e.g., In re Enron Corp. Sec., 284 F. Supp. 2d 511, 603-12 (S.D. Tex.. 2003) (citing cases).

> In cases in which the plaintiff could not assert title or right to possession of particular property, but in which nevertheless he might be able to show just grounds for recovering money to pay for some benefit the defendant had received from him, the plaintiff had a right to restitution *at law* . . . . In such cases, the plaintiff's claim was considered legal because he sought "to obtain a judgment imposing a merely personal liability upon the defendant to pay a sum of money." Restatement of Restitution § 160, Comment a, pp. 641-642 (1936). Such claims were viewed essentially as actions at law for breach of contract (whether the contract was actual or implied).
>
> In contrast, a plaintiff could seek restitution *in equity*, ordinarily in the form of a constructive trust or an equitable lien, where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession. . . . Thus, for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession.

Id. at 213-14 (emphasis in original) (citations and internal quotations omitted). Accordingly, the Court concluded, where the basis for the claim is "not that respondents hold particular funds that, in good conscience, belong to petitioners, but that petitioners are contractually entitled to some funds for benefits that they conferred," there is no viable cause of action under § 502(a)(3). Id. at 214.

A legion of cases from this Circuit has applied the Supreme Court's holding in Great-West to bar claims such as the one brought here by Callahan, including claims for breach of fiduciary duty. See Kishter v. Principal Life Ins. Co., 186 F. Supp. 2d 438, 445 (S.D.N.Y. 2002) (rejecting availability of § 502(a)(3) in breach of fiduciary duty claim: "such an action cannot be considered an action for restitution or one implicating a constructive trust because, under Great-West Life, such remedies are appropriate only where the specific property being sought is identifiable and in the hands of the defendant"); Augienello v. Coast-to-Coast Fin. Corp., No. 01 Civ. 11608 (RWS), 2002 U.S. Dist. Lexis 14584 (S.D.N.Y. Aug. 12, 2002) (plaintiffs could not pursue a claim under § 502(a)(3) because their suit for breach of fiduciary duty was not one for equitable relief). Cases

from other Circuits are universally in accord.  See In re Enron Corp. Sec., 284 F. Supp. 2d 511,

603-12 (S.D. Tex.. 2003) (canvassing case law from around the country and concluding that "[n]o

matter how artfully pled, 'make-whole' relief for a claim of breach of fiduciary duty by a trustee

cannot cloak a claim for compensatory damages").

Because there is no evidence – indeed, no allegation – that the Unisource Defendants hold

any funds even arguably belonging to Callahan, and because his claim is clearly one for

compensatory damages, the Supreme Court's decision in Great-West and its progeny are

dispositive of Callahan's claim under § 502(a)(3).  ERISA's thoughtful and complete framework

precludes any action by Callahan against the Unisource Defendants, and this Court should grant

summary judgment in their favor on his groundless complaint.

**E.     Even If The Unisource Defendants Were Proper Defendants, There Has Been No
         ERISA Violation In This Case.**

Even if Callahan could, somehow, articulate a basis under which the Unisource Defendants

could have potential ERISA liability, his claim would founder on the fact that there has been no

violation of ERISA in this case.  As set forth above, it is undisputed that the 1991 Plan provided

for its potential future termination at the discretion of the Alco Standard (now IKON) Board; that

the IKON Board's exercise of its discretion to terminate the Plan was entirely proper and legal;

and that every Plan participant, including Callahan, received the distribution to which he was

entitled according to the Plan's explicit terms.  Notably, Callahan has not challenged the IKON

Board's ability to terminate the 1991 Plan, but simply the result of that termination as it pertained

to him.

Callahan has suggested that the doctrine of equitable estoppel supports his purported claim

under ERISA.  See Am. Compl. at 8.  This doctrine, however, requires "(1) a material

misrepresentation; (2) reasonable reliance on that misrepresentation; and (3) injury attributable to

such reliance." <u>Lee v. Burkhart</u>, 991 F.2d 1004, 1009 (2d Cir. 1993).  As set forth above, there is no evidence tending to suggest, let alone prove, that the Unisource Defendants made any misrepresentations to Callahan, material or otherwise.  Instead, the record is clear that all of the facts provided to Callahan were accurate, and that any promises made to him were fulfilled.

Whether brought under the rubric of a fiduciary claim, a non-fiduciary claim, or the principles of equitable estoppel, this complaint simply does not set forth a cause of action under ERISA.  As such, this Court should grant summary judgment to the Unisource Defendants.

## <u>CONCLUSION</u>

Callahan's age discrimination and ERISA claims against the Unisource Defendants are confusing and intricate.  The result in this case, however, should not be.  Callahan executed a fully enforceable Release Agreement that bars his (in any event meritless) discrimination claim, and has no factual or legal basis for his ERISA claim.  For the reasons set forth above, the Unisource Defendants respectfully request that this Court enter an Order (1) granting summary judgment to the Unisource Defendants on Callahan's Amended Complaint and (2) granting such other and further relief as the Court deems just and proper.

Respectfully submitted,


THE DEFENDANTS
UNISOURCE WORLDWIDE, INC.
GEORGIA-PACIFIC CORPORATION


_____

Felix J. Springer (ct 05700)
Jennifer L. Sachs (ct 20684)
Day, Berry & Howard, LLP
CityPlace I
Hartford, CT  06103-3499
Tel:  860/275-0100
Fax: 860/275-0343
E-mail: fjspringer@dbh.com
         jlsachs@dbh.com

Rayne Rasty (ct 24918)
Georgia-Pacific Corporation
133 Peachtree St. NE
Atlanta, GA  30303
Tel:  404/652-4972
Fax:  404/584-1461
E-mail:  rmrasty@gapac.com

71250927_1.DOC  034332-00220

-38-

## CERTIFICATE OF SERVICE

This is to certify that on this date, I served a copy of the foregoing via first-class mail, postage prepaid to:

Andrew B. Bowman, Esq.
1804 Post Road East
Westport, CT 06880

Kay Kyungsun Yu
Pepper Hamilton LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103

Robert L. Wyld
Patrick Fahey
Shipman & Goodwin
1 American Row
Hartford, CT 06103


_____

Felix J. Springer