UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| WILLIAM E. CALLAHAN, | ) |
| | ) Civil Action No. 301 CV1205 (CFD) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| UNISOURCE WORLDWIDE, INC., | ) |
| GEORGIA-PACIFIC CORPORATION, | ) |
| ALCO STANDARD CORPORATION and | ) |
| IKON OFFICE SOLUTIONS, INC., | ) |
| | ) |
| Defendants. | ) October 29, 2004 |

**UNISOURCE DEFENDANTS' RULE 56(a)(1) STATEMENT
OF UNDISPUTED MATERIAL FACTS**

Pursuant to Local Rule 56(a)(1), defendants Unisource Worldwide, Inc. and Georgia-Pacific Corporation (the "Unisource Defendants") submit the following statement of material facts as to which there is no dispute.

**I. Callahan Signed Up To Participate In The 1991 Plan After Being Fully Advised As To Its Provisions And The Possibility That It Could Legally Be Terminated.**

1. In 1980, Callahan began his employment in sales at a company called Rourke Eno, which was owned at the time by Alco Standard. (Callahan Dep. at 39.[1]) Rourke Eno subsequently changed its name to Unisource. (See id.)

2. Effective January 1, 1997, Alco Standard spun off Unisource, which became a separate corporate entity unrelated to Alco Standard; Alco Standard changed its name to IKON

---

[1] Relevant portions of the August 25, 2003 Deposition of William E. Callahan ("Callahan Dep.") are attached hereto as Exhibit A.

71254545_1.DOC 034332-00220

Office Solutions, Inc. ("IKON") at the same time. (Hope Dep. at 15[2]; see also Special Report to Shareholders, attached hereto as Exhibit R.)

    3.    Unisource remained an independent entity until July 1999, when it was acquired by Georgia-Pacific. (See Affidavit of Gary Melampy ("Melampy Aff.") at ¶ 4, attached hereto as Ex. C.) Unisource remained a separate legal corporate entity following the acquisition. (Id. at ¶¶ 4-5.)

    4.    In or about November 1990, Callahan elected to participate in a deferred compensation plan offered to employees of Alco Standard and its subsidiaries, effective commencing January 1, 1991. (Callahan Dep. at 24-25, Ex. A hereto; Alco Standard Corporation 1991 Deferred Compensation Plan and Prospectus ("Plan and Prospectus"), attached hereto as Ex. D.)

    5.    The Plan was offered only to certain "highly compensated" employees of Alco Standard and its subsidiaries who met a qualifying income threshold of $100,000. (Plan and Prospectus at 1, Ex. D hereto.) It permitted these highly compensated employees to defer a portion of their income until retirement, and additionally to purchase life insurance pursuant to a "split-dollar" arrangement with Alco Standard. (Id. at 2-3.)

    6.    The Plan and Prospectus, provided to prospective participants including Callahan (see Callahan Dep. at 24-25, Ex. A hereto), clearly explained how the Plan was to operate. Two provisions are especially relevant here. First, the Plan provided that employees whose employment terminated prior to "vesting," which ordinarily occurred after ten calendar years of service beginning with the effective date of the Plan, would not be entitled to remain in the Plan.

---

[2] Relevant portions of the July 6, 2004 Deposition of Walter J. Hope, Jr. ("Hope Dep.") are attached hereto as Exhibit B.

Instead, they would receive the amount of their deferrals, without interest. (See Plan and Prospectus at 11, Ex. D hereto.)

7. Second, the Plan contained a provision explicitly permitting its termination at the sole discretion of Alco Standard's Board of Directors. In the case of Plan termination, participants would receive distributions based not on whether they were "vested" (had completed ten calendar years of service from January 1, 1991), but on whether they had begun to receive benefits at the time of the Plan's termination:

> 19. <u>Termination</u>. <u>The Board of Directors of Alco shall have the right to terminate the Plan</u> in its entirety and not in part at any time it determines that proposed or pending tax changes or other events cause, or are likely in the future to cause, the Plan to have an adverse financial impact upon Alco. In such event, Alco shall have no liability or obligation under the Plan or the Participant's Participation Agreement (or any other document), provided that 1) <u>Alco distributes, in lump sum to any Participant whose benefit payments have not commenced, the value of the amount of the Participant's deferrals to the date of termination plus interest (compounded annually) at a rate of 6% per annum</u>; and 2) Alco distributes, in a lump sum, to any Participant whose benefit payments have commenced, all amounts thereafter due . . . . Such lump-sum distribution, at Alco's election, may be made in the form of cash, or life insurance, or both.

Plan and Prospectus at 14, Ex. D hereto (emphasis added).

## II. When Callahan's Employment at Unisource Ended, He Signed A Release Agreement In Which He Waived Claims Against Unisource And Its Affiliates In Exchange For Substantial Consideration.

8. In 1998, Callahan was employed by Unisource as a Vice President of Customer Service. (Callahan Dep. at 78, Ex. A hereto.) As set forth above, Unisource was at the time a separate corporate entity unrelated either to IKON (which had spun off the company almost two years earlier) or to existing or future affiliates (including Georgia-Pacific, which would acquire Unisource almost 8 months later). (See Hope Dep. at 14-16, Ex. B hereto; Melampy Aff. at ¶ 4, Ex. C hereto.)

9.  Until 1995, Callahan had been employed solely in sales positions, where he had enjoyed significant success and a number of promotions over the years. (See May 27, 1999 Unisource Position Statement ("Position Statement") at 1, attached hereto as Ex. E.) His tenure in customer service was much less successful. (See id. at 1-2.) Indeed, Callahan's supervisors repeatedly had occasion to question Callahan's leadership potential in the customer service position and his suitability for that line of work. (Id.) Ultimately, Callahan's supervisors determined that it was not in the company's interest for Callahan to continue in customer service, but that he should return to sales where he had previously excelled. (Id.)

10. In September of 1998, Callahan's supervisor, Michael Keneally ("Keneally"), informed Callahan that he had decided to remove him from the customer service position. (Callahan Dep. at p. 78, Ex. A hereto.) Keneally offered Callahan the option of taking a position in sales at the same base salary, but Callahan declined. (Callahan Dep. at pp. 78, 81-82; Ex. A hereto; Position Statement at 2, Ex. E hereto.)

11. Following his meeting with Keneally in September 1998, Callahan voluntarily decided to leave his employment with Unisource rather than accept continued employment in another position. (Callahan Dep. at 97, Ex. A hereto, Position Statement 2, Ex. E hereto.)

12. At this point, as of September 1998, Callahan testified that he believed that he was being replaced with a younger employee (see Callahan Dep. at 153, Ex. A hereto), and was aware of comments that allegedly had been made by Unisource executives, which he believed suggested age-discriminatory animus on the company's part. Specifically, at the time of his resignation, Callahan was aware of a comment allegedly made by Unisource CEO Raymond Mundt in July 1998 that "the company was mired in old ways" and that Mundt wanted to introduce "the bright

young leaders of our company." (Callahan Dep. at 192, Ex. A hereto; <u>see</u> Setta Dep.[3] at 43-46, Ex. F.)

13.     At the time of his resignation, Callahan was also aware of a comment allegedly made by Unisource President Charles White to the effect that "being at Unisource for over 15 years . . . was a kiss of death." (Callahan Dep. at 196, Ex. A hereto.) Finally, Callahan purportedly heard from a colleague prior to his resignation that, of five marketing vice presidents, three older ones were being terminated while two younger ones were being retained. (Callahan Dep. at 202-03, Ex. A hereto.)

14.     Once Callahan made clear that he was not interested in the sales position and was instead intending to leave his employment with Unisource, Keneally provided him with a draft Release Agreement, which included a severance benefits package. (Callahan Dep. at 84, Ex. A hereto.) Callahan received this document in September 1998. (<u>Id</u>.)

15.     Within a few days, Callahan had retained an attorney, Albert McGrail ("Attorney McGrail"), to advise him with respect to the Release Agreement and severance package. (Callahan Dep. at 87, Ex. A hereto.) Significantly, Callahan testified that he and Attorney McGrail discussed the allegedly discriminatory comments by Unisource executives and his alleged replacement by a younger employee at their very first meeting, some time in October or November of 1998. (Callahan Dep. at 191, Ex. A hereto.)

16.     Over the next weeks, Callahan, Attorney McGrail, and Gary Setta ("Setta"), the Vice President of Human Resources for Unisource, discussed the terms of the Release Agreement in at least one lengthy meeting and on numerous telephone conferences. (Callahan Dep. at 89, Ex.

---

[3] Relevant portions of the April 8, 2004 Deposition of Gary Setta (" Setta Dep.") are attached hereto as Exhibit F.

A hereto; see also January 13, 1999 Invoice of McEleney & McGrail, attached hereto as Exhibit G.)  One issue of particular concern for Callahan was the non-compete language in the draft Release Agreement, which would preclude him from competing with Unisource in the future. (Callahan Dep. at 90-91, Ex. A hereto.)  Following negotiations between Callahan, Attorney McGrail and Setta, Unisource removed the non-compete language from the Release Agreement. (Callahan Dep. at 91, Ex. A hereto.)

17. Callahan also sought and received other concessions from Unisource, including the right to purchase his company car.  (Compare draft Release Agreement, attached hereto as Ex. H, with executed Release Agreement, attached hereto as Exhibit I.)

18. On or about December 24, 1998, Callahan executed a finalized copy of the negotiated Release Agreement.  The Release Agreement that Callahan ultimately signed included a generous salary continuation package equating to seven months' salary and various other substantial benefits.  (See Release Agreement, Ex. I hereto.)

19. The Release Agreement also included specific language concerning Callahan's continued participation in the 1991 Plan.  As set forth above, under the terms of the Plan, an employee whose employment terminated prior to "vesting" would receive his contributions, without interest, in a lump-sum payment.  (See Plan and Prospectus at 11, Ex. D hereto.) Paragraph 8 of the Release Agreement, which related to the 1991 Plan, provided that Callahan would be fully "vested" in the Plan, which meant that his contributions would not be returned to him upon the termination of his employment with Unisource.  (See id.; see also Hope Dep. at 76-77, Ex. B hereto.)  Instead, as set forth in the Release Agreement:

> 8.   ***Deferred Compensation***.  Benefits under the 1991 IKON Office Solutions, Inc. (formerly Alco Standard Corporation) Deferred Compensation Plan will vest 100% and be distributed to you in the future, <u>in accordance with the provisions of the Plan.</u>  You must continue to make the annual premium payments under the 1991

> IKON Office Solutions, Inc. Deferred Compensation Plan to your age 65 to perpetuate the lump sum death benefit and age 65 policy transfer thereunder. . . .

Release Agreement at 2 (emphasis added), Ex. I hereto.

20. Accordingly, this provision allowed Callahan to remain a participant in the 1991 Plan, instead of having his deferrals returned to him in lump sum and with no accumulated interest. (Id.; see also Hope Dep. at 76-77, Ex. B hereto; Callahan Dep. at 103-04, Ex. A hereto.)

21. W.J. Hope, an IKON employee who was at the time the Plan Administrator for the 1991 Plan, testified that this type of "vesting," to prevent an immediate lump-sum distribution of deferrals, was not uncommon:

> It is possible, and it has [been done] in various agreements, for an agreement to give, quote, vesting, closed quote, and thereby protect one from an immediate payout and preserve whatever rights they might otherwise have under the plan.

(Hope Dep. at 78, Ex. B hereto.)

22. In exchange for all of the consideration extended to him under the terms of the Release Agreement, Callahan executed a general release in which he agreed that:

> In consideration for the additional benefits extended to you in this letter, and intending to be legally bound hereby: (1) you agree to release and hold harmless forever [Unisource], its direct and indirect subsidiaries and affiliates [including but not limited to Georgia-Pacific], directors, officers and employees **from any and all causes of action, known or unknown, arising out of or relating to your association and/or employment with or termination from the Company, which may have existed prior to or contemporaneously with the execution of this agreement, including but not limited to . . . the Age Discrimination in Employment Act of 1967 as amended,** and the Older Workers Benefit Protection Act of 1990 . . . or any other federal, state, or local law (statutory or common) relating to discrimination in employment.

Release Agreement at 3, Ex. I hereto (emphasis added).

### III.   Callahan Immediately Breached The Release Agreement By Bringing A Discrimination Claim Against Unisource.

23.   In March 1999, practically before the ink had dried on his signature to the Release Agreement, Callahan breached it by bringing a claim of age discrimination against Unisource (not Georgia-Pacific) before the Connecticut Commission on Human Rights and Opportunities.  (See Affidavit of Illegal Discriminatory Practice, attached hereto as Exhibit J.)

24.   In proceedings before the CHRO, Callahan claimed that he entered into the Release Agreement under duress and as a result of coercion by Unisource – all claims that the CHRO rejected.  (See August 23, 1999 Notice of Final Agency Action, attached hereto as Exhibit K, and March 21, 2000 Merit Assessment Review Reconsideration Form, attached hereto as Exhibit L.)

25.   CHRO ultimately allowed the case to proceed only after the termination, by IKON, of the 1991 Plan, a termination that Callahan insisted could somehow be linked to Unisource.  (See December 13, 2000 Letter from William Callahan, attached hereto as Exhibit M.)  Prior to having to make any such showing of nexus between IKON's termination of the Plan and Unisource, Callahan filed this case in federal court, resulting in the dismissal of the CHRO action.

26.   Callahan acknowledged that his breach of the Release Agreement was intentional and premeditated.  Indeed, he testified explicitly and unambiguously that he intended at the time he executed it to violate the Release Agreement and to sue Unisource:

Q:   Did you recognize you were waiving valuable legal rights?

A:   No, because I was told by Attorney McGrail I could sign it and still sue them.

Q:   What did Mr. McGrail say?

A:   What did he say?

Q:   Yes.  You could sign this and still sue the company?

A:   Yes.

(Callahan Dep. at 130-34, Ex. A hereto.)

**IV.  IKON Terminated The 1991 Plan Pursuant To Its Explicit Provisions And Made Distributions As Required Under The Plan, Including To Callahan.**

27.   In 2000, the IKON Board of Directors (formerly the Alco Standard Board of Directors) decided to terminate the Plan, pursuant to its conclusion that "tax law changes or other events [have] cause[d], or are likely in the future to cause, the Plan to have an adverse financial impact upon Alco." (Plan and Prospectus at 14, Ex. D hereto.)

28.   The decision to terminate was made exclusively and solely by the Board of Directors, with input limited to a few other employees of IKON. (Hope Dep. at 43-50, Ex. B hereto.)

29.   Through the Plan Administrator, W.J. Hope, IKON notified Plan participants, including Callahan, of the pending termination, which was to be effective as of December 31, 2000. (Undated Termination Letter, attached hereto as Exhibit N.)

30.   Upon termination, the Plan provided for <u>all</u> participants (whether "vested" or not) whose benefit payments had not yet commenced to receive their deferrals plus 6 percent interest. (Plan and Prospectus at 14, Ex. D hereto.) Callahan, whose benefit payments had not commenced, accordingly was issued a lump-sum distribution comprising his deferrals plus 6 percent interest. (Callahan Dep. at 64, Ex. A hereto.)

31.   Some 25 other former Plan participants were "vested" at the time of termination due to various separation or early retirement agreements, but all similarly received in a lump-sum distribution their deferrals plus 6 percent interest. (<u>See</u> Hope Dep. at 122-23, Ex. B hereto; <u>see also</u> January 3, 2001 E-mail from Woody Hope to Carol McGowan, attached hereto as Exhibit O; June 21, 2000 Letter from W.J. Hope to Gary Melampy, attached hereto as Exhibit P.)

32.  Neither Unisource nor Georgia-Pacific, which had in the meantime acquired Unisource, had any involvement in the November 2000 decision to terminate the 1991 Plan or in the calculation of payments due to Plan participants.  (See Melampy Aff. at ¶ 9, Ex. C hereto.)  Indeed, the Plan documents did not on their face afford any role in this decision to either of the Unisource Defendants, and in fact no agent of Unisource or Georgia-Pacific participated in the decision.  (Plan and Prospectus, Ex. D hereto; Melampy Aff. at ¶ 9, Ex. C hereto; see also June 23, 2000 Letter from Gary Melampy to W.J. Hope, attached hereto as Exhibit Q.)  Hope, the Plan Administrator, met with some employees of Georgia-Pacific concerning the pending termination only after the decision to terminate had been made, and pursuant to a notice requirement that stemmed from Alco Standard's spinoff of Unisource.  (Hope Dep. at 53, 62, Ex. B hereto.)

        Respectfully submitted,


        THE DEFENDANTS
        UNISOURCE WORLDWIDE, INC. and
        GEORGIA-PACIFIC CORPORATION


        _____
        Felix J. Springer (ct 05700)
        Jennifer L. Sachs (ct 20684)
        Day, Berry & Howard, LLP
        CityPlace I
        Hartford, CT  06103-3499
        Tel:  860/275-0100
        Fax: 860/275-0343
        E-mail: fjspringer@dbh.com
                jlsachs@dbh.com

        Rayne Rasty (ct 24918)
        Georgia-Pacific Corporation
        133 Peachtree St. NE
        Atlanta, GA  30303
        Tel:  404/652-4972
        Fax:  404/584-1461
        E-mail:  rmrasty@gapac.com

## CERTIFICATE OF SERVICE

This is to certify that on this date, I served a copy of the foregoing via first-class mail, postage prepaid to:

>Andrew B. Bowman, Esq.
>1804 Post Road East
>Westport, CT 06880
>
>Kay Kyungsun Yu
>Pepper Hamilton LLP
>3000 Two Logan Square
>Eighteenth and Arch Streets
>Philadelphia, PA 19103
>
>Robert L. Wyld
>Patrick Fahey
>Shipman & Goodwin
>1 American Row
>Hartford, CT 06103

_____

Felix J. Springer