IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| WILLIAM E. CALLAHAN | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | NO. 3:01CV1205 (CFD) |
| | : | |
| UNISOURCE WORLDWIDE, INC., et al. | : | |
| | : | |
| Defendants | : | October 29, 2004 |
| | : | |

**THE IKON DEFENDANTS' LOCAL RULE 56(a)(1) STATEMENT**

**I.      STATEMENT OF UNDISPUTED FACTS**

**A.      The 1991 Deferred Compensation Plan**

1.      On or about September 12, 1990, Alco Standard Corporation ("Alco"), IKON's

predecessor, established the Alco Standard Corporation 1991 Deferred Compensation Plan.

(Declaration of Walter J. Hope, Jr. ("Hope Decl.") ¶ 4, attached to Appendix as Exhibit 1.)

2.      On or about January 23, 1997, Alco changed its name to IKON and the Plan

subsequently was amended to change all references from Alco Standard Corporation to IKON

Office Solutions, Inc.  (Hope Decl. ¶ 6, App. Ex. 1; see also Deposition of Walter J. Hope, Jr.

("Hope Dep.") 15:10-16:21, App. Ex. 5.)

3.      The Plan stated that:

> The purpose of the Alco Standard Corporation 1991 Deferred Compensation Plan
> is to permit certain eligible employees of Alco Standard Corporation and its
> affiliated companies to defer a portion of their compensation and to participate in
> a program under which they are provided supplemental income after their
> retirement and survivor protection both before and after retirement.  The program
> is intended to constitute an unfunded deferred compensation arrangement for a
> select group of management or highly compensated employees.

<u>See</u> 1991 Deferred Compensation Plan and Prospectus (the "Plan"), Section 1 (IKCP 38, App. Ex. 3).

4.    As "an unfunded deferred compensation arrangement for a select group of management or highly compensated employees," the Plan constituted what is commonly referred to as a top hat plan, the terms of which are enforceable under ERISA.  (Hope Decl. ¶ 5, App. Ex. 1.)

5.    Participation in the Plan was offered to a small group of Alco's highly compensated employees and furnished benefits that were in addition to, not in lieu of, other retirement benefits provided under IKON's traditional pension plan.  (Hope Decl. ¶ 7, App. Ex. 1.)

### 1.    The Plan's Vesting Provision

6.    Section 5 of the Plan defined the term "Vesting" as follows:

> A Participant shall vest in the benefits to be provided hereunder after he has completed ten calendar years of service with an Employer, beginning with the Effective Date.  Notwithstanding such vesting, a Participant's entitlement to the life insurance purchased pursuant to the Split Dollar Arrangement is conditional on his making payments for specified life insurance costs, which payments shall continue after vesting has occurred and following termination of employment, until such time as the death benefit is paid, or until the Participant reaches age 65.

> * * * *

> Each other Participant whose employment terminates prior to vesting (other than on account of death, as described in Paragraph 6, below) shall be entitled to receive, in a lump sum payment, the full amount of the Participant's deferrals to the date of termination, without interest.  No other benefits shall be payable under the Plan to such Participant, nor shall the Participant be entitled to continue payments for the life insurance.  All life insurance benefits shall terminate upon such termination of employment.

<u>See</u> Plan, Section 5 (IKCP 39-40, App. Ex. 3).

## 2.    The Plan's Amendment and Termination Provisions

7.    Section 17 of the Plan, which described the circumstances under which the Plan could be amended, provided that:

> This Plan shall remain in effect until termination by the Board of Directors of Alco.  The Board of Directors shall have the power to amend this Plan at any time; provided, however, that, except as set forth in Paragraph 19 and/or Paragraph 21, no amendment or termination of this Plan shall have a material adverse effect upon a Participant unless he consents to such amendment or termination in writing.

See Plan, Section 17 (IKCP 43, App. Ex. 3).

8.    The Plan also contained a termination provision, which stated that:

> The Board of Directors of Alco shall have the right to terminate the Plan in its entirety and not in part at any time it determines that proposed or pending tax law changes or other events cause, or are likely in the future to cause, the Plan to have an adverse financial impact upon Alco.  In such event, Alco shall have no liability or obligation under the Plan or the Participant's Participation Agreement (or any other document), provided that 1) Alco distributes, in lump sum, to any participant whose benefits have not commenced, the value of the amount of the Participant's deferrals to the date of termination plus interest (compounded annually) at a rate of 6% per annum; and 2) Alco distributes, in a lump sum, to any Participant whose benefit payments have commenced, all amounts thereafter due, in an amount as calculated in accordance with Paragraph [20], "Acceleration of Benefits." Such lump-sum distribution, at Alco's election, may be made in the form of cash, or life insurance, or both.

See Plan, Section 19 (IKCP 43, App. Ex. 3).

## 3.    The Termination Benefit

9.    Upon the termination of the Plan, the benefit payable to a participant whose benefits had not yet commenced was "the value of the amount of the Participant's deferrals to the date of termination plus interest (compounded annually) at a rate of 6% per annum." See Plan, Section 19 (IKCP 43, App. Ex. 3).

10.    The benefit payable to a participant whose benefits had already commenced was the amount thereafter due calculated in accordance with the Acceleration of Benefits provision of the Plan.  See Plan, Section 19 (IKCP 43, App. Ex. 3).

11.    The benefits payable under Section 19 of the Plan will be referred to as the "Termination Benefit."

### 4.    The Pre-Termination Benefit

12.    The benefits payable under the Plan prior to its termination were described as three separate options listed in Appendix A of the Plan (the "Pre-Termination Benefit").  See Plan, Appendix A (IKCP 120, App. Ex. 3).

13.    "Option II" of the Plan (the option that Callahan elected (IKCP 1-2, App. Ex. 3)) provided that, during the life of the Plan, when a participant retired and reached age 65, whichever was later, he or she would receive retirement benefits in the amount of $15,000 per year for ten years and a $95,000 Cash Value Life Insurance Policy with a Paid-up Death Benefit of $375,000.  See Plan, Section 6 and Appendix A (IKCP 40 & 45, App. Ex. 3).

### 5.    Discretionary Authority to Make Claims Determinations Under the Plan

14.    As described in the Plan's Prospectus, "[t]he Plan provides that authority for the administration and interpretation of the Plan will be vested in a Committee selected by the Board of Directors of Alco."  See Plan at p. 5 (IKCP 34, App. Ex. 3).

15.    The Plan itself provided that it is to be "administered by a Committee selected from time to time by the Board of Directors of Alco (the "Committee")."  See Plan, Section 14 (IKCP 43, App. Ex. 3).

16.    The Retirement Plans Committee was vested with the authority to administer the Plan.  (Hope Decl. ¶ 3, App. Ex. 1.)

17.    The Retirement Plans Committee then selected "an Administrator from time to time to administer the Plan under the general policy guidance of the Committee." (Hope Decl. ¶ 2, App. Ex. 1.)

18.    Under the Plan, the Administrator was responsible for:

(a) maintaining any records necessary in connection with the Plan;
(b) making calculations under the Plan;
(c) interpreting the provisions of the Plan; and
(d) otherwise administering the Plan in accordance with its terms.

See Plan, Section 14 (IKCP 43, App. Ex. 3).

19.    Plan participants were permitted to appeal any adverse determinations made by the Plan Administrator to the Retirement Plans Committee, which had the authority to review the Administrator's determinations.  The Plan described its claims procedure as follows:

> At any time the Administrator makes a determination adverse to a Participant or beneficiary with respect to a claim for benefits or participation under the Plan, the Administrator shall notify the claimant in writing of such determination, setting forth:
>
> (a) the specific reason for such determination;
> (b) a reference to the specific provision or provisions of the Plan on which such determination is based;
> (c) a description of any additional material or information necessary to perfect the claim, and an explanation of the reason that such material is required; and
> (d) an explanation of the rights and procedures set forth in this Paragraph 15.
>
> A person who receives notice of an adverse determination by the Administrator with respect to a claim may request, within 60 days of receipt of such notice, that the Committee review the Administrator's determination.  This request may be made on behalf of a claimant by a duly authorized representative.  The claimant or representative may review pertinent documents and submit issues and comments with respect to the controversy to the Committee.  The Committee shall render a decision within 60 days of a request for review (or within 120 days under special circumstances), which decision shall be in writing and shall set forth the specific reasons for the decision reached and the specific provisions of the Plan on which the decision is based.  A copy of the ruling shall be forwarded to the claimant.

See Plan, Section 15 (IKCP 43-44, App. Ex. 3).

**B.    Callahan's Participation in the Plan**

20.    In 1990, Alco offered Callahan the opportunity to participate in the Plan.  On November 28, 1990, Callahan signed a Participation Agreement, electing to participate in the Plan under Option II.  See Callahan's Participation Agreement (IKCP 1-4, App. Ex. 3).

21.    Callahan understood that the Board of Directors of IKON could terminate the Plan under certain circumstances.  (Deposition of William E. Callahan ("Callahan Dep.") 104:20-24, App. Ex. 4.)

22.    Callahan testified that he received a copy of the Plan when he was initially offered the opportunity to participate and that he carefully read and understood the terms of the Plan before electing to participate.  (Callahan Dep. 24:8-26:12, 31:7-8, App. Ex. 4.)

23.    Section 8 of Callahan's Participation Agreement expressly provides that:  "The Employee and Alco expressly agree that the terms of the Plan and as it may be hereafter amended from time to time, are incorporated herein by reference and that this Agreement shall be interpreted by reference to such Plan."  (IKCP 2, App. Ex. 3.)

24.    Callahan also executed a Split Dollar Insurance Agreement in connection with his participation in the Plan.  (IKCP 5-7, App. Ex. 3.)

25.    Under the Split Dollar Insurance Agreement, Callahan agreed that Alco would be the sole owner of the universal life insurance policy obtained to cover Callahan (the "Split Dollar Policy").  (IKCP 5, App. Ex. 3.)

**C.    Callahan's Termination Of Employment From Unisource**

26.    Unisource, Callahan's employer, was a subsidiary of Alco until December 31, 1996. (Hope Decl. ¶ 9, App. Ex. 1; Hope Dep. 14:5-7, App. Ex. 5.)

27.     Effective January 1, 1997, Alco spun off Unisource and it became a separate corporate entity unrelated to Alco.  (Hope Dep. 14:5-24, App. Ex. 5; Hope Decl. ¶ 10, App. Ex. 1.)

28.     In July 1999, Georgia-Pacific acquired Unisource.  (Hope Decl. ¶ 11, App. Ex. 1; see also Hope Dep. 71:14-72:3, App. Ex. 5.)

29.     As entities completely separate and unrelated to IKON, neither Unisource nor Georgia-Pacific has any interrelation of operations, centralized control of labor relations, or common management with IKON.  Nor does IKON have any common ownership or financial control of Unisource or Georgia-Pacific.  (Hope Decl. ¶ 22, App. Ex. 1.)

30.     When Callahan's employment with Unisource ceased effective December 31, 1998, the terms and conditions of his separation of employment was set forth in an agreement dated December 23, 1998 and executed on December 24, 1998.  (CALL 6-10, App. Ex. 2.)

31.     With respect to the Plan, Callahan's separation agreement with Unisource provided that:

> Benefits under the 1991 IKON Office Solutions, Inc. (formerly Alco Standard Corporation) Deferred Compensation Plan will vest 100% and be distributed to you in the future, in accordance with the provisions of the Plan.  You must continue to make the annual premium payments under the 1991 IKON Office Solutions, Inc. Deferred Compensation Plan to your age 65 to perpetuate the lump sum death benefit and age 65 policy transfer thereunder.  These will be invoiced to you annually by IKON Office Solutions, Inc.

(IKCP 7, App. Ex. 3.)

32.     IKON agreed to honor Unisource's agreement to provide Callahan with accelerated vesting set forth in his separation agreement and Callahan was treated as "vested" in the 1991 Plan, as that term is defined by the Plan.  (IKCP 17 & 71, App. Ex. 3).

33.     Without this accelerated vesting, under the Plan's Vesting Provision, Callahan would have received a lump-sum payment of the full amount of his deferrals to the date of

termination of employment, without interest, and would not have been eligible to receive any other benefit under the Plan. (Callahan Dep. 68:2-8, App. Ex. 4.)  See also Plan's Vesting Provision, Section 5 (IKCP 39-40, App. Ex. 3; see also Hope Dep. 75:3-17, App. Ex. 5).

34.    The total amount of Callahan's deferrals under the Plan was $18,275.00. (IKCP 19, App. Ex. 3.)

35.    With the accelerated vesting granted under his separation agreement, however, Callahan was permitted to continue to participate in the 1991 Plan notwithstanding his termination of employment from Unisource. (IKCP 17 & 71, App. Ex. 3; Callahan Dep., 107:20-108:3, App. Ex. 4.)

36.    As a result of this accelerated vesting, Callahan received a Termination Benefit in the amount of $28,356.91, $10,081.91 more than he would have received without accelerated vesting. (IKCP 19, App. Ex. 3.)

**D.    IKON's Termination of the Plan**

37.    On July 21, 2000, in accordance with the termination provision set forth in Section 19 of the Plan, IKON's Board of Directors took action to terminate the Plan effective December 31, 2000. (Hope Decl. ¶ 15, App. Ex. 1; see also Hope Dep. 68:5-16, App. Ex. 5.)

38.    There were two primary reasons for the decision to terminate the Plan. First, declining interest rates caused a decrease in the rate of return on the individual Split Dollar Policies covering the Plan participants. Indeed, it was originally contemplated that the Split Dollar Policies would experience a cash value growth of 9% per year at the time of the Plan's inception. In fact, the Split Dollar Policies experienced only a rate of return of 6% per year. Second, the decrease in participant deferrals resulting from the divestiture of two subsidiaries, as well as the termination of other IKON employees over the years, also caused the Plan to negatively impact IKON. (Hope Decl. ¶ 16-19, App. Ex. 1.)

39.    In 1999, the Split Dollar Policies had a rate of return of approximately 6% per year, down from the 9% per year originally contemplated at the time the Plan was first established in 1991. (Hope Decl. ¶ 16, App. Ex. 1.)

40.    As a result, a cash outlay of $2.4 million was required for the Plan as opposed to the $1.5 million originally assumed, and there was a negative earnings impact of $1.3 million as opposed to the originally expected positive earnings impact of $1 million. (Hope Decl. ¶ 17, App. Ex. 1.)

41.    It was estimated that, for the period from 2000 through 2004, had the Plan not been terminated and assuming the Split Dollar Policies continued to achieve a 6% rate of return, IKON would have suffered a cash outlay of an additional $2.2 million per year as opposed to $1.4 million per year as originally assumed, and a negative impact on earnings of $1 million per year as opposed to a positive $0.7 million per year as originally projected. (Hope Decl. ¶ 18, App. Ex. 1.)

42.    In addition to the decrease in the rate of return on the Split Dollar Policies that resulted from declining interest rates, the number of participants making deferrals and thereby contributing to the Plan diminished, which also contributed to the Plan's negative impact on IKON. (Hope Decl. ¶ 19, App. Ex. 1.)

43.    The decision of IKON's Board to terminate the Plan was based solely on its determination that continuing the Plan would cause an adverse financial impact IKON. (Hope Decl. ¶ 20, App. Ex. 1; see also Hope Dep. 47:6-48:16, 68:5-16, App. Ex. 5.)

44.    When the Plan was terminated on December 31, 2000, Callahan had not yet reached age 65 and, therefore, had not become eligible to commence benefits under the Plan. See Plan, Section 6 (IKCP 40, App. Ex. 3).

45.     On that date, neither IKON nor any other of the IKON Defendants was Callahan's employer. (Hope Decl. ¶ 23, App. Ex. 1.)

46.     Consequently, Callahan was informed that he would be paid the Termination Benefit in accordance with the Plan's termination provision. See Plan, Section 19 (IKCP 43, App. Ex. 3); Letter to Eugene Callahan mailed October 18, 2000 (IKCP 18-22, App. Ex. 3).

**E.     Callahan's Claim Under the Plan**

47.     Callahan was initially informed of the decision to terminate the Plan in October 2000. In a letter mailed to Plan participants on October 18, 2000, the Plan Administrator, Walter J. Hope, Jr., explained that:

> the Plan allows IKON's Board of Directors to terminate the Plan if the Board of Directors determines that events have caused, or are likely in the future to cause, the Plan to have an adverse financial impact upon IKON. Accordingly, pursuant to the terms and conditions of the Plan, the Board of Directors of IKON has taken action to terminate the Plan effective December 31, 2000, at which time you will have the right to the termination benefit prescribed by the Plan. At that time all other rights under the Plan will cease. We anticipate issuing checks for all termination benefits to participants during January 2001.

(IKCP 87, App. Ex. 3.)

48.     The October 18, 2000 letter to Callahan enclosed a copy of the Plan, along with other Plan information, and informed Plaintiff that he had made deferrals to the Plan in the amount of $18,275.00, and estimated the amount of his Termination Benefit to be $28,356.91. (IKCP 18-22, App. Ex. 3.)

49.     The document entitled "Questions & Answers Regarding Plan Termination," included with the October 18, 2000 letter, provided the following, in response to the question, "Why has IKON chosen to terminate the Plan?"

> The Plan allows IKON's Board of Directors to terminate the Plan if the Board of Directors determines that events have caused, or are likely in the future to cause, the Plan to have an adverse financial impact upon IKON.

The Plan is supported by life insurance policies issued by Metropolitan Life Insurance Company. Interest rates used to credit investment gain to the cash value portion of the Metropolitan policies has fallen dramatically since 1991. Decrease in the crediting rate has had a material adverse affect on IKON and is expected to have an adverse affect in the foreseeable future.

(IKCP 21, App. Ex. 3.)

50.    In response, Callahan sent a letter to the Plan Administrator dated November 22, 2000, stating that he believed that he was entitled to additional benefits beyond the Termination Benefit as part of his separation from Unisource in December 1998. (IKCP 23, App. Ex. 3.)

51.    On November 30, 2000, the Plan Administrator wrote back to Callahan stating that the Board had taken action to terminate the Plan and that Callahan would be paid the Termination Benefit in accordance with the terms of the Plan. (IKCP 24, App. Ex. 3.)

52.    On December 6, 2000, the Plan Administrator sent another letter to Plan participants, including Callahan, enclosing information regarding various government filings relating to the Plan, along with an additional copy of the Plan with two Plan amendments. (IKCP 29-66, App. Ex. 3.)

53.    Thereafter, on December 19, 2000, the Plan Administrator provided Callahan and all other Plan participants the opportunity to take a MetLife universal life insurance policy in lieu of the lump sum termination benefit, which life insurance policy would have a cash surrender value equal to the after-tax value of the participant's Termination Benefit. (IKCP 68, App. Ex. 3.)

54.    On January 2, 2001, the Plan Administrator sent a letter to Callahan confirming that he would be paid a Termination Benefit in the amount of $28,356.91. (IKCP 69, App. Ex. 3.)

55.     Callahan testified that he felt that the termination of the Plan did not apply to him because of a separation agreement he entered into with Unisource in December 1998. (Callahan Dep. 53:4-23, App. Ex. 4.)

56.     Specifically, Callahan stated that, because he was granted vesting in the Plan as a result of his separation agreement, he was entitled to the benefit payable had the Plan not been terminated regardless of the fact that the Plan was terminated. (Callahan Dep. 68:2-13, App. Ex. 4.)

57.     Callahan, however, has admitted that his separation agreement with Unisource does not state that the Plan's Termination Provision was altered. (Callahan Dep., 109:4-6, App. Ex. 4.)

58.     All Plan participants who were similarly situated to Callahan were treated in exactly the same manner and in accordance with the terms of the Plan. (Hope Decl. ¶ 21, App. Ex. 1.)

Respectfully submitted,

Kay Kyungsun Yu
Federal Bar No. ct13440
Pepper Hamilton LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA  19103-2799
(215) 981-4188 Telephone
(215) 689-4515 Facsimile

OF COUNSEL:

Joseph J. Costello
Morgan Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
(215) 963-5295

-13-

LOCAL COUNSEL:                          Robert L. Wyld
                                        Federal Bar No. ct04333
                                        Patrick M. Fahey
                                        Federal Bar No. ct13872
                                        Shipman & Goodwin
                                        One Constitution Plaza
                                        Hartford, Connecticut 06103
                                        (860) 251-5620/5824

# CERTIFICATE OF SERVICE

I, Kay Kyungsun Yu, hereby certify that on October 29, 2004, a true and correct copy of the foregoing IKON Defendants' Local Rule 56(a)(1) Statement was served via First-Class Mail upon the following:

Andrew B. Bowman, Esq.
1804 Post Road East
Westport, CT  06880

Rayne Rasty, Esq.
Georgia-Pacific Corporation
133 Peachtree Street NE
Atlanta, GA  30303-1847

Felix J. Springer, Esq.
Jennifer L. Sachs, Esq.
Day, Berry & Howard
CityPlace 1
Hartford, CT  06103-3499

Kay Kyungsun Yu