UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| WILLIAM E. CALLAHAN | : | |
| Plaintiff, | : | |
| VS. | : | DOCKET NO: 3:01CV1205(CFD) |
| UNISOURCE WORLDWIDE, INC., GEORGIA-PACIFIC CORPORATION, ALCO STANDARD CORPORATION AND IKON OFFICE SOLUTIONS, INC., ET AL | : : | |
| Defendants | : | DECEMBER 27, 2004 |

**PLAINTIFF CALLAHAN'S OMNIBUS MEMORANDUM
IN OPPOSITION TO DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT[1]**

### I. The Legal Standard For Summary Judgment

For the following reasons, the motions for summary judgment filed in behalf of

the Unisource and IKON defendants should be denied.   In deciding a motion for

summary judgment, the Court must determine whether there is a genuine issue of

material fact, Anderson vs. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91

---

[1] The Unisource Defendants and IKON Defendants have submitted separate memoranda in support of their motions for summary judgment.  For the sake of clarity and to avoid unnecessary duplication, plaintiff is responding to each of the two motions for summary judgment in this omnibus response.

L.Ed.2d 202 (1986).  The Court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion for summary judgment which in this case is the plaintiff; <u>Matsushita Elec. Indus. Co. vs. Zenith Radio Corp</u>., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).  The non-moving party may defeat the summary judgment motion by producing sufficient facts to establish there is a genuine issue of material fact for trial; <u>Celotex Corp. vs. Catrett</u>, 477 U.S. 317, 322, 91 L.Ed.2d 265, 106 S.Ct. 2548 (1986).  The Second Circuit has followed the Supreme Court's standard by holding, "[w]hen viewing the evidence, the court must assess the record in a light most favorable to the non-movant and…draw all reasonable inferences in [the non-movant's] favor."  <u>Weinstock vs. Columbia University</u>, 224 F.3[rd] 33, 41 (2nd Cir. 2000) <u>citing</u>, <u>Delaware & Hudson Railway Co. vs. Consolidated Rail Corp.</u>, 902 F.2d 174, 177 (2nd Cir. 1990).

## II.  Plaintiff's Age Discrimination Claims Are Sufficient To Withstand Summary Judgment

The Age Discrimination in Employment Act (ADEA) prohibits employers from discriminating against employees on account of age where the employee is a member of a protected age group; that is, over 40 years of age, see 29 U.S.C. §631(a). In order to establish a prima facie case of age discrimination, plaintiff must show that he was in

the protected age group; that he was qualified for the position; that he was discharged or suffered adverse employment action; and that adverse employment action occurred under circumstances giving rise to an inference of discrimination; Norton vs. Sam's Club, et al, 145 F.3rd 114, 118 (2nd Cir. 1998). "The burden of establishing a prima facie case is not onerous and has been frequently described as minimal", Norton, 145 F.3d at 118; Scaria vs. Rubin, 117 F.3rd 652, 654 (2nd Cir. 1997) (per curiam). Once plaintiff has established a prima facie case, defendant has the burden of producing "'reasons for its actions, which if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action'". Norton, supra, 145 f.3rd at 118, quoting Grady vs. Affiliated Cent, Inc., 130 F.3rd 553, 559 (2nd Cir. 1997) (quoting St. Mary's Honor Ctr. vs. Hicks, 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d. 407 (1993). If the defendant meets its burden of producing an age-neutral reason for the discharge, the presumption of discrimination raised by the prima facie case 'drops out of the picture', Grady, 130 F.3rd at 559-60, see also Fischer vs. Vassar College, 114 F.3rd 1332, 1336 (2nd Cir. 1997) (in banc).

The burden then returns to the plaintiff who must adduce sufficient evidence to allow a rational fact finder to infer that the employer was motivated in whole or in part by age discrimination. Norton, 145 F.3rd at 118; Fischer, 114 F.3rd at 1336. The

plaintiff is entitled to rely "on the evidence constituting the prima facie case, together with supportable inferences to be drawn from the false or erroneous character of the employer's proffered reason for the adverse action." Fischer, 114 F.3rd at 1333.

Plaintiff is not required to produce direct evidence of discrimination. Norton, 145 F.3rd at 119; see, Luciano vs. Olsten Corp., 110 F.3rd 210, 215 (2nd Cir. 1997). Plaintiff's case may be entirely circumstantial. Id., see also Burger vs. New York Institute of Technology, 94 F.3rd 830, 833-35 (2nd Cir. 1986) finding a jury question in an age discrimination case based wholly on circumstantial evidence. Indeed, plaintiffs in discrimination suits often must rely on the cumulative weight of circumstantial evidence, since '[a]n employer who discriminates is unlikely to leave a 'smoking gun', such as a notation in an employee's personnel file, attesting to a discriminatory intent'". Rosen vs. Thornberg, 928 F.2d 528, 533 (2nd Cir. 1991). There will seldom be 'eyewitness' testimony as to the employer's mental processes.; Luciano, 110 F.3rd at 215, and the Second Circuit has rejected "the view that circumstantial evidence is inherently weaker than direct evidence", see, Norton, 145 F.3rd at 119; quoting United States vs. Sureff, 15 F.3rd 225, 229 (2nd Cir. 1994).

The Second Circuit has been clear in holding that "it is primarily the province of the jury to determine what inferences can be drawn from circumstantial evidence. So

long as the evidence can reasonably support an inference of discrimination, the court should not upset the jury's decision" and a fortiori should not deny the plaintiff the opportunity to present that evidence for a jury's determination. Norton, 145 F.3rd at 119; see, Gallagher vs. Delaney, 139 F.3rd 338 (1998). The question is whether as a whole the evidence supports a sufficient rational inference.

In sum, in order to grant summary judgment not only must there be no genuine issue of material fact, but there must also be no controversy regarding the inferences to be drawn from them. See, Donahue vs. Windsor Locks Bd. of Fire Comm'rs., 834 F.2d 54, 57 (2nd Cir. 1987). In Gallo vs. Prudential Residential Servs., Ltd., Partnership, 22 F.3rd 1219, 1224 (2nd Cir. 1994) the Court of Appeals cautioned that summary judgment is a "drastic provisional remedy" where "intent is at issue".

### III. Plaintiff Has Demonstrated a Sufficient Case of Discrimination Under The ADEA Entitling Him To Present His Claims To A Jury

Plaintiff's *Ex. 3* is the final signed version of the Separation Agreement between William Callahan and Unisource Worldwide. It is dated on the first page December 23 but signed on the last page on December 24, 1998. The signatories are William E. Callahan and Gary J. Setta, Regional Vice President Human Resources (*Ex. 3).*

This Separation Agreement was the culmination of the following discriminatory events which constituted a constructive discharge of Bill Callahan because of his age. See <u>Kirsch vs. Fleet Street, Ltd</u>., 148 F. 3rd 149, 161-162 (2nd Cir. 1998).  The "discharge" element of an ADEA claim may be either an actual termination of the plaintiff's employment by the employer or a "constructive discharge" <u>Id</u>, 148 F.3[rd] at 161.  A plaintiff may prove a constructive discharge by establishing that his "employer, rather than acting directly, deliberately made his working conditions so intolerable that he was forced into an involuntary resignation, i.e., "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." <u>Id</u>, 148 F.3[rd] at 161.

In September 1998 Michael Keneally came into plaintiff's office and advised plaintiff that he had made a decision to remove him as Vice President of Customer Service (*Ex. 7, pg. 78).*  When plaintiff reminded Keneally that in conversations with him during the summer, Callahan had asked Keneally if Callahan was going to remain in his position as Vice President of Customer Service and then asked why the change was being made.  *(Ex. 7, pg. 78).*  Keneally said "it was time for a change" (*Ex. 7, pg. 78).*  Keneally then said "it was not performance related" (*Ex. 7, pg. 79).*  When plaintiff again reminded Keneally that he had asked both Keneally and Robin Cramp, another

supervisor, several times during the summer if he was going to remain in his position, Keneally responded, referring to Cramp, "he lied" – "he never supported you" (*Ex. 7, pg. 79*). Callahan was replaced by a 37 year old (*Pltf's Aff. par. 5*).

Previously, in July 1998 at a meeting at the Philadelphia Airport, Callahan asked both Cramp and Keneally whether, in light of supposed restructuring at Unisource, he should put his name in for other jobs available within the corporation he was qualified for, both Keneally and Cramp said "no" that Callahan was going to be okay in his position as Vice President of Customer Service (*Ex. 7, pg. 79*).

It was a *fait accompli*. Keneally then offhandedly said to Callahan "why don't you - - you could go into sales." (*Ex. 7, pg. 81*). When Callahan asked how he would support himself since he didn't have any accounts, Keneally sarcastically responded "Take Art Douville's accounts." (*Ex. 7, pg. 81*). Callahan responded that Art Douville still worked there and he didn't think Douville was going to give him his accounts (*Ex. 7, pg. 81*). Keneally just shrugged. (*Ex. 7, pg. 82*)(Douville was the regional President of Unisource).

Callahan was qualified to be Vice President of Customer Service (*Pltf's Aff. par. 1*). Callahan wasn't qualified for a job in sales (*Ex. 7, pg. 82-83*). He had never sold

for a living, and there was no account base to support his income (*Ex. 7, pg. 83*).  Most of the sales people at Unisource were full commission (*Ex. 7, pg. 84).*

Keneally then handed a draft signed Severance Agreement to Callahan (*Ex. 4; Setta 000012-16)* (This document was produced by Unisource at Setta's deposition marked up).  Keneally then asked Callahan to stay in the Customer Service Center "to help transition my replacement" *(Ex. 7, pg. 85).*  Callahan took the Severance Agreement (*Ex. 4),* and Keneally walked out the door (*Ex. 7, pg. 86).*

Callahan's objection was to being removed (*Ex. 7, pg. 87).*  He then consulted with an attorney Albert McGrail.  Attorney McGrail, Callahan and Setta had one or two meetings *(Ex. 7, pg. 89).*  Callahan had a specific recollection of a meeting where they finalized the deferred comp. piece in attorney McGrail's office, and that was after attorney McGrail said he had been trying to communicate with the company and they were not calling him back, and then Gary Setta telling me that he thought I should leave because he thought I was making everybody uncomfortable (*Ex. 7, pg. 89).*  With respect to the non-compete clause, McGrail told Callahan that it was completely unenforceable (*Ex. 7, pg. 90).*  Setta took it back and never resubmitted it (*Ex. 7, pg. 90-91).*

This all occurred in the context of Ray Mundt's comments at the Philadelphia Airport in July 1998. Mundt was the CEO of Unisource (*Ex. 7, pg. 192).* Mundt said "that the company was mired in old ways, it was time for a change, and he went on to introduce "the bright young leaders of our company". (*Ex. 7, pg. 192).* Charles White, President of Unisource, made a comment that being at Unisource for over 15 years "was a kiss of death" (*Ex. 7, pg. 196, Pltf's Aff. par. 9).*

When Keneally advised Callahan that he was removing him as Vice President for Customer Service, handed him the Separation Agreement that had already been signed by Gary Setta, off-handedly suggested to Callahan that he might consider sales, when he knew that Callahan had no sales experience and no accounts, Unisource's decision to terminate Callahan was as clear as daylight. In fact, by stripping Callahan of his job and then suggesting another job at Unisource for which Callahan was totally unqualified, Unisource created an intolerable and humiliating condition that no reasonable person could ever tolerate; see <u>Kirsch vs. Fleet Street, Ltd.</u>, 148 F.3rd at 161-2. Keneally's action in removing Callahan, providing him with no viable alternative and then handing him the Separation Agreement (*Ex. 4)* was a termination and discharge, whether constructive or actual, the effect was the same. Callahan was out, and he was out because of his age.

The Separation Agreement of December 23, 1998 (*Ex. 3)* provides that par. 8 the following:

> 8.  *Deferred Compensation*.    – Benefits Under the 1991 IKON Office Solutions, Inc. (formerly ALCO Standard Corporation Deferred Compensation Plan) will vest 100% **and be distributed to you in the future**, in accordance with the provisions of the Plan. You must continue to make the annual premium payments under the 1991 IKON Office Solutions, Inc. Deferred Compensation Plan to your age 65 to perpetuate the lump sum death benefit and age 65 policy transfer thereunder.  These will be invoiced to you annually by IKON Office Solutions, Inc.

In discussions at McGrail's office with Setta, Callahan and attorney McGrail asked Setta "Did he have the authority from the Board of Directors or the permission to promise me the Plan benefit as I was leaving the company" *(Ex. 7, pg. 227)*.  Mr. Setta said "yes". (*Ex. 7, pg. 228)*. Attorney McGrail specifically asked Setta to specify what the benefits were (*Ex. 7, pg. 229)* and when McGrail asked Setta about the language "in accordance with the Plan", Setta stated "that just means that he has to continue to make the premium payments" (*Ex. 7, pg. 229)*.  Callahan testified in his deposition that he and McGrail "were concerned about the Board of Directors being able to cancel the Plan, and that was why the specific question was asked: 'Do you have the authority of the Board of Directors to promise me the benefits of the Plan?'" (*Ex. 7, pg. 230)*.  Mr.

Setta responded and said "As long as I made the premium payments, I will get the benefits of the Plan" (*Ex. 7, pg. 231, Pltf's Aff. par. 6-24*).  Callahan believed the Setta had the authority to promise Callahan payment of the benefits of the Plan (*Ex. 7, pg. 231*).

Albert McGrail passed away in 1999.  He met with Bill and Linda Callahan on October 26, 1998 and caused a memorandum to be typed of his meeting with Bill Callahan (*Ex. 6*).  This memorandum clearly sets forth Callahan's desire at the fourth and fifth bullets to have the benefit of the $350,000 life insurance policy and the $15,000 a year monthly payment benefit, both of which were the benefits promised to Callahan under the 1991 IKON Plan.  McGrail also noted that Callahan was replaced by a 37 year old man, and that the Chairman of the Board in Philadelphia made a statement about age and that the President of Unisource had talked about how it was a "curse" to be at Unisource for 15 years or more.  "His ex-boss had made assurances to him in January 1998 that he would be with the company until the age of retirement".  McGrail's rough notes of his conversations (*set forth in Ex. 6*) included a notation concerning "full vesting income deferment 91 (5 years)".  These rough notes appear to be the basis for the dictation of the typewritten memorandum to the Callahan file (*Ex. 6*).

Even Setta had to concede that Callahan had conducted himself in a professional way in all respects.  On December 24, 1998 Setta wrote to Callahan telling him that he wanted to thank Callahan for the professional way he handled discussions pertaining to his departure, that Callahan had made a difficult situation easier to get through and that "it pains me to have been part of this situation". "Normally I can rationalize these kinds of situations as being part of my job.  However, having to go through this with someone who I have trusted…is an entirely different thing. (*Ex. 6).*  Setta then opines "I have said to you that you may, in fact, be the lucky one." (*Ex. 6).* Clearly, Setta knew that Callahan was the victim of age discrimination, and all of Unisource's protestations to the contrary are fatuous.

Unisource's own language must be construed against it, since Unisource drafted the language of par. 8.  *Exhibit 5* is an undated draft with Callahan's name written in.  This draft contains a marked up predecessor to the deferred compensation par. 8 at issue in this case (*Ex. 5).*  Although Setta testified in his deposition that he got the language from Bill Bauer at Unisource (*Ex.15, pg. 67)*, Bill Bauer, Director of Risk Management at Unisource, and Walter Hope, Administrator of the 1991 Plan denied being involved in any way either with Callahan's Separation Agreement as a whole or with the language of par. 8 in particular.  Bauer testified that although he was Director

of Risk Management at Unisource, he never saw any draft of the Separation Agreement or the actual signed Separation Agreement prior to his deposition (*Ex. 1, pg. 50-53*). Bauer testified he could recall no conversation with Setta as to whether to include a reference to the 1991 Deferred Compensation Plan in Callahan's Severance Agreement (*Ex. 1, pg. 56*). Bauer was speechless and could not explain why there was no reference to Callahan's participation in the 1991 Deferred Compensation Plan in Setta's original 1998 letter (*Ex. 4; Ex.1, pg. 57*). In fact, Bauer testified that he was surprised upon reviewing Callahan's Separation Agreement that Setta signed as the regional Vice President of Human Resources (*Ex. 1, pg. 58-59*). Bauer further testified that it would have been against company policy for Setta to have sent the first draft (*Ex. 4*) to Callahan with no provision relating to Callahan's participation in the 1991 Plan (*Ex. 1, pg. 66-67*).

Walter Hope, Administrator of the 1991 Plan, during the period commencing January 1, 1997, testified that the language in the Callahan Separation Agreement of December 24, 1998 "is not language that I recommend or will recommend. It's neither." Hope was emphatic, he testified "I did not offer this language". "To the best of my recollection, I have not seen this letter, therefore, this particular language…In other words, I didn't write it, I can't tell you about it, but it says what it says." (*Ex. 2,*

*pg. 83-84).*  Hope testified that nobody consulted with him on the language that appears in Callahan's Separation Agreement (*Ex. 2, pg. 84).*

The wording of par. 8 relating to deferred compensation (*Ex. 3)* is deceptive and misleading and intended to induce reliance by Bill Callahan and thereby to secure Callahan's departure from Unisource.  There is no reference in par. 8 of Exhibit 3 to the consequences of and even the possibility of prospective termination of the 1991 Plan down the road. Par. 8 does not even identify what "benefits" under the 1991 IKON Plan Callahan could expect to receive.  What it does say is that Callahan would be vested 100% in the Plan and that the benefits would "be distributed to you in the future", in accordance with the provisions of the Plan.  Par. 8 then continues as follows: "You must continue to make the annual premium payments…to your age 65 to perpetuate the lump sum death benefit and age 65 policy transfer thereunder…" which would be invoiced to Callahan annually by IKON (*Ex. 3).*

Callahan testified at his deposition that attorney McGrail specifically asked Setta what the phrase "in accordance with the provisions of the Plan" meant, and Setta responded that Callahan's only obligation would be to continue to make premium payments (*Ex. 7, pg. 229; Pltf's Aff. par. 12-14).*  There is no mention in par. 8 of the $15,000 per year payment for 10 years which was Callahan's entitlement under the

1991 Plan, and the only caveat expressed in par. 8 is that Callahan was to continue to make premium payments on the split dollar life insurance policy.  Finally, Unisource falsely represents to Callahan, that at age 65, the policy would be transferred to him if he continued to make the annual premium payments under the Plan to age 65. (*Ex. 3, par. 8).*  However, Bauer, Unisource's Director of Risk Management in 1998 and former Administrator of the 1991 Plan (*Ex. 1, pg. 6)* and Hope, the Director of Risk Manager at IKON in 1998 and Administrator of the 1991 Plan from January 1, 1997 through its termination (*Ex. 2, pg. 7)* testified that IKON remains the owner of insurance policies for emloyees both before and after termination (*Ex. 2, pg. 131; Ex. 1, pg. 31-33).*

Callahan was completely justified and reasonable in believing that he was receiving an unconditional commitment and representation from Unisource that when he turned age 65 he would unconditionally receive $15,000 per year for 10 years and the benefits of the split dollar MetLife Insurance policy (*Ex. 9)*, which is still in full force and effect, including a $95,000 cash value at age 65 and a paid up death benefit of $375,000.  Callahan had no way of knowing that this was one large deception, and the language used was calculated to obfuscate and to enable Unisource down the road, to claim, *ipse dixit,* that Callahan got just what he bargained for.   The truth is that

Callahan was a victim of a deception that takes the form even now in Unisource claiming that it never promised Callahan that he would be paid at age 65 $15,000 a year for 10 years and the cash value and paid up death benefit of the MetLife Life Insurance Policy.

Unisource made an unconditional promise to Callahan in order to induce him to sign the Separation Agreement and to leave Unisource. The best gloss one can give to Unisource is that Setta was reckless when he placed the language in the December 23, 1998 Separation Agreement at par. 8.  Apparently, he didn't consult with either Hope or Bauer who had more knowledge about the 1991 Plan, as former and present Administrators.  But recklessness is no excuse.  Both Bauer and Hope deny any involvement in the drafting of par. 8 of the Separation Agreement (*Ex. 49-59; Ex. 2, pg. 80-84)*. Apparently, the expert, Walter Hope, was at a loss to interpret the meaning of the language of par. 8 when he testified "to the best of my recollection, I have not seen this letter, therefore, this particular language…In other words, I didn't write it, I can't tell you about it, but it says what it says."  (*Ex. 2, pg. 83-84)*.  Setta drafted par. 8, inserted into the Separation Agreement *(Ex. 3-5)* and signed it all in behalf of Unisource.

**IV**.  **The Release Does Not Bar Callahan's Age Discrimination**
      **Or ERISA Claims**

Ambiguity in agreements should be construed against the drafter.  <u>Gambardella</u>

<u>vs. Pentec Inc.</u>, 2003 WL 22119182 (D. Conn. 2003)(Arterton, J.).  Construing par. 8

to provide Callahan with assurance of payment of his monthly benefit at age 65 and

the benefits of the split dollar life insurance policy clearly promotes the public interest,

especially where there is clear evidence of discriminatory animus on the part of

Unisource as herein before set forth.  Callahan was clearly induced to believe that he

would receive the 1991 Plan benefits when he turned age 65 without condition.

Without the promise of unconditional payment at age 65, Callahan would not have

signed the Separation Agreement which was critical to his future (*Pltf's Aff. par. 20-*

*24).*  Unisource had constructively discharged Callahan because of his age in violation

of the ADEA, and the Release sought to be enforced by Unisource was fraudulently

induced.

As Judge Korman held in <u>DePace vs. Matsushita Electric Corporation</u>, 257

F.Supp.2d 543, 556 (EDNY 2003), <u>Laniok</u> factors, 935 F.2d at 1368 (2nd Cir. 1991),

are not exclusive or dispositive in determining whether a waiver of ERISA claims is

knowingly and voluntarily made; <u>DePace</u>, 257 F.Supp.2d at 556.  The ultimate test is

whether the waiver was *in fact* knowing and voluntary.  DePace, 257 F.Supp.2d at 556; Laniok, 935 F.2d at 1368.  "As with any other contractual release, circumstances evincing fraudulent inducement, misrepresentation, mutual mistake or duress would justify setting aside the release", DePace, 257 F.Supp.2d at 556; see e.g., Allen vs. WestPoint- Pepperell, Inc., 945 F.2d 40 (2nd Cir. 1991)(release will be denied effect when based on misrepresentation of a material fact).  See also, Ott vs. Midland-Ross Corp., 600 F.2d 24 (6th Cir. 1979)(If an employer made a misrepresentation of material fact for the purpose of inducing employee to release it from liability under Title VII, it would be estopped to interpose release as bar to suit, provided employee acted in justifiable reliance upon misrepresentation); see also, Fonseca vs. Columbia Gas Systems, Inc., 37 F.Supp.2d 214, 229 (WDNY 1998) holding "In general, a release which has been procured through fraud, misrepresentation or deceit is not a bar to subsequent actions by the party executing the release."

## V. **There Was No Ratification By Callahan**.

Further, the Court in DePace vs. Matsushita held that failure to tender-back lump sum retirement benefits does not constitute a ratification of the release.  Like DePace, the question in Callahan's case is whether he is entitled to the additional benefits he has claimed in order to restore to him those benefits denied by Unisource

to him through discriminatory and retaliatory conduct.  As Judge Korman held in DePace, under these circumstances it would make little sense to require plaintiff to tender-back the payments he is obviously entitled to in order to pursue his claim of discrimination.  Id. 257 F.Supp.2d at 557.

Finally, Unisource's claim that Callahan should be equitably estopped from pursuing this age discrimination claim is absurd.  It was Unisource's misrepresentation, not Callahan's, that brings us to Court.[2]  It is Unisource's fraudulent and reckless inducement to Callahan relating to par. 8 promising unconditional payment at age 65 of the benefits under the 1991 Plan that is at issue in this case. This fraudulent inducement, if it is determined to be fraudulent, was made in the context of the comments of Ray Mundt and Bill White and the replacement of Callahan with a younger man under the age of 40.  Indeed, it was "the kiss of death" to stay at Unisource for more than 15 years as Unisource's own President Charles White stated, and Ray Mundt the CEO gave further life to the discriminatory atmosphere at Unisource by stating that the company was mired in old ways and it was time to bring new life into the company.

**VI.  Joint Action By Unisource, ALCO, IKON and Georgia Pacific**

ALCO Standard Corporation was a conglomerate for operating companies including Unisource Worldwide and ALCO Office Products (*Ex. 2, Hope dep. pg. 12-13)*. Unisource was in the paper distribution business, and ALCO Office Products was in the copier and fax machine business (*Ex. 2, pg. 13-14)*.  Through 1996, Unisource was a wholly owned subsidiary of ALCO Standard Corporation.  (*Ex. 2 pg.14)*. In January 1, 1997, ALCO Standard split off from itself and Unisource Worldwide in a tax free distribution to shareholders (*Ex. 2, pg. 14)*.  ALCO Office Products and ALCO Standard then became a single entity, and on January 27, 1997 ALCO changed its name to IKON Office Solutions, Inc. (*Ex. 2, pg. 16)*.

Defendant Walter J. Hope, Jr. became Administrator of the 1991 Plan in the last quarter of 1996 (*Ex. 2, pg. 18)*.  He succeeded Bauer as the Administrator, and prior to January 1997 "both had been on the corporate staff of ALCO Standard Corporation with Bauer being the Plan Administrator (*Ex. 2, pg.19-20)*.   Hope was the Administrator from January 1, 1997 through December 1, 2000 *(Ex. 2, pg. 20)*.  Hope

---

[2] It is of no consequence that Callahan believed that the duress he was experiencing when he signed the Separation Agreement was legally sufficient to avoid the Release.

reported to Michael Dillon, in the Controllers Office at ALCO Standard Corporation (*Ex. 2, pg. 21-22*).

Hope and Bauer remained in contact from January 1, 1997 through December 31, 2000 *(Ex. 2, pg. 36)*.

Hope testified at his deposition that the Board of Directors at IKON terminated the 1991 Plan *(Ex. 2, pg. 43)*, and those discussions about termination took place during 1999 and 2000 (*Ex. 2, pg. 44)*. Hope communicated with individuals at Georgia Pacific, the Senior Vice President of HR, Gary Melampy, counsel to Georgia Pacific and Georgia Pacific attorney Mary Hodgins regarding Plan termination. (*Ex. 2, pg. 52, Ex. 10-13)*.

During calendar year 2000 Hope met with Georgia Pacific representatives in Atlanta (*Hope. dep. pg. 53)*. The only reason articulated by the Board of Directors of IKON for their decision to terminate the 1991 Plan was "the Board of Directors articulated that there have been events that have occurred that had an adverse financial impact on IKON and as a consequence, the Board of Directors shows the termination of the Plan in accordance with the Plan's provisions to do so.  (*Ex. 2, pg. 68)*.   There was a Benefits Agreement between ALCO Standard and Unisource Worldwide articulating responsibilities of parties as respect benefit plans with regard to

the divestiture of Unisource Worldwide and how different Benefit and Welfare Plans would exist on a going-forward basis and which party would have responsibility for the various aspects of such benefits (*Ex. 2, pg. 70-71).*

Unisource became a wholly owned subsidiary of Georgia Pacific (*Ex. 2, pg. 71-72).*  According to Hope, IKON dealt with Unisource and Georgia Pacific in a fashion that was consistent with Unisource being a wholly owned subsidiary of Georgia Pacific Corporation (*Ex. 2, pg. 71-72, but see, Ex. 10-13).*

Hope had "numerous conversations between either himself or his staff and Bill Melampy at Georgia Pacific having to do with the mechanics of making sure Unisource individuals and various deferred compensation plans continued to receive the benefits to which they were entitled (*Ex. 2, pg. 73-74).* Melampy was Director of Compensation for Georgia Pacific (*Ex. 2, pg. 74).* Hope testified that the MetLife Insurance Policy insuring Bill Callahan (*Ex. 9)* is evidence that Callahan's insurance policy still exists (*Ex. 2, pg. 92-95).*

Hope testified that Georgia Pacific, through attorney Mary Hodgins,  (*Ex. 10)* expressed Georgia Pacific's consent to the provisions related to plan termination with respect to the 1991 Plan and declared Georgia Pacific to be successor in interest to Unisource Worldwide, Inc. (*Ex. 2, pg. 103).*    The actions of the IKON Board came

sometime after the March 13, 2000 letter (*Ex. 2, pg. 104*).  On June 21, 2000 Hope writes to Gary Melampy, chief counsel at Georgia Pacific Corporation advising that IKON is considering terminating the 1991 Plan (*Ex. 11*).  Hope also notes in his letter that a number of Unisource employees continue to be participants in the Plan (*Ex. 11*). The Board had not acted by the time Hope wrote *Ex. 11* to Melampy on June 21, 2000 (*Ex. 2, pg. 105-106*).  Callahan was not on a list of individuals to whom Unisource made commitments regarding the 1991 Plan.  (*Ex. 12, Ex 2, pg. 107-8*).

Georgia Pacific on June 23, 2000 represents to IKON in a letter from Melampy of GP to Hope at IKON that "Georgia Pacific/Unisource will not provide any affirmative statement, written communication or verbal opinion to our employees about your decision to terminate the Plan." *(Ex. 13)*. Georgia Pacific/Unisource worked hand in glove with IKON to facilitate not only Plan termination but also to keep the so-called reasons for such termination as close to their respective vests as possible. This was a joint effort at concealment by Georgia Pacific and IKON.  Hope refused to take responsibility for soliciting Georgia Pacific's agreement not to provide any affirmative statement regarding termination of the Plan by IKON (*Ex. 2, pg. 113-115*).

Finally, IKON remains the owner of the insurance policy for Callahan which is still in existence (*Ex. 9; Ex. 2, pg. 131*).  This insurance policy, part of Callahan's

Benefit Package under the 1991 Plan, is still in existence, even though the Plan was terminated as of December 31, 2000 (*Ex. 2, pg. 131*).  Both the Paneccasio and Callahan life insurance policies under the Plan are still in force (*Ex. 2, pg. 133-134).*

This was a cooperative effort between IKON and Georgia Pacific/Unisource during the year 2000, and Unisource and Georgia Pacific simply cannot escape liability here, because they were complicit with IKON in breaking the promise previously made to Bill Callahan in 1998 which was a critical inducement to his decision to sign the December 23, 1998 Separation Agreement.   (*Ex. 3).* These corporations jointly participated in and facilitated the destruction of the security of Bill Callahan who reasonably relied upon the affirmative representations made to him in 1998 by Unisource.  Bill Callahan was the victim of age discrimination, because Unisource, Georgia Pacific and IKON deceived and misled him and thereby took advantage of him because of his age and solely because of his age.  In doing so, they violated Callahan's rights under the Age Discrimination in Employment Act and ERISA.

### VII.  Plaintiff Has A Valid Estopppel Claim Against All Defendants On The ERISA Count

There is sufficient evidence to proceed to trial on the ERISA Claim for Relief on equitable estoppel grounds and the grounds of unlawful termination of the Plan

(*Section 8 infra*). Unisource, Georgia Pacific and IKON acting through Melampy and Hodgins for Georgia Pacific and Hope for IKON jointly executed the concealment of IKON's intentions to terminate the 1991 Plan during the years 1999 and 2000 (*Ex. 11-13*).

For the following reasons, neither Unisource, Georgia Pacific, nor the IKON defendants can escape liability for their respective roles in the deception concealment, and deprivation of benefits suffered by Bill Callahan. The Second Circuit has recognized "a federal common law action for a suit by plan participants against a non-fiduciary who participates knowingly in a breach of fiduciary duty." Lee vs. Burkhart, 91 F.2d 1004, 1008 (2nd Cir. 1993), and the implicit recognition of a cause of action for equitable or promissory estoppel under ERISA, see Lee vs. Burkhart, 91 F.2d at 1008; Chambless vs. Masters, Mates & Pilots Pension Plan, 772 F.2d 1032, 1039 (2nd Cir. 1985) cert denied., 475 U.S. 1012, 106 S.Ct. 1189, 89 L.Ed.2d 304 (1986).

"Under [Second Circuit] case law, promissory estoppel in ERISA cases requires satisfaction of four elements drawn from the state common law of promissory estoppel: (1) a promise; (2) reliance on the promise; (3) injury caused by the reliance; and (4) an injustice if the promise is not enforced." Aramony vs. United Way Replacement Benefit Plan, 191 F.3[rd] 140, 151 (2nd Cir. 1999).

There are "extraordinary circumstances" in this case, because as the Court of Appeals held in Aramony, 191 F.3rd at 152 "extraordinary circumstances" requires a "remarkable consideration such as the **use of a promise of benefits to induce certain behavior on the employee's part**".  Moreover, as the Aramony Court observed at n.5, where a promise by an employer is used to induce the plaintiff to retire, there is as a matter of law, "extraordinary circumstances" Id., 191 F.3rd at 152 n.5.  The Aramony Court analyzed its prior decision in Schonholz vs. Long Island Jewish Med. Ctr., 87 F.3rd 72, 79 (2nd Cir.) cert denied, 519 U.S. 1008, 117 S.Ct. 511, 136 L.Ed.2d 401 (1996) as implicitly finding 'extraordinary circumstances' "because the promise in that case, before being withdrawn, was used by the employer-defendant to induce the plaintiff to retire."  Aramony, 191 F.3rd at 152, n.5.

The promise in plaintiff Callahan's case, although made by Unisource, was made under circumstances where IKON knew or should have known that Unisource was making an unconditional promise to pay Callahan at age 65 the benefits under the 1991 Plan; the promise was false and he reasonably relied on the promise. (*Pltf.'s Aff. par. 6-24).*  Callahan was injured because of his reliance on the promise, and injustice will result unless the promise is enforced.  IKON, Unisource and Georgia Pacific were all signatories to the 1996 Benefits Agreement.  This Benefits Agreement coordinated

how benefits would be handled after Unisource was spun off in January 1997. IKON, Unisource and Georgia Pacific and each of them are liable for the deception by Unisource and the improper and illegal termination of the 1991 Plan. There are clearly extraordinary circumstances present in this case within the meaning of Aramony and Schonholz under the law of the Second Circuit, and plaintiff has clearly established proof of a legally sufficient claim based on promissory and equitable estoppel. No case cited by the IKON defendants or the Unisource defendants stands for the proposition that Callahan may permissibly be denied the benefits promised to him in the Separation Agreement of December 23, 1998, upon which he reasonably relied and which induced him to sign the Agreement and to structure his financial security for the future based upon that inducement. Deception was the hallmark of the defendants' conduct in this case.

IKON remains the owner of the insurance policy for Callahan which is still in existence (*Ex. 9; Ex. 2, pg. 131*). This insurance policy, as part of the Benefit Package Callahan received as a participant the 1991 Plan, is still in force, even though the Plan was terminated as of December 31, 2000 (*Ex. 2, pg. 131*). Both the Paneccasio and Callahan life insurance policies under the Plan are still in force (*Ex. 2, pg. 133-134).* As part of the remedy sought by plaintiff, there should be equitable relief requiring

IKON to restore the cash value of $95,000 and the paid up death benefit of $375,000 if, as Hope testified and as ex.9 indicates, the MetLife insurance policies for Paneccasio and Callahan are still in full force and effect.  Callahan has not yet reached the age of 65.

### VIII.  IKON'S Deceptive Conduct And Lack of Responsibility Can Never Provide A Justifiable "Event" Permitting Termination Under Paragraph 19 Of The 1991 Plan (Ex. 7)

Notwithstanding the testimony of Walter Hope, the Plan Administrator and the Holcomb decision decided by a Vermont magistrate judge who was never presented with the following evidence of financial irresponsibility and improper conduct, IKON violated ERISA and has distorted a fair reading of the Plan by concealing from Plan participants the true cause of the so-called "event" by which IKON seeks to justify the termination of the Plan.

The 1999 Annual Report of IKON Office Solutions (*Ex. 14)* states that on November 24, 1999 IKON reached a settlement in a series of class action complaints filed in the Eastern District of Pennsylvania on behalf of its shareholders.  The plaintiffs alleged that during the period from January 24, 1996 to August 13, 1999 IKON and certain current and former principal officers and employee directors publicly disseminated false and misleading statements concerning IKON's revenue, profitability

and financial condition in violation of federal securities law.  As part of that settlement, IKON will pay $121.1 million dollars.  Approval of the settlement was anticipated in February or March 2000.  IKON states in its Annual Report that it believes that the settlement also resolves a purported class action claim pending in the federal court in Utah.  That claim was brought under ERISA involving persons who participated in IKON's Retirement Savings Plan after January 1, 1994.  Those allegations mirror the allegations made in the complaints filed in the Eastern District of Pennsylvania.  IKON recorded a charge of $101.1 million dollars in fiscal 1999 relating to the settlement computed as follows:  $111 million as the settlement plus $10.1 million for legal fees offset by $20 million dollars of insurance proceeds. (*Ex. 14*).

IKON's claim that it was terminating the 1991 Plan, because it had an adverse financial impact on IKON is hollow.  What really happened was that IKON engaged in false and misleading practices aimed at deceiving the public and violating securities laws.  As a result, it was caught and was compelled to pay $111 million dollars in damages and $10.1 million dollars in legal fees for a total of $121 million dollars that was a result of its own misconduct.

It wasn't the Plan that was having an adverse impact on IKON; it was IKON's own misconduct, and the Board of Directors sought to punish participants in the 1991

Plan in order to obtain revenues to cover the cost of its own deceptive and misleading conduct.  This should never be permitted at the expense of plaintiff Callahan.  There is no indication in the <u>Holcomb</u> decision in Vermont that the magistrate judge was aware of IKON's misconduct.  Further, <u>Holcomb</u> does not deal in any way with the claims being made here by Bill Callahan under the 1998 Separation Agreement.

Finally, no deference should be given to IKON's decision to deny benefits to Callahan under a claimed Top hat Plan, since the proper standard for review of IKON's decision is <u>de novo</u>; see <u>Goldstein vs. Johnson & Johnson,</u> 251 F3d. 433, 443-44 (3d Cir. 2001); see also <u>Gallione vs Flaherty,</u> 70 F3d. 724, 729 (2nd Cir. 1995)(an open question in the Second Circuit)[3]

For all these reasons, the Motions for Summary Judgment filed by the Unisource and IKON defendants must be denied.

---

[3] Although this Court has previously dismissed plaintiff's state law claims under the doctrine of ERISA preemption, in view of the Second Circuit's recognition in <u>Gallione</u>, 70 F.3[rd] at 729 that the special nature of top hat plans means that some state law claims might not be preempted by ERISA, we ask the Court to reconsider its previous decision to dismiss the state law claims and to reinstate them to this case.

THE PLAINTIFF,
WILLIAM CALLAHAN


BY_____
   ANDREW B. BOWMAN
   Federal Bar No: ct00122
   1804 Post Road East
   Westport, CT 06880
   (203) 259-0599
   (203) 255-2570 (Fax)


## CERTIFICATE OF SERVICE

      This is to certify that a copy of the foregoing was mailed, postage prepaid, on this ____ day of December, 2004 to:

Felix J. Springer
Jennifer L. Sachs
Day, Berry & Howard
CityPlace 1
Hartford, CT 06103-3499

Kay Kyungsun Yu, Esq.
Pepper Hamilton, LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103


_____
ANDREW B. BOWMAN