UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| WILLIAM E. CALLAHAN | : |
|     PLAINTIFF | : |
| VS. | : DOCKET NO: 3:01CV1205(CFD) |
| UNISOURCE WORLDWIDE, INC., GEORGIA-PACIFIC CORPORATION, ALCO STANDARD CORPORATION AND IKON OFFICE SOLUTIONS, INC., ET AL | : : |
|     DEFENDANTS | : DECEMBER 27, 2004 |

**PLAINTIFF CALLAHAN'S LOCAL RULE 56(a) 2
STATEMENT IN RESPONSE TO THE
UNISOURCE DEFENDANTS' RULE 56(a) 1
<u>STATEMENT</u>**

Pursuant to Local Rule 56(a) 2 plaintiff William Callahan submits the following response to the Unisource defendants' Rule 56(a)1 Statement. Although the Callahan and Paneccasio cases are separate cases and were consolidated for discovery purposes only, plaintiff Callahan incorporates by reference both the Paneccasio Counter Affidavit and the Paneccasio Local Rule 56(a) 2 Statements. To do anything else and to repeat every single fact twice would be confusing, cumbersome and

counterproductive. Therefore, Callahan and Paneccasio incorporate their respective Counter Affidavits, Local Rule 56(a) 2 Statements and arguments made in their respective Memoranda in Opposition to all defendants' Motions for Summary Judgment. All references to exhibits are to plaintiff's exhibits unless otherwise specifically described as defendants' exhibits.

1.  Admit except Rourke-Eno was a division of Unisource.

2.  Admit that Unisource was a wholly owned subsidiary of ALCO Standard Corporation until January 1, 1997. ALCO Standard Corporation was also the owner of a subsidiary known as ALCO Office Products (*Ex. 2, Hope. dep. pg. 15-16).* Admit that on January 1, 1997, ALCO Standard spun off Unisource. On January 1, 1997, ALCO Standard was also the owner of a subsidiary known as ALCO Office Products (*Ex. 2, Hope. dep. pg. 15-16)*. Admit that on January 1, 1997, ALCO Standard spun off Unisource, and subsequently on January 27, 1997, ALCO Standard absorbed ALCO Office Products and changed its name to IKON Office Solutions, Inc. (*Ex. 2, Hope. dep. pg. 16)*.

3.  Admit that Unisource was spun off and assumed whatever status was the consequence. Admitted that in July 1999 it was acquired by Georgia Pacific. For purposes of the issues in this case, it is denied that Unisource remained a separate

legal corporate entity following acquisition, since Georgia Pacific through Mary Hodgins, an attorney for Georgia Pacific, expressed Georgia Pacific's consent to the termination of the 1991 Deferred Compensation Plan on or about March 13, 2000 and declared Georgia Pacific to be successor in interest to Unisource Worldwide (*Ex. 2, Hope dep. pg. 103-104, Ex. 10, see also, Ex. 11-13*) where Georgia Pacific agrees to conceal from Plan participants IKON's proposed termination.

    4.  Admitted.

    5.  Admitted.

    6.  Deny that the Plan and Prospectus "clearly explained how the Plan was to operate".  Admit that the Plan provided that employees whose employment terminated prior to "vesting" would not be entitled to remain in the Plan and would receive the amount of their deferrals without interest. These participants would also lose further life insurance coverage and would lose all of the payments for life insurance made up to the date of termination. (*Ex. 7, Plan par. 5).*

    7.  Admit that the Plan's termination provision's language is as set forth in defendant's Rule 56(a) 1 Statement.  However, plaintiff denies that there was a justifiable "event" justifying termination and denies that the Plan drafted in 1990 with an effective date of January 1, 1991 supersedes or takes a superior position to the

subsequent Separation Agreement of December 23, 1998 which was agreed to by Unisource and plaintiff Callahan. (*Ex. 3, 7, 14*).

8.  Admit that Callahan was employed by Unisource as Vice President of Customer Service in 1998 but was stripped of that title by Unisource in the late summer of 1998 (Pltf.'s Aff. par. 1-5).  Admit that in 1998 Unisource was a separate corporate entity from IKON but **deny** that it was unrelated, since IKON clearly sought Georgia Pacific's consent to the provisions related to Plan termination as early as March 2000 when IKON and Unisource agreed to conceal their intention to terminate the Plan (*Ex. 2, Hope. dep. pg. 103-104, Ex. 10-13)*.  Further, Georgia Pacific, through Mary Hodgins, its attorney, expressed Georgia Pacific's consent to the provisions related to Plan termination with respect to the 1991 Deferred Compensation Plan on or about March 13, 2000 and declared Georgia Pacific to be successor in interest Unisource Worldwide (*Ex. 2, Hope. dep. pg. 103-104, Ex. 10-13)*.

9.  Denied.  Unisource's "Position Statement" is really a lawyer's letter dated May 27, 1999 and is inadmissible evidence.  Deny that there was a reason to question Callahan's leadership; deny that there was any kind of justifiable basis for Unisource's decision not to continue Callahan in customer service; deny that there was any justification in compelling Callahan to return to sales; although he had managed other

managers in the past, he was never a sales person before taking the leadership job in charge of customer service. He did not have any existing ties to potential customers of Unisource. This was a hollow and discriminatory act against Callahan because of his age. (*Pltf.'s Aff. par. 1-5; Ex. 7, pg. 82-83*).

      10. Denied. Admit that in September 1998 Keneally advised Callahan that he had decided to remove him from his position as Vice President of Customer Service with no options (Pltf's. dep. pg. 78). When questioned by Callahan, Keneally told Callahan "it was not performance related" (Pltf's dep. pg. 78-79). Keneally also told Callahan that Robin Kramp, a Callahan supervisor, "lied" and that Kramp "never supported" Callahan (Pltf's dep. pg. 79-80).

      After Keneally informed Callahan he had decided to remove him as Vice President of Customer Service, Keneally, in "an offhand remark [stated] why don't you - - go into sales" (Pltf. dep. pg. 81). Keneally knew that this was a totally untenable position for Callahan (Pltf. Aff. par. 2-5). When Callahan asked Keneally how he would support himself since he didn't have any accounts, Keneally said "Take Art Douville's accounts." (Pltf. dep. pg. 81). When plaintiff responded that "Art Douville [the President of the Region] still works here; I don't think he's going to give me his accounts", Keneally made no response (Pltf. dep. pg. 81-82). Douville subsequently

left Unisource in October or November of 1998 (Pltf. dep. pg. 81). Further, in addition to having no accounts, Callahan was not qualified for a sales position (Pltf. dep. pg. 82-83). Callahan never sold for a living (Pltf. dep. pg. 83). Previously, he had sales managers reporting to him who managed sales people (Pltf's dep. pg. 83). There was no account base to support Callahan's income (Pltf's dep. pg. 83). Most sales people at Unisource were full commission (Pltf's dep. pg. 84). Keneally then presented Callahan with an already prepared draft Severance Agreement (Pltf's dep. pg. 84-85). Keneally then asked Callahan to stay on in the Customer Service Center to help transition his replacement (Pltf's dep. pg. 85). Callahan objected to being removed as Vice President of Customer Service (Pltf's dep. pg. 87).

  11. Denied. Callahan never voluntarily decided to leave his employment, and it was only after *Ex. 3* the December 24, 1998 Separation Agreement was signed containing for the first time par. 8 relating to "Deferred Compensation" that Callahan, in reliance thereon, agreed to leave his employment with Unisource. (Pltf's Aff. par. 5-24). The final December 23, 1998 Separation Agreement was the third and final draft of an agreement initially presented by Keneally in September 1998 (*Ex. 4*). That Agreement *(Ex. 4),* dated September 22, 1998 and signed by Gary Setta, Field Vice President, Human Resources, does not contain any reference to a promise to

Callahan relating to Deferred Compensation and Callahan's entitlement to benefits under the 1991 IKON Office Solutions, Inc. Plan.  There was a note written by Setta with attorney McGrail's name and fax number on the top and various ink changes to Setta's retained draft of the September 22, 1998 Agreement (*Ex. 4)*.  Setta produced another draft (*Ex. 5)* which contained certain pen changes and the typed proposed wording of a new paragraph 8 "Deferred Compensation". There is no date on this draft produced by Setta, 00006-11.  There is another draft produced by Setta, 000017-21 which does not contain any reference to Deferred Compensation and appears to be an unmarked copy of *(Ex. 4)* which also does not contain any reference to Deferred Compensation.

      12. Admit that plaintiff Callahan knew he was being replaced by a 37 year old (*Pltf's dep. pg. 152-153*), that comments had been made by Unisource CEO Raymond Mundt on July 1998 that "the company was mired in old ways" and that Mundt wanted to introduce "the bright young leaders of our company" (*Pltf's dep. pg. 192*). These comments were stated by Mundt at a meeting at the Philadelphia airport (*Pltf's dep. pg. 192*).  This was an indication to Callahan that there was discriminatory animus at Unisource (*Pltf's dep. pg. 191-194*).

13. Admit that Callahan was also aware of comments by Unisource President Charles White that "being at Unisource for over 15 years…was a kiss of death." (*Pltf's dep. pg. 196*). Mundt's previous comments about being mired in old ways and presenting young leaders was said in the context of the entire company, and also Mundt stated that he thought that the Customer Service Centers were working pretty well" and "he was going to expand on the Customer Service Centers" (*Pltf's dep. pg. 198*). Keneally repeated Mundt's words that it was time for a change (*Pltf's dep. pg. 201*). Callahan's position as Vice President of Customer Service had not been eliminated (*Pltf's dep. pg. 210*); only he had been eliminated.

14. Denied. See response to 10, 11, 12 and 13 above.

15. Admitted that Callahan retained attorney Albert McGrail to advise him and to negotiate for him with respect to his severance. (*Pltf's dep. pg. 87, Plf's Aff. par.* 6; *see also Ex. 6, notes of attorney McGrail's meeting with Callahan*). Admit that plaintiff discussed discriminatory comments by Unisource executives as set forth herein and his replacement by a younger employee at the very first meeting in October 1998 (*Pltf's dep. pg. 191-192*). Admitted that there were two meetings with Setta and several telephone calls participated in by Gary Setta, Unisource's purported "Field Vice President HR" (*Ex. 3, 4, 5*). Attorney McGrail believed the non-compete provision

was unenforceable (*Pltf's dep. pg. 90*).  Setta withdrew Unisource's demand for the non-compete (*Pltf's dep. pg. 90-91*).  Denied that the non-compete issue was of greater concern to Callahan than the Deferred Compensation entitlement which was completely absent from *Ex. 4*, the September 22, 1998 draft submitted by Keneally to Callahan. Id.

    17.  Admit that Callahan was able to negotiate the purchase of his company's leased vehicle for the sum of $5,000 (*Ex. 3*).

    18.  Deny that the salary continuation package was "generous".  Admit that Callahan signed *Ex. 3* on December 24, 1998.

    19.  Admit the language of par. 8 of the December 23, 1998 Separation Agreement without the emphasis provided by Unisource in terms of the underlined portion (*Ex. 3*). There is no emphasis for underlining except for the Title of par. 8 "Deferred Compensation" (*Ex. 3*). William Bauer, Director of Risk Management for Unisource in 1998, and previously the Director of Risk Management for ALCO Standard Corporation from the outset of the 1991 Plan through December 31, 1996 and the 1991 Plan Administrator from its inception through December 31, 1996, testified that while at Unisource in 1998 he provided input to HR people negotiating severance agreements with respect to provisions relating to employee benefits (*Ex. 1,*

*Bauer dep. pg. 48- 49)*.  Bauer testified that specifically during the period September through December 1998, he does not recall ever discussing Callahan's severance with Gary Setta or anyone else (*Ex. 1, Bauer dep. pg. 49)*.  Bauer also testified under oath that he never saw either of the drafts of the Separation Agreement, *Ex. 4 and 5*, or the actual signed Separation Agreement (*Ex. 3)* prior to being shown the document by attorney Yu just prior to his deposition in July 2004 (*Ex. 1, Bauer dep. pg. 50-53*). Bauer testified further that he could recall no conversation with Setta as to whether to include a reference to the 1991 Deferred Compensation Plan in the Callahan Severance Agreement (*Ex. 1, Bauer dep. pg. 56)*.  Bauer could not explain why there was no reference to Callahan's participation in the 1991 Deferred Compensation Plan in Setta's original 1998 letter (*Ex. 3, Ex. 1, Bauer dep. pg. 57)*. Bauer also testified that he was surprised upon reviewing Callahan's Separation Agreement that Setta signed as Vice President of Human Resources (*Ex. 1, Bauer dep. pg. 58-59)*.  Bauer never interacted with Setta in Setta's capacity as an HR Vice President or when Setta acted in an HR function (*Ex. 1, Bauer dep. pg. 59-60)*. <u>Bauer also testified that it would have been against company policy for Setta to have sent the first draft to Callahan with no provision relating to Callahan's participation in the 1991 IKON Plan</u> (*Ex. 1, Bauer dep. pg. 66-67)*.  Admit that Callahan remained a participant in the 1991 Plan until

Unisource and IKON wrongfully terminated his rights under the Plan. Deny the remaining allegations. In contradiction, Setta testified at his deposition that he discussed par. 8 of *Ex. 3* with Bauer who provided the language (*Ex.  , pg. 67-70*).

20. Denied. See response to 19 above.

21. Deny that paragraph 8 of the Separation Agreement is limited to "vesting" and plaintiff further states that par. 8 makes an unconditional promise and affirmative representation to him that if he continues to make his annual premium payments to age 65, he would receive the cash value and lump sum death benefit as well as a policy transfer when he reached age 65. In addition, Callahan would receive his monthly payment benefit commencing at age 65 for a period of 10 years and be 100% vested. It was specifically promised that "Benefits under the 1991 IKON Office Solutions, Inc. (formerly ALCO Standard Corporation) Deferred Compensation Plan will vest 100% "<u>and be distributed to you in the future…</u>". Deny the remaining allegations.

22. Admitted that this language appears in *Ex. 3*, but plaintiff further states that Unisource committed a discriminatory act when it breached its unconditional promise to pay the benefits under the 1991 Plan to Callahan when he reached age 65 and by

11

Georgia Pacific and IKON when they jointly participated in the termination of the 1991 Plan (*see*, *Plaintiff's Memorandum in Opposition, Pltf's Aff. par.* 5-24).

23. Deny that Callahan breached the Separation Agreement. Admit that he made a claim at the CHRO in March 1999. Denied that he breached the Separation Agreement.

24. Admit that in March 1999 he claimed that he entered into the Separation Agreement under duress and as a result of coercion by Unisource. Deny that the CHRO correctly rejected those claims.

25. Admit that CHRO permitted the case to proceed after being notified of the termination of the 1991 Plan by IKON (*see, Defendant's Ex. M*). Deny the remaining allegations regarding nexus between IKON's termination and Unisource. The nexus is clearly shown in plaintiff's Memorandum in Opposition, *Pltf's Aff. par. 5-24 and Plaintiff's Ex. 1 and 2, the Bauer and Hope depositions; Ex. 10-13*.

Deny that Callahan breached the Separation Agreement and deny that it was "intentional and premeditated". His testimony was that attorney McGrail felt that Unisource did not negotiate with Callahan in good faith, had lied to him and that Callahan should sign it under duress (*Pltf's dep. pg. 129-147*). Plaintiff was also under pressure because of the illness of his son and the purchase and financing of property

he had committed to purchase before being advised that Unisource wanted to fire him because of his age (*Pltf's dep. pg. 129-147*).

27. Denied that IKON lawfully or permissibly terminated the Plan and deny that there was an "event" that permitted IKON to terminate the Plan. (*Ex. 14 and Plaintiff's Memorandum in Opposition*). It was IKON's own deceptive and misleading conduct with shareholders that caused it to suffer adverse financial impact, not the 1991 Plan and as a result the termination of the Plan was totally unjustified and the denial of benefits to plaintiff Callahan was discriminatory and in violation of ERISA. (*Ex. 14*).

28. Denied. Unisource and Georgia Pacific both participated in the execution of the Plan termination with IKON (*Ex. 10-13*).

29. Admit that Hope notified Callahan some time after October 18, 2000 of the decision to terminate the 1991 Plan.

30. Deny that the language of the Plan supersedes the language set forth in Callahan's December 23, 1998 Separation Agreement (*Ex. 3*). Representations were made to Callahan and his attorney Mac McGrail that when paragraph 8 was inserted into the Separation Agreement *(Ex. 3)*, Setta had the authority and the Board of Directors concurred to alter Plan termination provisions with respect to Callahan. (*Pltf's dep. pg. 108, 227-228, Ex. 6, Pltf's Aff. par. 5-24*). In Callahan's presence,

attorney McGrail asked Gary Setta if he had the authority to promise Callahan the benefits of the 1991 Plan in the Severance letter (*Pltf's dep. pg. 227, Ex. 6)*, and Setta said he did (*Pltf's Aff. par.12-16)*. The discussions among Setta, McGrail and Callahan were specific; Callahan would be paid $15,000 for ten years at age 65, and would receive the benefits of an insurance policy with a $95,000 cash value and a $375,000 death benefit that was not subject to the termination provisions of the 1991 Plan (*Ex. 7, Pltf's dep. pg. 227-228)*. Setta provided Callahan with the benefits of the Plan (*Pltf's dep. pg. 228-229, Pltf's Aff. par. 5-24)*. When attorney McGrail asked Setta what the language "in accordance with the Plan" meant, Setta told McGrail and Callahan "that just means that he [Callahan] has to continue to make the premium payments (*Pltf's dep. pg. 229, Pltf's Aff. par. 12)*. Callahan was concerned about the Board of Directors being able to cancel the Plan and that was why McGrail in Callahan's presence asked Setta "do you have the authority of the Board of Directors to promise me the benefits of the Plan" and Setta said "As long as I made the premium payments, I would get the benefits of the Plan" *(Pltf's dep. pg. 230-231)*. Callahan believed that Setta had the authority to promise him the benefits of the Plan (*Pltf's dep. pg. 231)*. Callahan understood that Setta represented himself to be the Vice President of Human

Resources for the northeast region of Unisource (*Pltf's dep. pg. 234, Pltf's Aff. par. 5-24*).  Deny the remaining allegations.

31. Deny that any of the 25 Plan participants except Eugene Paneccasio have been promised, as had Callahan been promised, the monthly deferred compensation benefit as well as the cash value of the split dollar life insurance policy and the paid up death benefit at age 65.  Deny that the other "Plan participants", except Paneccasio, had been promised unconditionally that they would receive payment of their benefits under the Plan at age 65 in their Separation Agreement as had Callahan.

32. Deny that Unisource and Georgia Pacific had "no involvement" in the November 2000 decision to terminate the Plan.  It is clear that both Melampy and Hodgins, both attorneys at Georgia Pacific, made affirmative representations that Georgia Pacific was the successor in interest to Unisource and that Georgia Pacific agreed to conceal the proposed termination of the 1991 Plan from Plan participants (*Ex. 10-13*).

## Disputed Issues of Material Fact

1. Whether Unisource, Georgia Pacific and IKON were guilty of age discrimination against William Callahan.

2. Whether Unisource, Georgia Pacific and IKON were employers.

3. Whether Georgia Pacific as successor in interest to Unisouce is an employer.

4. Whether Unisource, Georgia Pacific and IKON jointly acted and aided and abetted each other in depriving Callahan of the benefits of his 1998 Separation Agreement and specifically paragraph 8 (*Ex. 3*) as well as the benefits of the 1991 Deferred Compensation Plan.

5. Whether Callahan was constructively discharged in September 1998 by Unisource when Keneally removed Callahan from his position as Vice President of Customer Service and offered him no viable alternative employment but rather isolated and humiliated him leaving Callahan with no choice but to sign the 1998 Separation Agreement in December 1998.

6. Whether Unisource made an unconditional promise to Callahan that at age 65 he would be paid an annual payment of $15,000 for a period of ten years, the cash value of a life insurance policy equal to $95,000 and a paid up death benefit at age 65 equal to $375,000.

7. Whether Unisource deceived and misled Callahan into believing that Unisource was making an unconditional promise that, at age 65, Callahan would receive the $15,000 annual payment for ten years and the cash value and paid up death benefit of the split dollar life insurance policy which is still in force.

8. Whether Unisource intended to induce reliance by Callahan.

9. Whether Unisource acted recklessly in making the unconditional promise of benefits to Callahan.

10. Whether IKON knew or should have known that Unisource was making the unconditional promise in the 1998 Separation Agreement that Callahan would, at age 65, <u>actually receive</u> the $15,000 annual payment for ten years, the cash value and the paid up death benefit regardless of whether IKON terminated the Plan in the future.

11. Whether IKON, Unisource and Georgia Pacific concealed from plaintiff their intention to terminate the 1991 Plan and to deny the benefits of the 1998 Separation Agreement and the 1991 Plan as a discriminatory act under the ADEA and ERISA for themselves and in an effort to aid and abet Unisource in its deception of Callahan.

12.  Whether the deception and concealment engaged in by Unisource, IKON and Georgia-Pacific estopped them from escaping liability for the deception perpetrated upon William Callahan and the denial to him of the benefits promised in the 1998 Separation Agreement and the 1991 Plan.

13.  Whether IKON's explanation of decrease in interest rates was a pretext and concealment of the true and actual reason for Plan termination and whether the true reason or "event" motivating IKON was the consequence of its own deceptive and misleading practices in violation of securities law which resulted in IKON having to pay $121.1 million dollars in settlement of a shareholders class action as set forth in its 1999 Annual Report (Ex. 14).

14.  Whether Callahan's signature on the December 23, 1998 Separation Agreement, which contained a material, misleading and deceptive representation as to his entitlement to actually receive at age 65 the $15,000 annual payment for 10 years, he cash value and the death benefit of the split dollar life insurance policy was a knowing and voluntary waiver of his right to file an age discrimination case with the CHRO, bring this lawsuit or claim a violation of his rights under ERISA.

                                       THE PLAINTIFF,
                                       WILLIAM E. CALLAHAN


                                      BY_____
                                        ANDREW B. BOWMAN
                                        Federal Bar No: ct00122
                                        1804 Post Road East
                                        Westport, CT 06880
                                        (203) 259-0599
                                        (203) 255-2570 (Fax)


## **CERTIFICATE OF SERVICE**

      This is to certify that a copy of the foregoing was mailed, postage prepaid, on this _____ day of December, 2004 to:

Felix J. Springer
Jennifer L. Sachs
Day, Berry & Howard
CityPlace 1
Hartford, CT 06103-3499

Kay Kyungsun Yu, Esq.
Pepper Hamilton, LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103


                                                 _____
                                               ANDREW B. BOWMAN