UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| WILLIAM E. CALLAHAN | : |
| PLAINTIFF | : |
| VS. | : DOCKET NO: 3:01CV1205(CFD) |
| UNISOURCE WORLDWIDE, INC., GEORGIA-PACIFIC CORPORATION, ALCO STANDARD CORPORATION AND IKON OFFICE SOLUTIONS, INC., ET AL | : : |
| DEFENDANTS | : DECEMBER 27, 2004 |

**COUNTER AFFIDAVIT OF PLAINTIFF WILLIAM
CALLAHAN IN OPPOSITION TO MOTIONS FOR
<u>SUMMARY JUDGMENT BY ALL DEFENDANTS</u>**

William Callahan, having been sworn, deposes and says:

1. I am the plaintiff in this action. I was born on April 9, 1948 and was employed by Unisource Worldwide, Inc. and Rourke-Eno from June 1980 through December 24, 1998 when I signed a Separation Agreement (*Ex. 3*). I was constructively discharged in September 1998 as hereinafter set forth. When I was constructively discharged in September 1998, I was 50 years of age. I was fully qualified to be Vice President of Customer Service.

2.  In September 1998 Michael Keneally, my supervisor, came into my office and advised me that he had made a decision to remove me as Vice President of Customer Service (*Ex. 7, pg. 78*).  When I reminded Keneally that during conversations with him during the summer, I had specifically asked Keneally if I was going to remain in my position as Vice President of Customer Service, he assured me that I was going to remain in that position (*Ex. 7, pg. 78-79*).  Keneally then said "It was time for a change" (*Ex. 7, pg. 78*).  Keneally then said "It was not performance related" (*Ex. 7, pg. 79*). When I asked Keneally about Robin Cramp's expression of support for me during the summer of 1998, Keneally replied "He lied – he never supported you" (*Ex. 7, pg. 79*).

3.  Keneally then off-handedly said to me "Why don't you go into sales?"  *(Ex. 7, pg. 71)*.  When I asked how I would support myself since I didn't have any accounts, Keneally sarcastically responded "Take Art Douville's accounts" (*Ex. 7, pg. 81*).  I told Keneally that Art still worked at Unisource [as President of the Northeast region], and I didn't think Douville was going to give me his accounts (*Ex. 7, pg. 81*).  Keneally just shrugged (*Ex. 7, pg. 82*).

4. I was not qualified for a job in sales. I had never sold for a living, and there was no account base to support my income. In addition, most of the sales people at Unisource were on full commission.

5. Keneally then handed me a draft of a Severance Agreement already signed by Gary Setta (*Ex. 4*). This document was produced by Setta at his deposition and already marked up when it was produced. Keneally then asked me to stay in the Customer Service Center "to help transition my replacement" who I found out was 37 years old (*Ex. 7, pg. 85*). I took the Severance Agreement (*Ex. 4*), and Keneally walked out the door. (*Ex. 7, pg. 86*). I told Keneally that I objected to being removed (*Ex. 7, pg. 87*).

6. I then consulted with attorney Albert McGrail who died in 1999. Attorney McGrail, Setta and I had one or two meetings and several telephone conversations during which I was present.

7. I recall a meeting where we finalized the Deferred Compensation piece in attorney McGrail's office, and that was only after attorney McGrail told me that he had been trying to communicate with the company, and they were not calling him back and Gary Setta telling me that he thought I should leave because he thought I was making everyone uncomfortable (*Ex. 7, pg. 89*).

8. From July 1998 through December 1998 Unisource acted with a discriminatory intent toward me at the company because of my age.

9. In July 1998 at the Philadelphia airport, Ray Mundt, the CEO of Unisource, told assembled employees "that the company was mired in old ways, it was time for a change, and he then went on to introduce "the bright young leaders of our company" (*Ex. 7, pg. 192*). I was aware that Charles White, President of Unisource, made a comment that being at Unisource for over 15 years "was a kiss of death" *(Ex. 7, pg. 196).*

10. When Keneally told me in September 1998 that I was out as Vice President of Customer Service and handed me the Separation Agreement (*Ex. 4)*, it was clear that my employment with Unisource was over, and there was nothing for me to do, because Keneally's sarcastic offer of sales was completely untenable since I was totally unqualified to sell. I had never done so in the past. The actions taken against me in July and culminating in December 1998 were discriminatory and taken against me because of my age.

11. The Separation Agreement of December 23, 1998 provides in paragraph 8 the following:

> 8. <u>Deferred Compensation</u>- Benefits Under the 1991 IKON Office Solutions, Inc. (formerly ALCO Standard

>Corporation) Deferred Compensation Plan will vest 100% **and be distributed to you in the future**, in accordance with the provisions of the Plan. You must continue to make the annual premium payments under the 1991 IKON Office Solutions, Inc. Deferred Compensation Plan to your age 65 to perpetuate the lump sum death benefit and age 65 policy transfer thereunder. These will be invoiced to you annually by IKON Office Solutions, Inc. (*Ex. 3*).

12.  During negotiations between September 1998 and December 24, 1998 with Setta and my attorney McGrail, my attorney specifically asked Setta "Do you have the authority from the Board of Directors and the permission to promise me the Plan benefit as I was leaving the company" (*Ex. 7, pg. 227*). Setta replied "yes" (*Ex. 7, pg. 228*). Attorney McGrail specifically asked Setta to specify what the benefits were (*Ex. 7, pg. 229)*, and when McGrail asked Setta about the language "in accordance with the Plan", Setta stated "That just means that he has to continue to make the premium payments." (*Ex. 7, pg. 229)*. I was present in attorney McGrail's office with Setta.

13.  Both attorney McGrail and I were concerned about the Board of Directors being able to cancel the Plan and that was why the specific question was asked "Do you have the authority of the Board of Directors to promise me the benefits of the Plan?" (*Ex. 7, pg. 230)*. Setta was clear in responding that as long as I made the premium payments, I would get the benefits of the Plan (*Ex. 7, pg. 231)*. Both my

attorney and I believed Setta had the authority to promise me unconditional payment of the Plan benefits. (*Ex. 7, pg. 231*)

14. The wording of paragraph 8 was inserted by Mr. Setta in behalf of Unisource.

15. I was shocked when I received a December 24, 1998 letter sent to me by Gary Setta in which he admitted that "It pains me to have been part of this situation" (*Ex. 6*). It was clear to me that Setta was aware of the fact that I was being discriminated against on account of my age when he wrote in his letter that by getting out of Unisource I may in fact be "the lucky one" (*Ex. 6*).

16. There was no reference in paragraph 8 to the consequences of or even the possibility of prospective termination of the 1991 Plan down the road.  It was clear to me from both my conversations with Setta in attorney McGrail's office and from the way in which the provision was explained by Setta to me and my lawyer that Unisource was making an unconditional promise and representation to me that I would be 100% vested in the 1991 Plan, that the benefits of that Plan would be paid to me at age 65 which benefits included an annual payment commencing at age 65 of $15,000 for a period of 10 years, a cash value of a life insurance policy equal to $95,000 and a paid up death benefit at age 65 equal to $375,000. Paragraph 8 also states that it was

my obligation to make annual premium payments through age 65 and that in fact the policy would then be transferred to me (*Ex. 3, par. 8*).

17.  The inclusion of paragraph 8 in the Separation Agreement was a critical inducement to me to sign this Separation Agreement on December 24, 1998.  If I had known that Unisource did not intend to honor the unconditional commitment that, at age 65, I would receive the benefits including the $15,000 per year payment at age 65 for a period of 10 years, the cash value and the paid up death benefit of the life insurance policy or that Unisource was misrepresenting that it had the authority to make that promise to me, I never would have signed the Separation Agreement.  Unisource's attempts along with IKON to deny me these benefits are discriminatory acts and are clear evidence of their continuing efforts to discriminate against me.

18. I received a copy of my entitlement to the benefits of the split dollar MetLife insurance policy (*Ex. 9)* in the mail which, as of December 31, 2002, was still in full force and effect.

19.  I had no way of knowing that the wording of paragraph 8 and the representations made to me in the presence of my lawyer by Gary Setta, Vice President of Human Resources of Unisource was one great deception.

20. If I had known that the insertion of paragraph 8 in *Ex. 3* was not an unconditional promise to me that I would actually receive the benefits outlined in this affidavit when I reached age 65 provided I continued to make premium payments on the insurance policy, I would never have signed the Separation Agreement, and Unisource would have physically been required to escort me from the premises. They had already constructively terminated me, but I never would have signed the Separation Agreement if I had known that my benefits could be terminated by the action of the IKON Board of Directors in December 2000.

21. I relied completely on the insertion of paragraph 8 and Setta's representations to me and my lawyer in deciding both to sign the 1998 Separation Agreement and in not coming back to Unisource.

22. If paragraph 8 is determined not to be an unconditional promise that Unisource had the authority to make, then I was deceived and fraudulently induced to sign the 1998 Separation Agreement. I was 50 years old. When I signed the Separation Agreement containing the promise that, at age 65, I would begin receiving $15,000 per year for 10 years, have a cash value of a life insurance policy equal to $95,000 and a paid up death benefit which provided security for my wife in the event of

my death in the amount of $375,000, that promise was a material and critical inducement to my signature.

23. It was the unconditional promise of the actual payment of benefits at age 65, upon which I reasonably relied, that induced me to sign the 1998 Separation Agreement.

24. Gary Setta made an unequivocal commitment to me and to my attorney, Mac McGrail, that Unisource was undertaking an affirmative obligation to make certain that at age 65 I was actually paid these benefits. The only condition was that I continue to make premium payments on the split dollar life insurance policy. Both attorney McGrail and I believed that we were reasonable and justified in relying upon Setta's representation including his representation that he had the authority of the Board of Directors at IKON to make this unconditional offer to me.

                                                                        _____
                                                                        WILLIAM CALLAHAN

Subscribed and sworn to before me this \_\_\_\_\_ day of December, 2004

                                                                       _____
                                                                        NOTARY PUBLIC

## CERTIFICATE OF SERVICE

      This is to certify that a copy of the foregoing was mailed, postage prepaid, on this ____ day of December, 2004 to:

Felix J. Springer
Jennifer L. Sachs
Day, Berry & Howard
CityPlace 1
Hartford, CT 06103-3499

Kay Kyungsun Yu, Esq.
Pepper Hamilton, LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103

_____
ANDREW B. BOWMAN