**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| WILLIAM E. CALLAHAN, | ) |
| | ) Civil Action No. 301 CV1205 (CFD) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| UNISOURCE WORLDWIDE, INC., | ) |
| GEORGIA-PACIFIC CORPORATION, | ) |
| ALCO STANDARD CORPORATION and | ) |
| IKON OFFICE SOLUTIONS, INC., | ) |
| | ) |
| Defendants. | ) January 26, 2005 |

**UNISOURCE DEFENDANTS' REPLY**
**IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

In his omnibus opposition to the defendants' motions for summary judgment, plaintiff William Callahan ("Callahan") is unable to contest the central, controlling facts in this litigation:

- that when he left employment with Unisource Worldwide Inc. ("Unisource") in 1998, he signed a separation agreement and general release (the "Release Agreement")[1] barring him from bringing claims against Unisource or related entities, including Georgia-Pacific Corporation ("Georgia-Pacific") (Unisource and Georgia-Pacific referred to collectively as "Unisource Defendants"); and

---

[1] Although Callahan has stated that he never intended to abide by the terms of the Release Agreement, as set forth in the Unisource Defendants' opening memorandum and infra, he has shown no reason why it should not be enforced against him.

- that as a participant in a deferred compensation plan (the "1991 Plan" or the "Plan") created by Alco Standard Corporation ("Alco Standard") and subsequently controlled by IKON Office Solutions, Inc. ("IKON") (Alco Standard and IKON referred to collectively as "IKON Defendants"), Callahan received the benefit specifically prescribed by the Plan when it was legally terminated in 2000. While this termination benefit of deferrals plus 6 percent interest was less than what Callahan would have received had the Plan not been terminated, it nonetheless represented a substantial increase over the amount he would have received had he stopped participating in the Plan upon his departure from employment (a return of deferrals with no interest). Callahan has acknowledged that the Plan specifically provided for such a termination benefit (see Plaintiff's Local Rule 56(a)(2) Statement at ¶ 7) and has never claimed that it was improperly calculated as to him. Moreover, he has conceded that had he not executed the Release Agreement, his participation in the Plan would have ended when his employment terminated and he would have received his deferrals without interest. (See id. at ¶ 6.)

Because Callahan cannot challenge these facts, he has no viable claim, either for age discrimination or for any purported violation of ERISA.

Perhaps recognizing that the material facts in this case are uncontroverted and compel dismissal of his claims, Callahan turns instead to the immaterial facts. He devotes page after page to a recitation of irrelevant factual assertions, unsupported speculation, contradictory legal claims, and inflammatory rhetoric designed to obscure the lack of substance in his case. None of this is sufficient to overcome the fatal defect in his case – the fact that, as a matter of law, Callahan did

not suffer any wrong at the hands of any of the defendants.[2] As set forth below, the Unisource Defendants are entitled to summary judgment on Callahan's claims against them in this matter.

## ARGUMENT

**I.    Callahan Has No Claim For Age Discrimination**.

Notwithstanding Callahan's lengthy recitation (see Pl's. Opp'n at 6-9) of allegations concerning purportedly age-discriminatory conduct and constructive discharge by Unisource, the Release Agreement that Callahan signed in 1998 upon his departure from employment clearly and unequivocally bars him from bringing any such claim for age discrimination against the Unisource Defendants. Recognizing this, Callahan now claims that the Release Agreement was void because in it, Unisource allegedly misrepresented the benefit to which he would be entitled from the 1991 Plan. (See Pl's. Opp'n at 10-16.) Callahan contends that, notwithstanding any termination of the Plan, under the Release Agreement he was entitled to receive the benefit he would have gotten had the Plan not been terminated.

This contention is squarely defeated by the plain language of the Release Agreement that Callahan negotiated and executed upon his departure from Unisource. Paragraph 8 of the Release Agreement, which addresses benefits under the 1991 Plan, clearly stated that such benefits would

---

[2] Callahan devotes several pages of his opposition brief to detailing what he claims is evidence of "joint action" among the various defendants, and in particular between the Unisource Defendants and the IKON Defendants. (See Pl.'s Opp'n at 20-24.) Upon examination, however, not a single one of Callahan's factual allegations purports to contradict the basic fact that IKON decided to terminate the Plan with no involvement from the Unisource Defendants. (See Defs. Mem. at 11-12.) The fact that the Unisource Defendants may have been informed of this decision is irrelevant to the question whether they had substantive control over it; and the answer to that question is incontrovertibly that they did not.

Indeed, Callahan's allegations do not even purport to evidence "joint action." For the most part, they simply repeat the corporate chronology set forth in the Unisource Defendants' opening brief. Callahan's ultimate conclusion, that there was a "cooperative effort between IKON and Georgia-Pacific/Unisource" (see Pl.'s Opp'n at 24), is without factual foundation.

be "distributed to [Callahan] in the future, **<u>in accordance with the provisions of the Plan</u>**" (emphasis added). As set forth in the Unisource Defendants' opening memorandum, those Plan provisions allowed for termination and the payment to participants of the defined termination benefit. Thus, the Release Agreement clearly contemplated that, although Callahan would not be forced to receive a lump sum return of his deferrals without interest, his ultimate benefit would vary according to the fate of the Plan.[3]

Unable to dispute that the Release Agreement was accurate on its face, Callahan argues that its language is "ambiguous" and that it would "promote[] the public interest" to construe paragraph 8 as promising him, not benefits "<u>in accordance with</u> the provisions of the Plan," but benefits <u>notwithstanding</u> the provisions of the Plan. (<u>See</u> Pl.'s Opp'n at 17.) This contention is utterly specious. It is well settled that "[c]ontract language is unambiguous when it has a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of interpretation." <u>Sartor v. Town of Manchester</u>, 312 F. Supp. 2d 238, 243 (D. Conn. 2004) (Droney, J.) (citation and internal quotation omitted). The phrase "in accordance with the provisions of the Plan" has just such a definite and precise meaning, and is not subject to any reasonable difference of interpretation. It is clear that "courts should not find the language ambiguous on the basis of the interpretation urged by one party, where that interpretation would 'strain[] the contract language beyond its reasonable and ordinary meaning.'" <u>Metro Life Ins. Co. v. RJR Nabisco, Inc.</u>, 906 F.2d 884, 889 (2d Cir. 1990)(quoting <u>Bethlehem Steel Co. v. Turner Constr. Co.</u>, 2 N.Y.2d 456, 459 (1957)). Callahan's

---

[3] Callahan himself admits that "Par. 8 does not even identify what 'benefits' under the 1991 IKON Plan Callahan could expect to receive," and that "[t]here is no mention in par. 8 of the $15,000 per year payment for 10 years" that Callahan now claims he is owed. (<u>See</u> Pl's. Opp'n at 14.) All paragraph 8 says is that Callahan will receive whatever benefit he is entitled to, at the time he is entitled to receive it. That is precisely what happened.

-4-

interpretation of "in accordance with the provisions of the Plan" to mean "notwithstanding the provisions of the Plan" would not just strain the contract language – it would upend it entirely. As such, Callahan's claim of ambiguity must be rejected.

Because the Release Agreement is unambiguous on its face, this Court is not permitted to consider extrinsic evidence as to the parties' intent. See Metro Life, 906 F.2d at 889 ("parties' rights under an unambiguous agreement should be fathomed from the terms expressed in the instruments itself rather than from extrinsic evidence as to terms that were not expressed or judicial views as to what terms might be preferable"); Consarc Corp. v. Marine Midland Bank, N.A., 996 F.2d 568, 573 (2d Cir. 1993) ("If a contract is unambiguous, courts are required to give effect to the contract as written and may not consider extrinsic evidence to alter or interpret its meaning"). Moreover, the Release Agreement itself provides that no such extrinsic evidence may be considered. In it, Callahan specifically acknowledges that he has "not relied upon any representation or statement made by the Company or any employee or other person on behalf of the Company with regard to the subject matter, meaning, or effect of this agreement." (See Release Agreement at 4.)

Accordingly, Callahan's argument that this Court should consider statements purportedly made to him about paragraph 8 by a Unisource employee, Gary Setta ("Setta"), fails as a matter of law. In any event, however, Setta's alleged statements in no way call into question the interpretation of paragraph 8, nor do they suggest that Callahan was the victim of any misrepresentation or inducement.

According to Callahan, during negotiations about the terms of the Release Agreement, he and his now-deceased attorney, Albert McGrail, had the following discussion with Setta:

> We were concerned about the board of directors being able to cancel the plan, and that was why the specific question was asked: Do you have the authority of the board of directors to promise me the benefits of the plan? . . . Mr. Setta said as long as I made the premium payments, I will get the benefits of the plan.

(See Pl.'s Opp'n at 10-11, quoting Callahan Dep. at 230.) This statement does not contradict, or vary in any way, the plain language of paragraph 8, which promise Callahan that benefits will be distributed to him "in accordance with the provisions of the Plan." Even crediting Callahan's self-serving recollection of his conversations with his late attorney and a representative of defendant Unisource, and even assuming that this recollection is relevant despite the utter lack of ambiguity in the Release Agreement, there is no basis for concluding that Setta made any false or fraudulent promises to Callahan. Accordingly, Callahan's contention that the Release Agreement was deceptive or misleading has no factual basis whatsoever, and the cases that he cites in support of his claim that the Release Agreement should not be enforced, all of which are predicated on the existence of a misrepresentation, are completely inapposite. (See Pl.'s Opp'n at 17-18 and cases cited therein.) Instead, as a matter of law, the undisputed facts in this case and the existence of the Release Agreement compel dismissal of Callahan's purported claim under the ADEA.[4]

---

[4] In their opening brief, the Unisource Defendants also pointed out that (1) there was no duress or coercion present when Callahan executed the Release Agreement; (2) Callahan's factual claims did not in any event support a claim of age discrimination; (3) Callahan is barred by the doctrine of equitable estoppel from challenging the Release Agreement because he signed it with no intention of adhering to its provisions; and (4) Callahan ratified the Release Agreement by accepting and failing to tender back more than $70,000 in salary continuation payments. Callahan appears to have conceded the first point (see Pl.'s Opp'n at 20 n.2); offers no response to the second point; and makes no response to the third point other than to deem it "absurd" (without, it should be noted, contesting that his execution of the Release Agreement was deceptive).

As to the fourth point, that the doctrines of ratification and tender-back bar his claim, Callahan relies solely on the decision in DePace v. Matsushita Elec. Corp., 257 F. Supp. 2d 543 (E.D.N.Y. 2003). His reliance is unavailing. In DePace, the Court's conclusion that the plaintiffs were not required to tender back their severance and early retirement payments was explicitly based on the fact that the plaintiffs were entitled to those payments regardless of the outcome of their subsequent lawsuit. Here, Callahan breached the Release Agreement some three months after executing it by bringing an age discrimination claim before the Connecticut Commission on

### II.   Callahan Has No Claim Under ERISA.

In his opposition to defendants' summary judgment motions, Callahan has clarified that his purported ERISA claim does not arise under any specific statutory provision, but as one for equitable estoppel.  (See Pl.'s Opp'n at 25.)[5]  As he correctly notes, however, equitable estoppel requires the satisfaction of four elements: (1) a promise; (2) reliance on the promise; (3) injury caused by the reliance; and (4) an injustice if the promise is not enforced." Aramony v. United Way Replacement Benefit Plan, 191 F.3d 140, 151 (2d Cir. 1999).  Equitable estoppel under ERISA additionally requires the presence of "extraordinary circumstances."  See id. (citing cases).

In this case, Callahan cannot establish a single one of the elements of his purported claim for equitable estoppel, and the Unisource Defendants are entitled to summary judgment on this claim.

### A.   There Were No False Promises And No Justifiable Reliance.

As set forth above, despite his best efforts to characterize either the plain language of the Release Agreement or statements purportedly made to him by Gary Setta as promising him a specific series of payments notwithstanding the potential termination of the Plan, the facts are clear and undisputed in this case that the only promise made to Callahan was that he could continue to participate in the Plan following the end of his employment with Unisource and that he would receive benefits in accordance with the Plan's provisions – a promise that was, by everyone's account, kept.  While Callahan may have wished that the Release Agreement contained a different

---

Human Rights and Opportunities.  Due to this breach, he was not entitled to any consideration flowing to him under the Release Agreement, and the doctrine of tender back applies in full force as to him.

[5] Callahan also notes the existence of a federal common law cause of action for breach of fiduciary duty.  (See Pl.'s Opp'n at 25.)  In light of the fact, uncontroverted by Callahan, that no fiduciary duties were implicated by the termination of the Plan because such termination is a settlor function, this common law cause of action is irrelevant.

promise, he has offered no factual or legal justification for this wish and no basis for any reliance by him.

**B.    There Was No Injury Caused By Callahan's Alleged Reliance.**

In order to establish a purported injury stemming from the Unisource Defendant's alleged false promise, Callahan now claims in an affidavit that "If I had known that the insertion of Paragraph 8 in Ex. 3 [the Release Agreement] was not an unconditional promise to me that I would actually receive the benefits outlined in this affidavit when I reached age 65 . . . I would never have signed the Separation Agreement. . . . I relied completely on the insertion of paragraph 8 and Setta's representations to me in deciding both to sign the 1998 Separation Agreement and in not coming back to Unisource." (See December 27, 2004 Counter Affidavit of Plaintiff William Callahan at ¶¶ 20-21, attached to Pl.'s Opp'n.)

Unfortunately for Callahan, however, both his own assertions and his conduct belie the notion that he suffered any injury as a result of an alleged false inducement to sign the Release Agreement. Callahan claims that, at the time he signed the Release Agreement, he had been constructively discharged by Unisource, and therefore that his employment with Unisource already had ended. (See id. at ¶ 20.) He further acknowledges that he signed the Release Agreement intending to retain the salary continuation payments made to him as consideration for his release and to sue for age discrimination, which he promptly did. (See Callahan Dep. at 130, attached as Ex. 7 to Pl.'s Opp'n.) Accordingly, Callahan lost neither his job nor, in his mind, the right to bring suit as a result of his execution of the Release Agreement. The only consequences to Callahan of his execution of the Release Agreement were (1) his receipt of over $70,000 in salary continuation to which he would not otherwise have been entitled, and (2) the ability to maintain participation in the Plan rather than receiving back his contributions in lump sum, without accrued interest.

Callahan does not explain how this economic windfall to him constitutes a legally cognizable injury, and this Court should reject his claim.

C. **Callahan's Treatment By The Defendants Involves Neither A Threat Of Injustice Nor Extraordinary Circumstances.**

Despite Callahan's repeated attempts to portray himself as a hapless "victim" in this case (see Pl's. Opp'n. at 16), the uncontroverted facts compel the conclusion that he took care of himself quite nicely. The only injustice here would result from holding the Unisource Defendants to a promise that was never made. Because Callahan has not established the elements of a claim for equitable estoppel, the Unisource Defendants are entitled to summary judgment.

III. **Callahan's Own Opposition Demonstrates That The Unisource Defendants Did Not Engage In Any Improper Behavior Toward Him.**

Although Callahan studiously avoided making this claim until now, with the filing of his opposition, it is apparent that he is really challenging not the language of the Release Agreement or promises purportedly made to him, but the ability of the IKON Board of Directors to terminate the Plan in 2000. Callahan argues that IKON terminated the Plan because it needed revenues to pay for legal and settlement costs it incurred in connection with an unrelated class action lawsuit. (See Pl.'s Opp'n at 28-30.) Callahan further contends that, assuming these allegations to be true, IKON could not legally terminate the Plan.[6] (Id.)

---

[6] Callahan further requests the reinstatement of state law claims that were dismissed by this Court almost two years ago, on March 27, 2003. At this point, of course, such a request is untimely. See D. Conn. L. Civ. R. 7(c)1 ("Motions for reconsideration shall be filed and served within ten (10) days of the filing of the decision or order from which such relief is sought . . . ."). Even if the request were timely, reconsideration still would not be warranted, as Callahan has cited no controlling decisions that the Court overlooked in its original ruling. See, e.g., Chambers v. Principi, No. 3:00CV656, 2004 WL 722249, at *1 (D. Conn. Mar. 24, 2004). Finally, at this point, following the close of discovery and the completion of dispositive motion pleadings, reinstating the state law claims would be grossly prejudicial to all of the defendants.

As set forth in the reply brief of the IKON Defendants, at whom this argument principally is directed, Callahan's contentions are without merit. They are nonetheless revealing, because they underscore that Callahan's true grievance is not some allegedly false promise of the Unisource Defendants, but the subsequent, unrelated decision of the IKON Board of Directors to terminate the Plan. His true reliance was not on an alleged misrepresentation by Unisource, but on the belief – erroneous, as it turned out – that the Plan would continue in existence.

These circumstances do not indicate wrongdoing. They are not actionable. Under the undisputed facts, there is no basis for Callahan to maintain any claim against the Unisource Defendants, and this Court should enter summary judgment for the Unisource Defendants on all counts of Callahan's Amended Complaint.

## **CONCLUSION**

For the reasons set forth above, the Unisource Defendants respectfully request that this Court enter an Order (1) granting summary judgment to the Unisource Defendants on Callahan's Amended Complaint and (2) granting such other and further relief as the Court deems just and proper.

Respectfully submitted,

THE DEFENDANTS
UNISOURCE WORLDWIDE, INC.
GEORGIA-PACIFIC CORPORATION

_____
Felix J. Springer (ct 05700)
Jennifer L. Sachs (ct 20684)
Day, Berry & Howard, LLP
CityPlace I
Hartford, CT  06103-3499
Tel:  860/275-0100
Fax: 860/275-0343
E-mail: fjspringer@dbh.com
        jlsachs@dbh.com

Rayne Rasty (ct 24918)
Georgia-Pacific Corporation
133 Peachtree St. NE
Atlanta, GA  30303
Tel:  404/652-4972
Fax:  404/584-1461
E-mail:  rmrasty@gapac.com

## CERTIFICATE OF SERVICE

This is to certify that on this date, I served a copy of the foregoing via first-class mail, postage prepaid to:

Andrew B. Bowman, Esq.
1804 Post Road East
Westport, CT 06880

Kay Kyungsun Yu, Esq.
Pepper Hamilton LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103

Joseph J. Costello, Esq.
Morgan, Lewis & Bockius, LLP
1701 Market Street
Philadelphia, PA 19103-2921

Robert L. Wyld, Esq.
Patrick Fahey, Esq.
Shipman & Goodwin
1 American Row
Hartford, CT 06103

_____
Felix J. Springer