UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| WILLIAM CALLAHAN,<br>        Plaintiff | :<br>:   Civil Action No. 3:01 CV 1205 (CFD)<br>: |
| v. | :<br>: |
| UNISOURCE WORLDWIDE, INC., et. al.,<br>        Defendants. | :<br>: |

## RULING ON MOTIONS FOR SUMMARY JUDGMENT

William Callahan brought this action against defendants Unisource Worldwide ("Unisource"), Georgia-Pacific Corporation ("Georgia-Pacific"), Alco Standard Corporation ("Alco"), and IKON Office Solutions ("IKON").[1] The two claims that remain after a previous ruling by this Court on the defendants' motions to dismiss[2] assert violations of the Age

---

[1] Unisource and Georgia-Pacific are jointly represented and collectively referred to here as the "Unisource Defendants." Alco and IKON are jointly represented and collectively referred to here as the "IKON Defendants."

[2] In a prior ruling, the Court dismissed Callahan's state law causes of action, including his contract claim, because they were preempted by ERISA. Callahan v. Unisource Worldwide, Inc., 2003 U.S. Dist. LEXIS 4787 at **13-23. The Court finds in this ruling that the Plan is a top hat plan and exempt from some of ERISA's central provisions. That exemption, however, does not subject the top hat plan to state common law causes of action. Top hat plans remain subject to other ERISA provisions including its reporting and disclosure provisions, and its administration and enforcement provisions. See Demery v. Extebank, 216 F.3d 283, 287 (2d Cir. 2000). While the Second Circuit has not directly reached the issue, see id.; Gallione v. Flaherty, 70 F.3d 724, 727 (2d Cir. 1995), at least one other circuit has determined that top hat plans are subject to federal common law causes of action. See, e.g., Kemmerer v. ICI Americas, 70 F.3d 281 (3d Cir. 1995) (challenges to top hat plans fall within the civil enforcement provisions of ERISA but federal common law applies). Callahan has not argued that his contract claim should be subject to federal common law, but asks for reconsideration of the dismissal of the state law claims. Just as in Demery and Gallione, however, whether state contract law or an emerging federal common law doctrine would survive ERISA preemption of top hat plans, no breach of contract occurred in this case. The Court therefore does not – and need not – address the potential cause of action in federal common law for breach of a top hat plan and does not need to reconsider its prior

Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et. seq.*, against the Unisource Defendants, and violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et. seq.* against all defendants.  Before the Court are two motions by the defendants for summary judgment.  For the following reasons, both motions are granted.

I.  **Background**[3]

William Callahan was hired by a division of Unisource in 1980.[4]  Unisource was a distributor of office supplies and equipment.  In 1998, Callahan was a Vice President of Customer Service.  In September of that year, he was informed by his supervisor, Michael Keneally, that he had decided to remove him from that position.  During that September meeting, Keneally handed Callahan a copy of a proposed severance agreement ("Release Agreement" or "Separation Agreement") that was already signed by Unisource's Vice President of Human Resources, Gary Setta. The parties dispute whether Keneally then also offered Callahan a position in the Unisource Sales Department as an alternative to leaving the company.  Callahan did not pursue a position in Sales, but rather retained counsel to advise him in negotiating the terms of his termination and Release Agreement with Unisource.  In December 1998, Callahan and his lawyer met with Setta to discuss these topics, including their effect on Callahan's

---

decision on the motion to dismiss concerning preemption of state law causes of action.

[3]The following information is taken from the parties Loc. Civ. R. Pro. 56(a)(1) and (2) statements and exhibits thereto and is undisputed unless otherwise indicated.

[4]Until January 1, 1997, Unisource was a wholly owned subsidiary of Alco Standard Corporation.  At that time, Alco changed its name to IKON, and spun off Unisource as an independent entity.  Unisource was then acquired by Georgia-Pacific in July 1999.  IKON continued to administer the deferred compensation plan which is discussed in the text infra.

participation in a deferred compensation plan.

In 1990, Callahan had elected to participate in the "Alco Standard Corporation 1991 Deferred Compensation Plan," (the 'Plan') which was offered to employees of Alco and some of its subsidiary companies, including Unisource. The Plan, which is commonly referred to as a "top hat" plan, was available to employees who earned at least $100,000 per year and offered benefits in addition to other retirement benefits provided by Unisource. The Plan allowed participants to defer a portion of their compensation until retirement and purchase "split dollar" life insurance. Eligible employees could select among three options for payment schemes under the Plan. Callahan selected Option II, which provided that when he retired or reached age 65, whichever was later, he would receive benefits in the amount of $15,000 per year for ten years, and a $95,000 cash value life insurance policy with a paid-up death benefit of $375,000.

The Plan also provided that: (1) "vesting" would generally occur after ten years of employment; (2) an employee whose employment terminated before "vesting" would no longer be able to participate in the Plan, and would receive back his deferred payments without interest at the time of termination; (3) termination of the Plan was permitted at the sole discretion of Alco's Board of Directors;[5] (4) upon termination of the Plan, a participating employee who had

---

[5]The Plan provided that:
    Termination. The Board of Directors of Alco shall have the right to terminate the Plan in its entirety and not in part at any time it determines that proposed or pending tax law changes or other events cause, or are likely in the future to cause, the Plan to have an adverse financial impact on Alco. In such an event, Alco shall have no liability or obligation under the Plan or the Participant's Participation Agreement (or any other document), provided that 1) Alco distributes, in lump sum, to any Participant whose benefit payments have not commenced, the value of the amount of the Participant's deferrals to the date of termination plus interest (compounded annually) at a rate of 6% per annum; and 2) Alco

vested but who had not begun receiving benefits payments would receive a lump sum payment of the amount of prior deferred payments plus interest; and (5) upon termination of the Plan, an employee who had begun receiving benefits payments would receive a lump sum of the future amounts.

After the meeting with Setta and Callahan's attorney in December 1998 and a number of telephone conferences between Callahan's attorney and Setta, Callahan signed a revised Release Agreement on December 24, 1998 and terminated his employment on December 31. Although Callahan was an "at will" employee, the Release Agreement provided that he would receive a post-termination salary continuation of approximately $70,000, continuation of his health insurance for seven months, continuation of the accrual of certain retirement benefits, an agreed upon purchase price of his company car, outplacement services, and vesting in certain other benefits programs. The Release Agreement also provided that although Callahan had not participated in the Plan for ten years, he would "vest 100%."[6]

The Release Agreement included the following clauses:

> In consideration for the additional benefits extended to you in this letter, and intending to be legally bound hereby: (1) you agree to release and hold harmless forever the Company, its direct and indirect subsidiaries and

> distributes, in a lump sum, to any Participant whose benefit payments have commenced, all amounts thereafter due, in any amount as calculated in accordance with Paragraph 19, "Acceleration of Benefits." Such lump-sum distribution, at Alco's election, may be made in the form of cash, or life insurance, or both.

---

[6] The September proposed Release Agreement did not mention the Plan. The final version contained the language set forth on page 9 of this opinion concerning the Plan (paragraph 8 of the Release Agreement). This paragraph, including the early vesting provision, was requested by Callahan's attorney.

> affiliates, directors, officers and employees from any and all causes of action, known or unknown, arising out of or relating to your association and/or employment with or termination from the Company, which may have existed prior to or contemporaneously with the execution of this agreement, including but not limited to . . . Age Discrimination in Employment Act of 1967 as amended, and the Older Workers Benefit Protection Act of 1990 . . . or any other federal, state, or local law (statutory or common) relating to discrimination in employment.
>
> . . .
>
> You have not relied upon any representation or statement made by the Company or any employee or other person on behalf of the Company with regards to the subject matter, meaning, or effect of this agreement. . . .

Callahan filed an age discrimination claim with the Connecticut Commission on Human Rights and Opportunities ("CHRO") in March 1999 in which he argued that he entered the Release Agreement under duress and as a result of coercion by Unisource. He subsequently received right to sue letters from the CHRO and the Equal Employment Opportunity Commission.

In the fall of 2000, Callahan was notified by the Plan Administrator, W.J. Hope, that the Plan would be terminated on December 31, 2000. Because Callahan had not yet begun to receive benefits payments, it was estimated that he would receive a lump sum termination benefit of $28,356.91, which was comprised of his contributions and interest. Callahan sent Hope a letter on November 22, 2000 stating that he believed he was entitled to additional benefits beyond the termination benefit because of his December 1998 Separation Agreement. Hope responded on November 30, 2000, and stated, "The Board of Directors of IKON Office Solutions, Inc. has taken action to terminate the IKON Office Solutions, Inc. 1991 Deferred Compensation Plan (the "Plan") effective December 31, 2000. You will be paid a Plan termination benefit in accordance with the terms of the Plan." On January 2, 2001, Hope sent Callahan another letter confirming

that he would be paid a Plan termination benefit of $28,356.91.

Callahan brought this action in June of 2001. Count One of the Amended Complaint alleges age discrimination in violation of the ADEA against Unisource and Georgia Pacific and Count Two alleges ERISA violations against all the defendants. The Unisource Defendants and the IKON Defendants have filed separate motions for summary judgment.

**II.     Summary Judgment Standard**

In a summary judgment motion, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000). The burden of showing that no genuine factual dispute exists rests upon the moving party. Carlton v. Mystic Transp., Inc., 202 F.3d 129, 133 (2d Cir. 2000) (citing Gallo v. Prudential Residential Servs., Ltd. Partnership, 22 F.3d 1219, 1223 (2d Cir. 1994)). Once the moving party has met its burden, in order to defeat the motion the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor. Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

In assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38. "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party." Carlton, 202 F.3d at 134. "When reasonable persons, applying the proper legal standards, could differ in their responses to

the question" raised on the basis of the evidence presented, the question must be left to the jury. Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

### III.    Age Discrimination

Callahan argues that he was discriminated against on the basis of his age when he was removed from his position as Vice President of Customer Service at Unisource and again when IKON terminated the Plan.  The Unisource Defendants and the IKON Defendants move for summary judgment on Callahan's age discrimination claim on three bases.  First, they argue that Callahan waived his right to sue the defendants for age discrimination when he executed the Release Agreement.  Second, the Unisource Defendants argue that Callahan has not established a prima facie case of age discrimination.  Finally, the Unisource Defendants argue that Georgia-Pacific cannot be considered Callahan's employer under the ADEA.  Because there is no genuine issue of fact whether Callahan waived his right to sue the defendants under the ADEA, the defendants' other arguments do not require resolution.

Under the Older Workers Benefit Protection Act ("OWBPA"), 29 U.S.C. § 626(f) *et. seq.*, a waiver of an ADEA claim must be made knowingly and voluntarily in order to be valid. The waiver must, at minimum, comply with the specific duties imposed on employers by the statute. See 29 U.S.C. § 626(f)(1); Tung v. Texaco Inc., 150 F.3d 206, 208-209 (2d Cir.1998) (per curiam).  District courts review the "totality of the circumstances" to determine whether the waiver is knowing and voluntary.  See id.; see also Bormann v. AT & T Communications, Inc., 875 F.2d 399, 403 (2d Cir. 1989), cert. denied, 493 U.S. 924 (1989); Pampillonia v. RJR Nabisco, Inc., 138 F.3d 459, 463 (2d Cir.1998); Bachiller v. Turn on Products, Inc., 86 Fed.

Appx. 465, 467 (2d Cir. 2004) (applying totality of the circumstances test to find plaintiff's waiver was knowing and voluntary and granting summary judgment); Mastrianni v. Bayer Corp., No. 3:02 CV 22261, 2006 WL 752888, at *3 (2006 D. Conn.) (granting summary judgment where the undisputed facts showed that plaintiff's waiver of his ERISA rights was made knowingly and voluntarily). The factors that have been adopted by the Second Circuit for district courts to evaluate the totality of the circumstances surrounding a waiver are: "1) the education and experience of the plaintiff; 2) the amount of time the plaintiff had to examine the agreement; 3) the role of the plaintiff in drafting its terms; 4) the agreement's clarity; 5) whether plaintiff was counseled; and 6) whether the consideration given to plaintiff exceeds what was required by law." Fletcher v. Palazzo, 151 Fed. Appx. 73, 75 (2d Cir. 2005), citing Bormann, 875 F.2d at 403. "This list is not exhaustive, and all factors need not be met or considered." Fletcher, 151 Fed. Appx. At 75. Indeed, "courts have considered a seventh factor – whether the employer encouraged the employee to consult an attorney and whether the employee had a fair opportunity to do so." Livingston v. Adirondack Beverage Co., 141 F.3d 434, 438 (2d Cir. 1998).

     There is no genuine issue of material fact that Callahan knowingly and voluntarily waived his right to bring an ADEA claim against the defendants when he signed the Release Agreement. First, it is undisputed that Callahan had considerable experience as an executive at Unisource and was sophisticated about the company's operations. Second, Callahan had the proposed settlement agreement between September and December 24, 1998, giving him sufficient time to reflect on its terms, seek advice, and attempt to negotiate with Unisource. Finally, of particular significance, Callahan was represented by counsel throughout the entirety of the negotiations of the Release Agreement. Indeed, Callahan and his attorney met with Setta in December to discuss

the agreement, discussed particular aspects of the agreement on the telephone, and exchanged various letters during negotiations. As a result of these discussions, a number of changes were made to the original prepared agreement including the terms of Callahan's severance pay, the removal of a non-compete provision, and early vesting in the Plan. Finally, Callahan received considerable consideration for his execution of the Release Agreement, including approximately $70,0000 in salary continuation, seven months of health insurance and 100% vesting in the Plan.

Callahan argues, however, that he was induced by certain oral representations made by Setta to sign the agreement.[7] Callahan testified in his deposition that, prior to signing the agreement, Callahan asked Setta about his authority to promise benefits upon Callahan's separation from the company. Callahan also testified that he asked specifically about paragraph 8 of the Release Agreement, which provides:

> 8. *Deferred Compensation*. Benefits under the 1991 IKON Office Solutions, Inc. (formerly Alco Standard Corporation) Deferred Compensation Plan will vest 100% and be distributed to you in the future, in accordance with the provisions of the Plan. You must continue to make the annual premium payments under the 1991 IKON Office Solutions, Inc. Deferred Compensation Plan to your age 65 to perpetuate the lump sum death benefit and age 65 policy transfer thereunder. . . .

Callahan claims Setta told him that the phrase reading "in accordance with the provisions of the

---

[7] For the purposes of this motion the court assumes that the parol evidence rule does not guide the interpretation of ADEA waivers. "The OWBPA sets up its own regime for assessing the effect of ADEA waivers, separate and apart from contract law." Oubre v. Entergy Operations, Inc., 522 U.S. 422, 427 (1998). In addition, in some circumstances refusing to consider extrinsic evidence may be inconsistent with the totality of the circumstances test. However, several courts have suggested that the parol evidence rule is still relevant in ADEA waiver cases. See, e.g., Carpenter v. General Motors Corp., No. 98-1763, 1999 WL 644337, at *3 (6th Cir. 1999) (suggesting that integration clause in ADEA waiver precluded admission of parol evidence); Rodriguez v. Puerto Rico Marine Mgmt., Inc. 975 F. Supp. 123, 128 (D.P.R. 1997).

Plan" meant "that [Callahan] has to continue to make the premium payments."[8] Further, Callahan claims that Setta told him "as long as [Callahan] made the premium payments [he] will get the benefits of the Plan." According to Callahan, Setta specified that the "benefits of the Plan" were "$15,000 for ten years at age 65, $95,000 paid up, $95,000 cash value, and an insurance policy worth . . . $375,000." Callahan also maintains that he had asked Setta whether he had the authority to promise benefits because he was concerned about the possibility of the IKON Board terminating the Plan. However, Callahan did not specifically ask what benefits he would receive if the Plan was terminated and Callahan did not say to Setta that he was concerned about the possible termination of the Plan.[9] Setta also did not describe what Callahan's benefits would be in the event the Plan was terminated.

While Setta's purported statements, as recounted by Callahan, may not be a complete description of the Plan, they do not misrepresent the terms of the Release Agreement, which provided that deferred compensation payments would be made "in accordance with the

---

[8] Under the terms of the Plan a participant was required to make payments towards the deferred compensation portion of the Plan for either five or ten years and was required to continue making payments towards the life insurance portion of the Plan until the participant reached age 65. Callahan selected the five year option and had completed his payments towards the deferred compensation portion of the Plan at the time of his termination. However, because he was not yet 65, Callahan was still required to continue to make payments towards the life insurance portion of the Plan after his termination, even though he had fully vested at that time by virtue of Paragraph 8 of the Release Agreement.

[9] The court has also reviewed a file memorandum of Callahan's attorney describing a meeting with Callahan and notes that appear to describe his meeting with Callahan and Setta. It is uncertain that these documents would be admissible at trial, but the court notes that they do not describe Callahan's concern about the possibility that the Board might terminate the Plan or any representations by Setta about the effect of termination on Callahan's benefits. The memorandum does indicate that Callahan "wants [the Plan] to continue in existence until it would ordinarily have run out."

provisions of the Plan." Further, the Release Agreement was clear; it provided for full vesting in the Plan, but specified that it did not alter other terms of the Plan. Finally, the Release Agreement specifically stated that Callahan had "not relied upon any representation or statement made by the Company or any employee . . . on behalf of the Company with regard to the subject matter, meaning, or effect of [the Release Agreement]."

Setta's purported statements are not sufficient to alter the terms of the Release Agreement, nor do they indicate that Callahan's decision to execute the release was other than knowing and voluntary. See Bachiller v. Turn on Products, Inc., 86 Fed. Appx. at 467 (granting employer's motion for summary judgment and finding release valid under OWBPA where release was unambiguous and clearly provided employee with 21 days to consider its terms, even when employee signed it on the date of her termination because her manager informed her that she would not receive her vacation pay unless she signed it then).

Based on the totality of these circumstances, there is no genuine issue of material fact that Callahan knowingly and voluntarily waived his right to sue when he signed the Release Agreement. He was a sophisticated and experienced executive, who had ample opportunity to consider the agreement. He also was represented by counsel, who negotiated extensively on his behalf and succeeded in changing the terms of the agreement in his client's favor. While Callahan may have relied on Setta's statements, those statements do not vary the termination provision of the Plan or even relate to it. Although Callahan may have expressed his concern about the Plan's termination to his lawyer, he did not specifically address this with Setta. Finally, the Release Agreement made clear that oral representations could not vary it. Also

absent is any indication of threat, manipulation, trickery, or duress[10] by Unisource in connection with the Release Agreement with Callahan.

Summary judgment is therefore granted to the Unisource Defendants and the IKON Defendants as to Callahan's ADEA claim.

## IV.    ERISA and  Equitable Estoppel

Count two of Callahan's amended complaint alleges that the Plan is subject to ERISA, that the defendants breached their fiduciary and non-fiduciary duties owed to him when they terminated his benefits, and that because he relied on their representations regarding his future benefits under the Release Agreement, the defendants should be estopped from denying their liability.  The defendants make a number of arguments in favor of summary judgment on this claim.  The Unisource Defendants argue that they are not an appropriate defendant under any of the relevant civil enforcement provisions contained in ERISA § 502(a).  29 U.S.C. § 1132(a).  The Unisource Defendants also argue that even if the Court finds that they are proper defendants under ERISA, there was no violation of ERISA.  Finally, the Unisource Defendants argue that there is no evidence to support Callahan's equitable estoppel claim under ERISA.  The IKON Defendants likewise seek summary judgment as to Callahan's ERISA claims on the basis that payment of the termination benefit was neither arbitrary or capricious, that Callahan received all that he was owed when he was paid his termination benefit, and that the evidence does not

---

[10] In his deposition testimony Callahan claimed that his attorney told him that he was signing the Release Agreement under duress.  However, Callahan does not describe any circumstances that would support a finding that he was under duress.  In his Memorandum in Opposition to Defendants' Motions for Summary Judgment, Callahan appears to have abandoned his claim that the waiver was signed under duress.

support a breach of fiduciary duty claim. Finally, the IKON Defendants join the Unisource Defendants in their argument that Callahan does not state an equitable estoppel claim. These arguments will be addressed below.

A.   ERISA Claim

Callahan does not contest the Unisource Defendants' assertion that he fails to assert an ERISA claim within the civil enforcement provisions of §§ 502(a). 29 U.S.C. §§ 1132(a)(1) and (3). Rather, he argues that the defendants breached a fiduciary duty owed to him under the Plan. The issue then, is whether the defendants breached fiduciary duties owed to him under the provisions of ERISA.[11]

The parties do not dispute that the Plan was a "top hat" plan. "[S]uch a plan [is] excluded from ERISA's vesting, funding, and fiduciary responsibility requirements because Congress deemed top-level management, unlike most employees, to be capable of protecting their own pension expectations." Gallione v. Flaherty, 70 F.3d 724, 727 (2d Cir. 1995). Under the provisions of ERISA, a top hat plan is unfunded, and "is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated individuals." 29 U.S.C. § 1051(2). Because top hat plans are exempt from the fiduciary duties provided for in ERISA, Callahan cannot, as a matter of law, assert his claim under that portion of the ERISA statute. See, e.g., Demery v. Extebank Deferred Compensation Plan (B), 216 F.3d 283, 290 (2d Cir. 2000)("[A]s the fiduciary responsibility provisions of

---

[11]In its prior ruling, this Court dismissed Callahan's breach of contract claim because it was preempted by ERISA. Callahan v. Unisource Worldwide, Inc., 2003 U.S. Dist. LEXIS 4787 at **12-23. See supra n. 2.

ERISA do not apply to top hat plans . . . to the extent that plaintiffs' claim for breach of fiduciary duty was based upon ERISA, the district court correctly dismissed it."). Summary judgment is therefore granted for all defendants on Callahan's breach of fiduciary duty claim.

### B.   Equitable Estoppel

Turning to Callahan's equitable estoppel claim, the Second Circuit has recognized that in "'extraordinary circumstances' principles of estoppel can apply to ERISA cases." Lee v. Burkhart, 991 F.2d 1004, 1009 (2d Cir. 1993). "[T]he "extraordinary circumstances" necessary to equitable estoppel in the context of an ERISA plan require conduct tantamount to fraud." Greifenberger v. Hartford Life Ins. Co., 131 Fed. Appx. 756, 759 (2d Cir. 2005). Additionally, to establish an estoppel claim under ERISA the plaintiff must prove the following elements: "(1) a promise, (2) reliance on the promise, (3) injury caused by the reliance, and (4) an injustice if the promise is not enforced." Aramony v. United Way, 191 F.3d 140, 151 (1999), citing Schonolz v. Long Island Jewish Med. Ctr., 87 F.3d 72, 79 (2d Cir. 1996).

Both the Unisource Defendants and the IKON Defendants contend that there is no evidence to support Callahan's claim that they should be estopped from denying liability. They also argue that the Release Agreement does not alter the provisions of the Plan as to early termination. They argue that because there was no promise to alter the termination provision, there was therefore no detrimental reliance. Finally, they maintain there are no circumstances here that can be considered "extraordinary" for estoppel application.

Callahan argues that "'extraordinary circumstances' requires a 'remarkable consideration such as the use of a promise of benefits to induce certain behavior on the employee's part.'"

(Callahan Brief at 26, citing Aramony, 191 F.3d at 152).  Under this standard, Callahan contends that extraordinary circumstances exist in this case because he was induced to sign the Release Agreement in reliance on Setta's promise of unconditional benefits under the Plan.[12]  However, even if Callahan did rely on Setta's statement that he would receive benefits if he paid his contributions to the Plan, that reliance does not rise to the level of "extraordinary circumstances."  Also, Setta's statements did not misrepresent the Release Agreement's provision that deferred compensation payments would be made "in accordance with the provisions of the Plan."  As the Second Circuit noted, "reliance is one of the four basic elements of promissory estoppel, and would not by itself render this case 'extraordinary.'" Devlin v. Transportation Communications International Union, 173 F.3d 94, 102 (2d Cir. 1999).  Ultimately, Callahan does not provide any factual support that raises a genuine issue of material fact about whether any promises were made or "extraordinary circumstances" existed.  Summary judgment is therefore granted for both defendants on Callahan's estoppel claim.

---

[12] Callahan also argues that although he relied on the promise of a Unisource employee (Setta), that promise should be imputed on the IKON Defendants as well because Callahan was induced to enter an agreement affecting his rights as to IKON. Because summary judgment is granted in favor of all defendants on the ERISA claims as discussed in the text, the Court need not reach this issue.

## V.  Conclusion

The defendants' motions for summary judgment **[Doc. # 77 ] and [Doc. # 80 ]** are **GRANTED**, and judgment is entered for the defendants.  The clerk is ordered to close this case.

SO ORDERED this   14th   day of September, 2006, at Hartford, Connecticut.


                                    /s/ CFD
                                    **CHRISTOPHER F. DRONEY**
                                    **UNITED STATES DISTRICT JUDGE**